JUDGE WOOD

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

15 CV 03599

| | |
|---|---|
| INTERNATIONAL UNION OF OPERATING ENGINEERS LOCAL NO. 478 PENSION FUND, Individually and on Behalf of All Others Similarly Situated, | Case No: _____ |
| Plaintiff, | |
| v. | **CLASS ACTION COMPLAINT** |
| FXCM INC., DROR NIV, and ROBERT LANDE, | **JURY TRIAL DEMANDED** |
| Defendants. | |



RECEIVED
MAY 08 2015
U.S.D.C. S.D. N.Y.
CASHIERS

Plaintiff International Union of Operating Engineers Local No. 478 Pension Fund, by and through the undersigned attorneys, alleges the following upon information and belief, except as to those allegations concerning Plaintiff, which are alleged upon personal knowledge. Plaintiff's information and belief is based upon, among other things, counsel's investigation, which includes, without limitation: (1) a review and analysis of regulatory filings by FXCM Inc. ("FXCM" or the "Company") with the U.S. Securities and Exchange Commission ("SEC"); (2) a review and analysis of press releases and media reports issued by and about the Company; and (3) a review of other publicly available information concerning FXCM. Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## SUMMARY OF THE ACTION AND OVERVIEW

1.     This is a securities class action on behalf of all purchasers of FXCM common stock between June 11, 2013 and January 20, 2015, inclusive (the "Class Period"), asserting claims under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5 promulgated thereunder.

2.     Defendant FXCM provides online foreign exchange ("FX") trading and related services to retail and institutional customers worldwide. The Company acts as an agent between retail customers and a collection of global banks and financial institutions by making foreign currency markets for customers trading in foreign exchange spot markets. FXCM provides its customers access to over-the-counter FX markets through its proprietary technology platform.

3.     Throughout the Class Period, Defendants issued materially false and/or misleading statements regarding the Company's business operations and the strength of its financial prospects, while concealing significant weaknesses concerning its core business.

1

4.     Specifically, Defendants consistently (1) touted the Company's agency model of FX trading as being extremely low-risk; (2) proclaimed that volatility in FX markets was uniformly good for the Company's business; (3) expressed confidence in the capability of the Company's proprietary technological platform; and (4) stated that the Company maintained sufficient regulatory capital reserves for unforeseen scenarios.

5.     The truth was that (1) the Company's agency model did not insulate the Company from financial risk from its heavily leveraged clients; (2) the Company did not disclose the true potential risk posed by market volatility; (3) the Company did not maintain sufficient regulatory capital reserves; and (4) the Defendants' positive statements about the Company's business, operations, and growth, lacked a reasonable basis.

6.     On January 15, 2015, the Swiss National Bank announced that it was ending a policy in place since 2011 which capped the Swiss franc-euro exchange rate at 1.20 euros to the Swiss franc and allowed the franc to trade freely against the euro.  The franc jumped as much as 41% against the euro.  After hours on January 15, 2015, the Company announced that its customers had suffered cumulative losses of $225 million as a result of the aftermath of the announcement by the Swiss National Bank and that the Company was in danger of not meeting its regulatory capital requirements.

7.     On January 16, 2015, the Company announced that it had been extended a $300 million loan by Leucadia National Corp. in order to stave off the regulatory default and possible bankruptcy facing the Company.  The terms of the loan were described as "highly punitive" and wiped out nearly all shareholder value in the Company.  Trading of the Company's stock was suspended.

8.      Trading of FXCM stock resumed on January 20, 2015.  That day, the stock price closed at $1.60, down from a close of $12.63 on January 15, 2015.  In all, Company stock *dropped over 90%* in three trading days.

9.      As a result of Defendants' wrongful acts and omissions, FXCM stock traded at artificially inflated prices during the Class Period, and Plaintiff and other Class Members have suffered significant losses and damages.

10.     At the same time that Defendants artificially inflated the price of FXCM stock, Defendant Lande sold over $3 million of his personal holdings of FXCM stock.

## JURISDICTION AND VENUE

11.     The claims asserted herein arise under Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. §240.10b-5).  This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §1331 and Section 27 of the Exchange Act (15 U.S.C. §78aa).

12.     Venue is proper in this District pursuant to 28 U.S.C. §1391(b) and Section 27(c) of the Exchange Act (15 U.S.C. §78aa(c)).  FXCM's headquarters is located at 55 Water Street, Floor 50, New York, NY 10041, which is in this District.  FXCM shares are offered and trade on the New York Stock Exchange ("NYSE"), located in this District.  Many of the acts charged herein, including the preparation and dissemination of materially false and misleading information, occurred in substantial part in this District.

13.     In connection with the acts alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications, and the facilities of the national securities markets.

## PARTIES

14.     Plaintiff International Union of Operating Engineers Local No. 478 Pension Fund ("IUOE 478"), as set forth in the accompanying certification, incorporated by reference herein, purchased FXCM common stock during the Class Period and suffered damages as a result of the federal securities law violations and false and/or misleading statements and/or material omissions alleged herein.

15.     Defendant FXCM is headquartered in New York, NY and incorporated in Delaware.  Its common stock is traded on the NYSE under the ticker symbol "FXCM."

16.     Defendant Dror "Drew" Niv ("Niv") is the co-founder of FXCM and is, and at all relevant times during the Class Period, was the Company's Chief Executive Officer ("CEO") and Chairman of the Board of Directors.

17.     Defendant Robert Lande ("Lande") is, and at all relevant times during the Class Period, was the Company's Chief Financial Officer ("CFO").

18.     Defendants FXCM, Niv, and Lande are collectively referred to herein as the "Defendants."

19.     Defendants Niv and Lande are collectively referred to herein as the "Individual Defendants."

## SUBSTANTIVE ALLEGATIONS

### Background

20.     FXCM provides online foreign exchange trading and related services to retail and institutional customers worldwide.  It operates in two segments: Retail Trading and Institutional Trading.  The Company acts as an agent between retail customers and a collection of global banks and financial institutions by making foreign currency markets for customers trading in

foreign exchange spot markets. FXCM provides its customers access to over-the-counter FX markets through its proprietary technology platform.

21.     In an FX trade, a participant buys one currency and simultaneously sells another, a combination known as a "currency pair."

22.     The Company provides its customers what is referred to as an agency model to execute their trades. In the agency model, when a customer executes a trade on the best price quotation offered by the Company's FX market makers, it acts as a credit intermediary, or riskless principal, simultaneously entering into offsetting trades with both the customer and the FX market maker. The Company earns trading fees and commissions by adding a markup to the price provided by the FX market makers. The agency model is fundamental to FXCM's core business philosophy.

23.     In 2012, in order to accommodate its expanding customer base, FXCM began to offer its smaller retail clients the option to trade through a principal model. In the principal model, FXCM sets the price and acts as the counterparty for its customers' transactions, earning revenue on its trading gains or losses. Unlike in the agency model, the Company does not simultaneously offset each trade with another party.

24.     FXCM also earns other forms of revenue such as fees earned from: referring broker fees and white label arrangements with other financial institutions to provide platform, back office and trade execution services, trading in contract-for-differences ("CFDs"), trading in equities and equity options, payments for order flow, FX market prices, and other various ancillary FX related services and joint ventures.

25.     FXCM offers a number of trading systems, all of which are supported by its proprietary technology infrastructure. Its technology tracks the balances, positions, profits and

losses, and margin levels for all account holders in real time.  The back office system's real time margin-watcher feature is meant to automatically close out open positions if a customer's account is at risk of going into a negative balance as a result of a trading position losing value and reaching the minimum margin threshold.

## Defendants' Materially False and Misleading Statements

26.    On June 11, 2013, the Individual Defendants attended an industry conference presented by JP Morgan.  At the conference, Defendant Niv made the following statements:

> The story of FXCM is one where we, if you look at the – and we go through all of the points, listed here on the presentation and I think the most people don't appreciate the – what FXCM is, as they are variably integrated it, it is not just a brokerage firm but also in our space we are the exchange to clearing house – entire stock that the client fees. *And this is something that has led to actually a relatively low risk model and a model that is much more stable and much more scalable and mostly perfect.*
>
> * * *
>
> More importantly than that it's the primary reason why both institutional customers and retail customer trade FX is for carrying. And if you think about it, what happens today our business is very sort of straight jacket into volatility. *When volatility is high, we do really well, volatility is low we don't.*

[Emphasis added.]

27.    On September 11, 2013, Defendant Lande attended an industry conference presented by Barclays.  At the conference, Defendant Lande made the following statement:

> So investment themes for FXCM is one, we are an agency FX player, meaning that we stream 16 quotes from market makers to you and we just take a markup on that. It tends to be around $90 to $100 per $1 million on average and we just make our money on the volume. That's different from most of our competitors who are principal-based competitors and so they're taking the other side of the trade and deciding whether they want to offset that trade or not based on their own risk parameters.
>
> *So we have a very in our view low-risk business model. We're not taking principal risk. We have a technology platform that has been developed that's very tried and true.*

[Emphasis added.]

28.     At the same conference, Defendant Lande made the following statement:

*Any kind of volatility in the market is all good for FXCM* because FX traders tend to engage when there's volatility as opposed to equity traders who tend to disengage. They do seek this. In the absence of interest rates volatility is really the other thing that makes things interesting for FX traders. *And so all of this is something that we would benefit from.*

[Emphasis added.]

29.     The Company consistently touted the benefits of its agency model and the capabilities of its technology platform in filings with the SEC.  For example, the Company's Form 10-K filed with the SEC on March 17, 2014, and signed by the Individual Defendants, contained the following statements:

**Technology and Infrastructure**

*Proprietary technology platform*

Our FX technology platform has been designed using proprietary technologies to deliver high standards in performance, flexibility and reliability. Our platform can be divided into three main groups: (1) front-end technology platforms and trading decision support tools, (2) agency model technology platform and (3) back office applications for account management, operations, reporting and reconciliation processes.

We believe that our technology and infrastructure platform provides us with a competitive advantage and enables us to provide innovative solutions to our customers and partners. As examples, we introduced the concept of real-time rebate calculation for referring brokers and automation of basic operations and account management routines to reduce processing time.

*Scalability*

*Our agency model system has been designed to meet the demands of our growing customer base with a focus on speed, accuracy and reliability.* Within our network, we currently process orders in under 2 milliseconds during peak load periods, and have processed over 1,700 orders per second during volatile market conditions, 340 times our average volume over the last two years. We believe our current platform has the capacity of scale to meet our growth expectations for the foreseeable future.

*Reliability and Availability*

Our trading infrastructure is primarily hosted at collocation facilities run by Equinix and Xand. The two trading venues are located in New Jersey and Tokyo, with a disaster recovery location in Pennsylvania. The New Jersey and Pennsylvania datacenters are over 90 miles apart, on separate power grids and separate fiber connectivity. Each facility has N+1 (or greater) uninterruptible power supply systems, generator systems, public utility power feeds, cooling systems, internet providers and private network providers. Locations on the eastern coast of the United States were chosen to achieve both optimal networking latency to price providers and required geographic distance separation.

Applications, servers, network, storage devices, power and temperature are monitored 24 hours a day, seven days a week by support personnel through a combination of industry standard monitoring and alerting tools, including Nagios, Cacti, SmokePing and NfSen. Custom written applets and scripts are used to report key resource usage in near real-time.

Personnel are distributed across five major office locations with key operations, such as dealing, customer support and technology support, staffed at multiple locations. Each office location utilizes redundant network connections to access datacenter resources.

\* \* \*

**Risk management**

We primarily utilize what is commonly referred to as an agency model, which we have been offering to customers since July 2007. We have continued to invest in our agency platform, adding additional FX market makers, improving execution and adding features to enhance the trading experience of our customers and *believe that our commitment to the agency model is one example of our core business philosophy to reduce risks.* In our agency model, when a customer executes a trade with us, we act as a credit intermediary, or riskless principal, simultaneously entering into trades with the customer and the FX market maker.

Our FX trading operations require a commitment of our capital and involve risk of loss due to the potential failure of our customers to perform their obligations under these transactions. In order to minimize the incidence of a customer's losses exceeding the amount of cash in their account, which we refer to as negative equity, we require that each trade must be collateralized in accordance with our collateral risk management policies. Each customer is required to have minimum funds in their account for opening positions, referred to as the initial margin, and for maintaining positions, referred to as maintenance margin, depending on the currency pair being traded. Margin requirements are expressed as a percentage of

the customer's total position in that currency, and the customer's total margin requirement is based on the aggregated margin requirement across all of the positions that a customer holds at any time. Each net position in a particular currency pair is margined separately. Because we do not net across different currency pairs, we believe we produce a fairly conservative margin policy. Our systems automatically monitor each customer's margin requirements in real-time and we confirm that each of our customers has sufficient cash collateral in their account before we execute their trades. If at any point in time a customer's trading position does not comply with the applicable margin requirement because our predetermined liquidation thresholds have been exceeded, the position will be automatically liquidated in accordance with our margin policies and procedures documented in our customer agreement. *We believe this policy protects both us and the customer. We believe that as a result of implementing real-time margining and liquidation processing, the incidence of customer negative equity has been insignificant.*

* * *

*Regulatory capital risk*

Various domestic and foreign government bodies and self-regulatory organizations responsible for overseeing our business activities require that we maintain specified minimum levels of regulatory capital in our operating subsidiaries. If not properly monitored or adjusted, our regulatory capital levels could fall below the required minimum amounts set by our regulators, which could expose us to various sanctions ranging from fines and censure to the imposition of partial or complete restrictions on our ability to conduct business. To mitigate this risk, we continuously evaluate the levels of regulatory capital at each of our operating subsidiaries and adjust the amounts of regulatory capital in each operating subsidiary as necessary to ensure compliance with all regulatory capital requirements. These may increase or decrease as required by regulatory authorities from time to time. *We also maintain excess regulatory capital to provide liquidity during periods of unusual or unforeseen market volatility, and we intend to continue to follow this policy.* In addition, we monitor regulatory developments regarding capital requirements to be prepared for increases in the required minimum levels of regulatory capital that may occur from time to time in the future. As of December 31, 2013, we had $82.5 million in regulatory capital requirements in the aggregate at our regulated subsidiaries and $301.5 million of capital on a consolidated basis.

[Emphasis added.]

30.     On August 7, 2014, the Individual Defendants held a conference call with analysts to discuss the Company's second quarter 2014 results.  During the call, Defendant Niv made the following statement:

> *As an agency-model broker, we are not exposed to these levels of market risks,* which are forcing many firms to exit the industry, presenting opportunities for FXCM. As we've said in prior quarters, we do not assume that market conditions will improve. Instead, we focus on what makes sense in this environment; cost controls and opportunities to gain market share organically via new product introductions and through acquisitions of other brokers. When volatility does return, and we believe that it never really will, *FXCM will be well positioned to prosper for this as we have demonstrated in the past.*

[Emphasis added.]

31.     On November 6, 2014, the Individual Defendants held a conference call with analysts to discuss the Company's third quarter 2014 results.  During the call, Defendant Niv made the following statement:

> As I've said to many of you before that whatever we speak, *company strategy assumes the market volatility will remain low obviously our prayer assumer otherwise or hope for otherwise*, but strategy banks on market volatility being low.

[Emphasis added.]

32.     Defendants' statements in ¶¶26-31 above were materially false and/or misleading when made because Defendants misleadingly omitted, among other things: (1) that the Company's agency model did not insulate the Company's customers or the Company itself from financial risk; (2) the true potential risk to the Company posed by market volatility; (3) that the Company did not maintain sufficient regulatory capital reserves; and (4) that the Defendants' positive statements about the Company's business, operations, and growth lacked a reasonable basis.

**The Fog Begins to Lift and the Truth is Revealed**

33.     On January 15, 2015, the Swiss National Bank unexpectedly announced that it was ending a policy in place since 2011 which capped the Swiss franc-euro exchange rate at 1.20 euros to the Swiss franc and allowed the franc to trade freely against the euro.  The franc jumped as much as 41% against the euro

34.     After hours on January 15, 2015, the Company announced that – despite its vaunted agency model which supposedly insulated it from counterparty risk – the Company's customers had suffered cumulative losses of $225 million as a result of the aftermath of the announcement by the Swiss National Bank, and that the Company was in danger of not meeting its regulatory capital requirements.

35.     On January 16, 2015, the Company announced that it had been extended a $300 million loan by Leucadia National Corp. in order to stave off the regulatory default and possible bankruptcy facing the Company.  The terms of the loan were described by Sandler O'Neill Research analyst, Richard Repetto, as "highly punitive" and wiped out nearly all shareholder value in the Company.  Trading of the Company's stock was suspended.

36.     Trading of FXCM stock resumed on January 20, 2015.  That day, the stock price closed at $1.60, down from a close of $12.63 on January 15, 2015.  In all, Company stock dropped *over 90%* in three trading days.

37.     In the aftermath of the drop, analysts commented that FXCM's massive losses were likely driven by a highly leveraged customer base that exposed the Company to a huge amount of risk.

## INSIDER TRADING

38.     Defendant Lande profited greatly from his wrongdoing during the Class Period, in the form of unusual and suspicious sales of stock at inflated prices.  Defendant Lande made two sales (and one purchase) during the Class Period, selling 175,000 shares for a total proceeds of over $3.3 million, while making one small purchase of 7,500 shares for $120,000.  Defendant Lande had never before – and has not since – sold a single share of Company stock.

## CLASS ACTION ALLEGATIONS

39.     Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a class consisting of all those who purchased or otherwise acquired FXCM common stock during the Class Period (the "Class") and were damaged thereby.  Excluded from the Class are Defendants, the directors and officers of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors, or assigns, and any entity in which Defendants have or had a controlling interest.

40.     The members of the Class are so numerous that joinder of all members is impracticable.  Throughout the Class Period, FXCM securities were actively traded on the NYSE.  While the exact number of Class members is unknown to Plaintiff at this time and can be ascertained only through appropriate discovery, Plaintiff believes that there are thousands of members in the proposed Class.  Record owners and other members of the Class may be identified from records maintained by FXCM or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

41.     Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

42.     Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation. Plaintiff has no interests antagonistic to or in conflict with those of the Class.

43.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

(a)     whether the federal securities laws were violated by Defendants' acts as alleged herein;

(b)     whether statements made by Defendants to the investing public during the Class Period omitted and/or misrepresented material facts about the business, operations, and management of FXCM;

(c)     whether the price of FXCM common stock was artificially inflated during the Class Period; and

(d)     to what extent the members of the Class have sustained damages and the proper measure of damages.

44.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually

redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

## LOSS CAUSATION

45.     Defendants' wrongful conduct, as alleged herein, directly and proximately caused the economic loss suffered by Plaintiff and the Class.

46.     During the Class Period, Plaintiff and the Class purchased FXCM securities at artificially inflated prices and were damaged thereby.   When the misrepresentations that had been made to the market, the information alleged herein to have been concealed from the market, and/or the effects thereof were revealed, the price of the Company's securities significantly declined, causing investors' losses.

## APPLICATION OF PRESUMPTION OF RELIANCE
## (FRAUD-ON-THE-MARKET DOCTRINE)

47.     The market for FXCM securities was open, well developed, and efficient at all relevant times.  As a result of the materially false and/or misleading statements and/or failures to disclose, FXCM securities traded at artificially inflated prices during the Class Period.  Plaintiff and other members of the Class purchased or otherwise acquired the Company's securities, relying upon the integrity of the market price of FXCM securities and the market information relating to FXCM, and have been damaged thereby.

48.     During the Class Period, the artificial inflation of FXCM stock was caused by the material misrepresentations and/or omissions particularized in this Complaint, causing the damages sustained by Plaintiff and other members of the Class.  As described herein, during the Class Period, Defendants made or caused to be made a series of materially false and/or misleading statements about FXCM's business, operations, and financial prospects. These material misstatements and/or omissions created an unrealistically positive assessment of FXCM

and its business and financial condition, thus causing the price of the Company's securities to be artificially inflated at all relevant times and, when disclosed, negatively affected the value of the Company stock. Defendants' materially false and/or misleading statements during the Class Period resulted in Plaintiff and other members of the Class purchasing the Company's securities at such artificially inflated prices, and each of them has been damaged as a result.

49.     At all relevant times, the market for FXCM securities was an efficient market for the following reasons, among others:

(a)     FXCM stock met the requirements for listing and was listed and actively traded on the NYSE, a highly efficient and automated market;

(b)     As a regulated issuer, FXCM filed periodic public reports with the SEC and/or the NYSE;

(c)     FXCM regularly communicated with public investors via established market communication mechanisms, including through regular dissemination of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and/or

(d)     FXCM was followed by securities analysts employed by brokerage firms who wrote reports about the Company, and these reports were distributed to the sales force and certain customers of their respective brokerage firms. Each of these reports was publicly available and entered the public marketplace.

50.     As a result of the foregoing, the market for FXCM securities promptly digested current information regarding FXCM from all publicly available sources and reflected such information in FXCM's stock price. Under these circumstances, all purchasers of FXCM

securities during the Class Period suffered similar injury through their purchase of FXCM securities at artificially inflated prices, and a presumption of reliance applies.

## NO SAFE HARBOR

51.    The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this Complaint. The statements alleged to be false and misleading herein all relate to then-existing facts and conditions.   In addition, to the extent certain of the statements alleged to be false may be characterized as forward looking, they were not identified as "forward-looking statements" when made and there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements.   In the alternative, to the extent that the statutory safe harbor is determined to apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the speaker had actual knowledge, or was reckless in not knowing, that the forward-looking statement was materially false or misleading, and/or the forward-looking statement was authorized or approved by an executive officer of FXCM who knew, or was reckless in not knowing, that the statement was false when made.

## COUNT I

### Violation of Section 10(b) of the Exchange Act and Rule 10b-5 Promulgated Thereunder
### Against All Defendants

52.    Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

53.    During the Class Period, Defendants carried out a plan, scheme, and course of conduct which was intended to and, throughout the Class Period, did: (i) deceive the investing

public, including Plaintiff and other Class members, as alleged herein; and (ii) cause Plaintiff and other members of the Class to purchase FXCM securities at artificially inflated prices.    In furtherance of this unlawful scheme, plan, and course of conduct, the Individual Defendants, and each of them, took the actions set forth herein.

54.    The Defendants: (i) employed devices, schemes, and artifices to defraud; (ii) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (iii) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the Company's securities in an effort to maintain artificially high market prices for FXCM securities in violation of Section 10(b) of the Exchange Act and Rule 10b-5.    The Individual Defendants are sued either as primary participants in the wrongful and illegal conduct charged herein or as controlling persons as alleged below.

55.    The Defendants, individually and in concert, directly and indirectly, by the use, means, or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about FXCM's business, operations, and financial performance and prospects, as specified herein.

56.    The Defendants employed devices, schemes, and artifices to defraud, while in possession of material adverse non-public information and engaged in acts, practices, and a course of conduct as alleged herein in an effort to assure investors of FXCM's value, performance, and continued substantial growth.    These acts included the making of, or the participation in the making of, untrue statements of material facts and/or omitting to state material facts necessary in order to make the statements made about FXCM and its business operations and financial prospects, in light of the circumstances under which they were made,

not misleading.   As set forth more particularly herein, Defendants further engaged in transactions, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the Company's securities during the Class Period. Defendants had actual knowledge of the misrepresentations and/or omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose such facts, even though such facts were available to them.   Defendants' material misrepresentations and/or omissions were done knowingly or recklessly and for the purpose and effect of concealing FXCM's financial condition from the investing public and supporting the artificially inflated price of its securities.   As demonstrated by Defendants' misstatements and/or omissions concerning the Company's business, operations, financial well-being, and prospects throughout the Class Period, Defendants, if they did not have actual knowledge of the misrepresentations and/or omissions alleged, were reckless in failing to obtain such knowledge by deliberately refraining from taking those steps necessary to discover whether those statements were false or misleading.

57.    As a result of the dissemination of the materially false and/or misleading information and/or failure to disclose material facts, as set forth above, the market price of FXCM securities was artificially inflated during the Class Period.  In ignorance of the fact that market prices of the Company's securities were artificially inflated, and relying directly or indirectly on the false and misleading statements made by Defendants, upon the integrity of the market in which the securities trade, and/or in the absence of material adverse information that was known to or recklessly disregarded by Defendants, but not disclosed in public statements by Defendants during the Class Period, Plaintiff and the other members of the Class acquired FXCM securities during the Class Period at artificially high prices and were damaged thereby.

58.     At the time of said misrepresentations and/or omissions, Plaintiff and other members of the Class were ignorant of their falsity and believed them to be true.  Had Plaintiff and the other members of the Class and the marketplace known the truth regarding FXCM and its business and prospects, which were not disclosed by the Defendants, Plaintiff and other members of the Class would not have purchased or otherwise acquired their FXCM securities, or, if they had acquired such securities during the Class Period, they would not have done so at the artificially inflated prices which they paid.

59.     By virtue of the foregoing, Defendants have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

60.     As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their respective purchases and sales of the Company's securities during the Class Period.

## COUNT II

### Violation of Section 20(a) of the Exchange Act
### Against the Individual Defendants

61.     Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

62.     The Individual Defendants acted as controlling persons of FXCM within the meaning of Section 20(a) of the Exchange Act as alleged herein.  By virtue of their high-level positions, ownership, and contractual rights, participation in and/or awareness of the Company's operations, and/or intimate knowledge of the false statements filed by the Company with the SEC and disseminated to the investing public, the Individual Defendants had the power to influence and control, and did influence and control, directly or indirectly, the decision making of the Company, including the content and dissemination of the various statements which

Plaintiff contends are false and misleading.  The Individual Defendants were provided with or had unlimited access to copies of the Company's reports, press releases, public filings, and other statements alleged by Plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

63.     In particular, the Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Company and, therefore, are presumed to have had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.

64.     As set forth above, FXCM and the Individual Defendants violated Section 10(b) and Rule 10b-5 by their acts and/or omissions as alleged in this Complaint.  By virtue of their positions as controlling persons, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act.  As a direct and proximate result of the Individual Defendants' wrongful conduct, Plaintiff and other members of the Class suffered damages in connection with their purchases of the Company's securities during the Class Period.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff prays for relief and judgment, as follows:

A.     Determining that this action is a proper class action under Rule 23 of the Federal Rules of Civil Procedure with Plaintiff serving as class representative;

B.     Awarding compensatory damages in favor of Plaintiff and the other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

C.      Awarding Plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

D.      Such other and further relief as the Court may deem just and proper.

## JURY TRIAL DEMANDED

Plaintiff hereby demands a trial by jury.

Dated: May 8, 2015                          Respectfully Submitted,

                                            SCOTT+SCOTT, ATTORNEYS AT LAW, LLP

                                            Thomas L. Laughlin
                                            Donald A. Broggi
                                            Joseph P. Guglielmo
                                            The Chrysler Building
                                            405 Lexington Avenue, 40th Floor
                                            New York, NY 10174
                                            Telephone: 212-223-6444
                                            Facsimile: 212-223-6334
                                            tlaughlin@scott-scott.com
                                            dbroggi@scott-scott.com
                                            jguglielmo@scott-scott.com

                                            David R. Scott
                                            SCOTT+SCOTT, ATTORNEYS AT LAW, LLP
                                            156 South Main Street
                                            P.O. Box 192
                                            Colchester, CT  06415
                                            Telephone:  (860) 537-5537
                                            Facsimile:  (860) 537-4432
                                            david.scott@scott-scott.com

                                            *Counsel for Plaintiff International Union of Operating Engineers Local No. 478 Pension Fund*