# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

RETIREMENT BOARD OF THE
POLICEMEN'S ANNUITY AND BENEFIT
FUND OF CHICAGO ON BEHALF OF
THE POLICEMEN'S ANNUITY AND
BENEFIT FUND OF CHICAGO,
Individually and on Behalf of All Others
Similarly Situated,

       Plaintiff,

  v.

FXCM INC., DROR NIV, and
ROBERT LANDE,

      Defendants.

Case No: 1:15-cv-03599-KMW

**AMENDED AND
CONSOLIDATED CLASS
ACTION COMPLAINT**

JURY TRIAL DEMANDED

Plaintiff Retirement Board of the Policemen's Annuity and Benefit Fund of Chicago on Behalf of the Policemen's Annuity and Benefit Fund of Chicago, by and through the undersigned attorneys, alleges the following upon information and belief, except as to those allegations concerning Plaintiff, which are alleged upon personal knowledge.  Plaintiff's information and belief is based upon, among other things, counsel's investigation, which includes, without limitation: (1) a review and analysis of regulatory filings by FXCM Inc. ("FXCM" or the "Company") with the U.S. Securities and Exchange Commission ("SEC"); (2) a review and analysis of press releases and media reports issued by and about the Company; (3) a review of other publicly available information concerning FXCM; and (4) information developed from confidential witnesses.  Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## SUMMARY OF THE ACTION AND OVERVIEW

1. This is a securities fraud class action brought on behalf of all purchasers of FXCM common stock between June 11, 2013 and January 20, 2015, inclusive (the "Class Period"), asserting claims under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5 promulgated thereunder against FXCM, its chief executive officer ("CEO"), Drew Niv, and its chief financial officer ("CFO"), Robert Lande.

2. Defendant FXCM, through its operating subsidiaries in the United States, Europe, Asia, and other locations, and using its proprietary technology platform, facilitates billions of dollars of on-line, over-the-counter, foreign exchange ("FX") trading and related services to "retail" customers, including individuals and institutions, who gamble on the movements in foreign currency prices in a currency trading market that involves trillions of dollars of trading each day.

1

3.     Unlike other retail brokers of over-the-counter foreign currency who act as principals and take the other side of currency trades by their customers, and profit or suffer a loss in connection with their customers' trades, FXCM used what it touted as a unique "agency" model for the bulk of its business, in which it earned a set rate of commissions when it matched the purchases and sales of its customers with a collection of global banks and financial institutions it called "liquidity providers."  According to FXCM, this "agency" model involved minimal risk – a position that could not be farther from the truth.  This became apparent to FXCM's investors on January 15, 2015, when the Swiss National Bank ("SNB") decoupled its currency from the euro, liquidity evaporated, and FXCM announced its responsibility for over $200 million of its customers' trading losses that necessitated a bailout the following day, which effectively wiped out all of the shareholders' equity in the Company.

4.     These losses were magnified by FXCM's failure to control its credit risk, contrary to its public statements throughout the Class Period.  FXCM purportedly controlled its credit risk by limiting the amount of leverage it provided to customers.  In truth, however, because the daily changes in the relative prices of the 59 FX currency "pairs" (*e.g.*, (euros to U.S. dollars ("EUR/USD") or euros to Swiss francs ("EUR/CHF")) which FXCM permitted its customers to trade on its system were typically small, to generate interest on the part of potential retail customers, FXCM provided them with massive amounts of leverage.  However, FXCM held the "downside" risk on its customers' trades and was at risk if currency prices changed quickly and the Company could not match customer orders or close out  a customer's account before the customer's slim margin collateral was exhausted.  This is precisely what occurred with FXCM customers' EUR/CHF trades on January 15th.   As Defendant Niv himself explained in an

interview with a *BloombergBusiness* reporter, "[l]everage is the enemy;" and it's the "big move" that kills you.

5.      The much higher than represented risks of FXCM's "agency" model resulting from the absence at FXCM of a functioning risk management department or controls and the Company's practice of permitting sky-high amounts of leverage were further exacerbated by FXCM's on-line research services and marketing.  In this regard,  FXCM urged its customers to concentrate and increase their bets on the EUR/CHF pair in one direction – *i.e.*, betting that the euro would continue its strength as against the Swiss franc in light of the SNB's then-existing "cap" on the price of its currency.  In addition, FXCM heavily advertised its policy of not pursuing collection of negative balances in customers' overly leveraged accounts.  Thus, by January 15, 2015, FXCM's customers had accumulated an enormous and thinly collateralized one-sided position of over $1 billion on the EUR/CHF pair.

6.      On January 15, 2015, at 9:30 a.m. GMT (UK time), the SNB announced that it was lifting the 1.2:1 cap on the price of the Swiss franc versus the uuro, thereby permitting the franc to move to its actual market value, based on the two currencies' relative strengths, and the price of the Swiss franc swung wildly following the announcement.  During the day, the price of the Swiss franc soared by as much as 40% against the euro, and ultimately settled at a free market price that was about 14% higher in relationship to the euro than the previous day.

7.      Given the volatility and extreme EUR/CHF price changes that followed the SNB's announcement, most of FXCM's liquidity providers stopped providing prices and liquidity for long periods of time on January 15th.  As a result, FXCM was unable to close out its customers'  $1 billion in open, one-sided positions before the margin collateral in their accounts was exhausted.  Further, as FXCM  closed out its customers' massive long positions in the euro

in the face of scarce demand from its "liquidity providers," it "chased" the prices lower.  At the end of the day, notwithstanding the purported "limited" risk inherent in its "agency" model, FXCM announced that it had suffered a staggering $225 million in losses on its customers' open EUR/CHF positions, and that, as a result, certain of its operating subsidiaries (particularly those registered in the United Kingdom) were in violation of their minimum regulatory capital requirements.  As FXCM would later report in its First Quarter 2015 ("1Q2015") Form 10-Q, FXCM's customers actually had negative accounts of $276 million due to the price changes on the EUR/CHF customer trades.  Thus, FXCM customers had incurred losses of more than 30% on their bets on this pair (taking into account the then-existing margin collateral in their accounts) for which FXCM was largely responsible.

8.      On January 16, 2015, FXCM announced that in order to close its regulatory capital gap and avoid being shut down by its regulators who were already on site, it had obtained $300 million in additional financing from Leucadia National Corporation ("Leucadia").  The terms of the Leucadia deal, however, were so punitive that, in addition to an interest rate that grew to 17%, and high deal fees, FXCM also agreed to terms of a "letter agreement" with Leucadia that required FXCM to pay over to Leucadia the bulk of its operating profits and proceeds from the required sales of various of its business units.

9.      As a result, on January 16, 2015, FXCM's stock stopped trading on the NYSE, and by Monday, January 20, 2015, when trading resumed, FXCM's stock had lost over 90% of its value, dropping from $14.87 on January 14, 2015, to $1.60 on January 20, 2015.  By May 2015, Leucadia was bragging to its own investors that its $300 million investment in FXCM had tripled in value.

10.     While Defendants, in presentations to the market after January 15, 2015, ascribed FXCM's collapse to the unprecedented and unforeseeable actions of the SNB, in reality, Niv, Brendan Callan ("Callan"), FXCM's CEO of Europe, and the Company's "Dealing Desk," who, along with Niv, made the Company's "risk management" decisions, were fully aware of the extraordinary risks they were assuming.  And, in fact, the heads of the Dealing Desk had dumped millions of dollars of their stock in the final months of 2014.

11.     As a preliminary matter, the risks of a likely "big move" in currency prices of the EUR/CHF pair in the event that the Swiss lifted its currency cap were well known in the industry even if the precise timing of SNB's action was a surprise.  The largest and fastest changes in the currency prices of any G-10 country in recent decades had occurred when the SNB first pegged its currency to the euro in September 2011, and capped it at the 1.2:1 rate, with the warning that the cap was temporary.  Throughout 2014, the European Central Bank ("ECB") had hinted that it would soon take steps to adjust its currency through "quantitative easing," steps which would devalue the euro, and make it increasingly costly for the Swiss to retain their currency cap in relationship to the euro.  As a result, in September 2014, two of FXCM's largest retail brokerage competitors announced increases in their margin collateral requirements for the increasing risk from the EUR/CHF pair.  This action provided FXCM with a significant competitive advantage, given its unchanged and much looser margin requirements, and there was an almost immediate and enormous influx of retail customers to FXCM placing bets on this pair.  But, most importantly, as a former FXCM managing director in Germany, Confidential Witness ("CW") 1, explained, by late 2014, he, along with other FXCM officers in Europe, had specifically and repeatedly explained the extraordinary risks associated with this pair, including that, if the cap was lifted, there would not be sufficient liquidity to cover FXCM's book of business, and

implored the FXCM CEO in Europe to increase the margin collateral on hundreds of millions of dollars of his customer accounts, but to no avail.

12.    Instead of disclosing these enormous and growing risks to shareholders, Defendants continued to downplay their exposure, extol the benefits of the market's increasing volatility and tout the unique "low risk" advantages of their "agency" model.  Defendants also pointed to their "excess" and unneeded cash to meet their regulatory capital requirements, while suggesting that they were operating their business prudently at much lower levels of leverage than they were.

13.    As market analysts observed in reports published following the SNB's decoupling, FXCM's collapse revealed the fundamental fallacy and risks of its business strategy, which were hidden from investors, the "truth" that, when revealed, resulted in hundreds of millions of dollars of losses to Plaintiff and the class.

## JURISDICTION AND VENUE

14.    The claims asserted herein arise under Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. §240.10b-5).  This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §1331 and Section 27 of the Exchange Act (15 U.S.C. §78aa).

15.    Venue is proper in this District pursuant to 28 U.S.C. §1391(b) and Section 27(c) of the Exchange Act (15 U.S.C. §78aa(c)).  FXCM's headquarters is located at 55 Water Street, Floor 50, New York, NY 10041, which is in this District.  FXCM shares are offered and trade on the New York Stock Exchange ("NYSE"), located in this District.  Many of the acts charged herein, including the preparation and dissemination of materially false and misleading information, occurred in substantial part in this District.

16.     In connection with the acts alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications, and the facilities of the national securities markets.

**PARTIES**

17.     Plaintiff Retirement Board of the Policemen's Annuity and Benefit Fund of Chicago on Behalf of the Policemen's Annuity and Benefit Fund of Chicago ("PABF"), as set forth in the certification previously filed in this action, and incorporated by reference herein, purchased FXCM common stock during the Class Period and suffered damages as a result of the federal securities law violations and false and/or misleading statements and/or material omissions alleged herein.

18.     Defendant FXCM is headquartered in New York, NY and incorporated in Delaware.  Its common stock is traded on the NYSE under the ticker symbol "FXCM."  FXCM is a holding company that operates through subsidiaries located in New York, the United Kingdom ("UK"), Hong Kong and other locations, which are subject to the differing margin, regulatory and capital requirements of the countries in which they operate.  Since 2010, when it went public, FXCM has been managed and controlled by a small group of five to six founders who, for all relevant times, retained a controlling interest in its stock.

19.     Defendant Dror "Drew" Niv ("Niv") is one of the founders of FXCM and is and, at all relevant times during the Class Period, was the CEO and Chairman of the Board of Directors.

20.     Defendant Robert Lande ("Lande") is one of the founders and, at all relevant times during the Class Period, was the Company's CFO.

21.     Defendants FXCM, Niv, and Lande are collectively referred to herein as the "Defendants."

22.     Defendants Niv and Lande are collectively referred to herein as the "Individual Defendants."

## SUBSTANTIVE ALLEGATIONS

### Background

23.     FXCM was one of the first currency brokerage firms to serve retail customers, which during the Class Period constituted about 5-7% of the overall global foreign currency market.  The daily global trading of foreign exchange exceeds $1 trillion a day and the vast majority of retail customers (approximately 72%) lose money betting on changes in the prices of foreign currencies.  During the Class Period, FXCM was the largest FX broker in the United States and one of the largest retail FX brokers in the world.  Two of FXCM's largest competitors were Gain Capital and Saxo Bank.

24.     FXCM provides trading and related services to individuals and institutions who trade over the counter on its sophisticated on-line technology platform.  The platform includes training programs teaching the fundamentals of trading currencies, and includes daily articles referred to as the "Daily FX," by FXCM's in-house research analysts who provide tips and proposed trading strategies to promote increased interest in trading by potential retail customers.

25.     In an FX trade, a participant buys one currency – *i.e.*, trades "long" – and simultaneously sells another, a combination known as a "currency pair."  During the Class Period, FXCM permitted its customers to trade up to 59 currency "pairs," including euros to Swiss francs ("EUR/CHF").

26.     FXCM, when it went public in December 2010, was structured as a holding company for a series of operating subsidiaries located in the United States, the UK, Hong Kong and various other locations.  Each subsidiary is subject to different regulatory oversight and capital requirements imposed by its local government and regulator.  Some, like the United States, also impose limits on the amount of leverage FXCM can provide to its customers.  Thus, *e.g.*, in the United States, where FXCM's principal offices are located, and where FXCM customers conducted approximately 13% of FXCM's trades, the Commodities Futures Trade Commission ("CFTC") permitted retail trading of pairs of currency with leverage of up to fifty-to-one ("50:1"), depending upon the currencies being paired.  When a customer used leverage of 50:1, it deposited margin collateral of only 2% of its trades, which meant that a currency movement in the wrong direction of more than 2% would exhaust the collateral in the customer's account and its account would have a negative, or "debit" balance – *i.e.*, that the customer would owe FXCM money.  Trades in the UK, Hong Kong and other less regulated jurisdictions, however, were not subject to the margin requirements set by the CFTC.  As CW2, an Operations Associate in Plano, Texas, throughout the Class Period until September 2014, explained, FXCM set the "default" for required margin for offshore accounts at 100:1, but permitted customers in jurisdictions that permitted higher leverage to request and receive much higher levels of leverage.  Thus, *e.g.*, CW2 noted that customers in Australia were permitted to trade with leverage of as much as 500:1.  Leverage of that amount meant that an adverse currency price change of as little as 1/5 of 1% would wipe out the positive balance of a customer's open account for that pair.  Ultimately, on January 15, 2015, FXCM breached its regulatory capital requirements in the UK as a result of its customers' huge trading losses on the EUR/CHF pair in Europe, which FXCM was forced to absorb because of its customers' low margin collateral.

27.     While most retail brokers earn their trading revenues by taking the opposite side of their retail customers' trades, for the largest portion of its operations, FXCM followed what it termed an "agency model."   Pursuant to this business approach, FXCM passed on to its customers the upside of obtaining the best prices quoted by about 12 to 16 banks and financial institutions, with which FXCM did business, its "liquidity providers," who provided the prices and liquidity and served as the market makers for the trades by FXCM's customers.   When FXCM's customers placed their orders with FXCM, FXCM simultaneously entered into off-setting trades with the liquidity providers, and its revenues were limited to the fees or commissions it earned on the transactions.   FXCM commonly charged customers a rate of approximately $90 per million dollars traded.   When, however, a customer's account went "negative," because currency prices had moved beyond the margin collateral in the customer's account and before FXCM was able to execute the off-setting trade, FXCM effectively became the "owner" of the losses, as FXCM continued to be responsible to the liquidity providers and market makers on the other side of its customer trades.   As FXCM had warned as early as 2010 when it went public, "[A]lthough the retail customer's positions are automatically closed once his or her useable margin falls to zero, it is possible for a customer account to go negative, for example, due to system failure."

28.     Because FXCM earned its revenues as commissions, FXCM's revenues increased as the volume of its customers' trades increased.   As Niv explained to FXCM's shareholders, typically, the prices of currency pairs changed only slightly, and FXCM's retail customer trading increased when the pace of the price changes accelerated, *i.e.*, when the "volatility" in the prices increased.   Throughout the Class Period, Defendants asserted to FXCM's shareholders that its customers' trading increased, and FXCM's revenues and profits increased, when the "volatility"

of currency prices increased.  Defendants, and particularly Niv, however, also fully understood that a sudden and severe change in prices, particularly one that occurred as a result of government interference in its currency – what Niv called the "big move" in a May 2014 interview with David Evans, a reporter at *Bloomberg News*[1] – could cause FXCM's "liquidity providers" to stop providing prices and liquidity, and therefore result in FXCM having to absorb the massive trading losses of its customers.  This risk was what had caused FXCM to halt its clients' trading in the United States dollar versus the Russian Ruble in December 2014, when turmoil in Russia had caused the Ruble's value to move sharply in the preceding weeks.

29.     Although Niv, in the same May 2014 interview with *Bloomberg News*, had acknowledged that, "[L]everage is the enemy," one of the principal ways that FXCM stimulated its customers' interest in gambling on the changes in currency prices, and competed against other retail brokers, was to permit its customers to trade with huge amounts of leverage.  As Niv put it, "Currencies don't move that much . . . . So if you had no leverage, nobody would trade."  FXCM further lured retail customers to engage in currency trades by assuring customers that it was FXCM's policy not to pursue collection of negative account balances – *i.e.*, that customers' risk was limited to their margin collateral.

30.     To avoid taking losses on its customers' thinly collateralized accounts, FXCM depended on its technology systems to constantly monitor changes in the currency prices of the pairs in which its customers were invested and update the associated changing values of its customers' open accounts.  When its customers' balances became negative, FXCM's systems automatically closed them out with off-setting trades with its liquidity providers.  This, however,

---

[1]     Evans reported Niv's comments about the "big move" in articles he published after the SNB's decoupling of the euro on January 15, 2015.

was not possible if the currency pairs were too thinly traded or currency prices had moved too quickly – as occurred on January 15, 2015, with the EUR/CHF currency pair.

**FXCM's $1 Billion Bet on the EUR/CHF Pair**

31.    FXCM's business came crashing down on January 15, 2015, when the SNB decoupled its currency from the euro and lifted the 1.2:1 cap.  Within minutes the pricing of the EUR/CHF pair swung by as much as 40%, and the banks and financial institutions that FXCM and other brokers relied upon stopped providing prices and liquidity for trading of the pair.

32.    The Bank of England ("BOE") in its first quarter 2015 quarterly bulletin provided the following explanation of what happened on January 15th:

> In a surprise decision in mid-January, the Swiss National Bank (SNB) removed the ceiling on the exchange rate between euro and Swiss franc, allowing the domestic currency to appreciate.  Contacts thought that the SNB decision was prompted by concerns about the likely scale of foreign currency intervention required to keep the Swiss franc from rising above the ceiling in future, given the widely anticipated monetary policy easing by the ECB.  Although the change in SNB policy came as a surprise, contacts were nonetheless shocked by the speed and scale of the exchange rate moves that followed.  The Swiss franc appreciated by 14% against the euro on the day of the decision, while the intraday range was several times that number — market participants continue to debate over the highest value of the franc traded during the day.  In part, the severity of the moves was a reflection of the fact that many market participants had thought that the peg was credible, so some were wrong-footed by the shift in policy.  But changes in market structure may also have contributed to the disorderliness.

> Electronic platforms have become much more prevalent in the foreign exchange market in recent years, and now account for more than half of all spot currency trades.  Following the SNB announcement, banks reportedly switched off electronic trading platforms as quickly as possible — some faster than others — with some dealers temporarily pulling quotes for all currencies.  ***It only required one or two of the large players to switch off their electronic platforms for liquidity to disappear altogether, given the close interlinkages in the foreign exchange market.  Once prices returned, algorithmic traders left with open positions placed their offers at the level of the previous bid, "chasing" the price downwards***.

[Emphasis added].

12

33.     FXCM reported in a press release issued on January 15, 2015, that,

[D]ue to unprecedented volatility in EUR/CHF pair after the Swiss National Bank announcement this morning, clients experienced significant losses, generated negative equity balances owed to FXCM of approximately $225 million.

As a result of these debit balances, the company may be in breach of some regulatory capital requirements.

We are actively discussing alternatives to return our capital to levels prior to today's events and discussing the matter with our regulators.

34.     On January 16, 2015, FXCM announced its financing deal with Leucadia, along

with the confiscatory terms of its associated letter agreement.

<u>Amended and Restated Letter Agreement</u>

The Amended and Restated Letter Agreement provides, among other things, that Holdings and Newco [a newly created FXCM subsidiary] will pay in cash to Leucadia and its assignees a percentage of the proceeds received in connection with certain transactions, including sales of assets (subject to certain limited exceptions), dividends or distributions, the sale or indirect sale of Newco (whether by merger, stock purchase, sale of all or substantially all of Newco's assets or otherwise), the issuance of any debt (subject to certain limited exceptions) or equity securities, and other specified non-ordinary course events, such as certain tax refunds and litigation proceeds.

The Amended and Restated Letter Agreement allocates proceeds as follows:

| **Aggregate amount of proceeds** | **Leucadia** | **FXCM Holdings** |
|---|---|---|
| Amounts due under Leucadia term loan, including fees | *100%* | 0% |
| Next $350 million | *50%* | 50% |
| Next amount equal to 2 times the balance outstanding on the term loan and fees as of April 16, 2015, such amount not to be less than $500 million or more than $680 million | *90%* | 10% |
| All aggregate amounts thereafter | *60%* | 40% |

* * *

In addition, the Amended and Restated Letter Agreement provides that beginning in three years and thereafter, upon the request of Leucadia or its assignees, the Company, Holdings and Newco will cause the sale of Holdings, Newco and/or

13

any of their respective subsidiaries' assets or equity interests for cash at the highest reasonably available price.  Upon the occurrence of such event, Newco will pay Leucadia and its assignees in accordance with the methodology described above.

35.    In March 2015, FXCM published a second-by-second account of what had occurred on January 15th.  FXCM reported that, while its "circuit breakers" had shut down trading within a minute of the SNB's announcement, when FXCM resumed trading of customers' accounts 50 minutes later, "[l]iquidity levels [we]re as little as 5% of normal levels, and only three or four liquidity providers [were] quoting consistently."

36.    FXCM suffered larger losses on the EUR/CHF trading than any published by any other trader of foreign currency.  In its 1Q2015 Form 10-Q, FXCM changed its estimate of the customer "debit balances" for the "slightly over" $1 billion in open positions in the EUR/CHF pair, from the $225 million it had announced on January 15th, to $275 million.  Accordingly, with its customers' reportedly $80 million of margin collateral for this pair, FXCM's customers' trading losses on this pair had exceeded $300 million, or more than 30% of their original open positions – *i.e.*, far in excess of the 14% overall price decline for the day.  The 1Q2015 Form 10-Q also reported that FXCM had suffered $292 million in losses as a result of its "letter agreement" with Leucadia – meaning that, as a practical matter, the events of January 15-16, 2015, had wiped out virtually the entirety of FXCM's shareholders' equity.  As FXCM reported in its Form 10-Q, its $643 million in shareholder equity at December 31, 2014, had become a deficit of $87 million as of March 31, 2015,.  By May 2015, Leucadia was telling its own shareholders that its investment in FXCM had tripled in value.

**Defendants Knew They Were Risking the Company By Allowing Their Customers to Place a Billion Dollar, One-Sided, Highly Leveraged Bet on the EUR/CHF Pair**

37.    Although the precise timing of the SNB's inevitable decoupling of its currency from the Euro was unknown, that it would occur was a certainty.  The SNB had always

maintained that the cap was a temporary measure, and even FXCM's own research analysts recognized that the Company was playing with fire by holding huge one-sided positions in the EUR/CHF pair because it was only a matter of time until the SNB lifted the cap on its currency.

38.     Thus, *e.g.*, David Rodriguez stated in his "Daily FX" research reports dated September 4, 2014, and September 11, 2014, respectively:

> **Euro/Swiss France Positions at Record Long – Where's the SNB?**
>
> EURCHF – Incredibly one-sided positions warn that the Euro . . . is at a major inflection point versus the Swiss Franc. . . . The key question is: will the Swiss National Bank intervene as the exchange rate nears SFr1.20?
>
> Trade Implications – EURCHF:  We've seen up to 98 percent of open positions long the Euro versus the Swiss Franc – a new record.  The last time we saw anything similar was in 2012 when the Euro similarly traded near SFr1.20 for months on end.  In that instance, the Swiss National Bank ably defended its stated SFr1.20 price floor.  The critical question remains: will they once again give traders a free ride?
>
> **Euro Very Likely to Test 1.20 Versus Swiss Franc**
>
> EURCHF – Retail traders remain near their most long the Euro . . . versus the Swiss Franc . . . on record, and it seems almost inevitable that the EURCHF tests the Swiss National Bank's stated floor at SFr1.20.

39.     Likewise, FXCM's research analyst, Kristen Keir, reported on December 19, 2014, that although she continued to recommend buying the EUR/CHF long at the 1.2 level, "[a]t some point we believe market forces will force the SNB to abandon the floor, but that looks a long way off."

40.     In addition, Defendants knew that the fastest and most extreme currency price changes among "G-10" currencies in recent history prior to January 15, 2015, had also occurred with the EUR/CHF pair, specifically on September 6, 2011 when the SNB first introduced the 1.2 cap during a Eurozone crisis.  On that day, the price of the Swiss franc changed more than 8% within minutes of the SNB's announcement.  Thus, it was only a matter of when, not

whether, the SNB would remove the cap, with little doubt that, when that occurred, the resulting price changes would be swift and far exceed the scant margin collateral in FXCM customer accounts.

41.     CW3, an FXCM Operations Specialist until November 2014, who provided client and trade support, explained that he had realized in late 2013 that once the SNB removed the 1.2 benchmark, FXCM would not be able to cover all the open positions of its clients.  He knew this because he was able to view all open positions on the EUR/CHF currency pair at any given time, through FXCM's back office system.  He also was able to see that most clients had stop-loss orders on their trades that had been "set at exactly 120 – the benchmark."

42.     CW3 explained that he had assisted in establishing FXCM branches in Germany and France and had set up all operational procedures for both.  He noted that French-based customers had not engaged in trading the EUR/CHF pair to the extent that German customers had.

43.     CW3 stated that he spoke to the then Managing Director of FXCM Germany, CW1, in December 2013 about the serious risk associated with the EUR/CHF pair.

44.     Information provided by CW1, who was formerly employed as a FXCM Managing Director in Germany from the start of the Class Period through December 2014, demonstrates that the Defendants in this case fully understood that they were taking on enormous risks to the solvency of the Company, by continuing to provide massive amounts of leverage for the one-sided book of open EUR/CHF customer accounts through the close of 2014.

45.     CW1 reported to the European-based executive who oversaw retail sales for Europe, and who reported to the CEO of Europe, Brendan Callan.  Callan was one of the original founders of FXCM and reported directly to CEO Drew Niv.  As the managing director of

16

Germany, CW1 oversaw all operations for FXCM in German-speaking countries including Germany, Austria, and the German-speaking portion of Switzerland.

46.     CW1 interfaced with FXCM's "Dealing Department" in New York City on a fairly regular basis, many times with regard to specific clients, and other times relating to broader initiatives. For example, CW1 would inquire as to why the Dealing Department widened or decreased the spread on certain currency pairs, or he at times requested to review the trading data prior to execution of a particular client's trade.  The global head of the Dealing Department was Eduard Yusupov, and its chief dealer was William Ahdout.  Both were co-founders of FXCM and sold massive amounts of stock in November-December 2014.

47.     Through CW1's ongoing interactions with the Dealing Department, CW1 came to realize that Defendant Niv was ultimately responsible for the Company's risk management practices and decisions.  For example, CW1 recalled that there were frequently client issues relating to contract for differences ("CFDs") trades. He explained that some FXCM customers in the German-speaking market traded on the German DAX index, via CFDs. Oftentimes CW1 would complain to the Dealing Department that the department had widened the DAX CFD spread. If spreads offered by FXCM were wider than what its competitors offered, it sometimes caused clients to trade using competitor platforms.  The reply from the Dealing Desk was "we would [narrow the spread] if we could, but Drew [Niv] didn't let us." CW1 explained that maintaining wider spreads was a method for FXCM to minimize risk.

48.     According to CW1, the trading strategy adopted by the overwhelming majority of retail customers trading EUR/CHF was to maintain an open long position, with a stop loss order set just below the 120 mark. This strategy worked under the assumption that the 120 peg would hold, CW1 explained. For example, customers would buy EUR/CHF at 1.2010 or 1.2015.

Assuming the 120 peg held, the downside risk of this trade was very small. With a stop loss order in place at or around 120 (enabling the trader to exit the position in the event the peg was removed), the total potential downside would only be about .0015% or 15 "pips." However, the potential upside was significant.

49.     As CW1 further explained, if the value of the pair rose to 1.2020 or 1.2030 as it sometimes did, then a client would stand to reap significant gains.  Using 400:1 leverage a trader would double his or her money if the Swiss franc depreciated by a mere 0.25%.  This trade was therefore extremely attractive and perceived by many high stakes clients as almost "too good to be true."  FXCM research analysts broadly promoted this trading strategy on FXCM's on-line marketing site, the "Daily FX," resulting in a 95% one-way billion dollar book of EUR/CHF trades as of the end of September 2014.

50.     According to CW1, the significance of most traders maintaining stop loss orders at or close to the 120 peg, was that "it clarifies the risk."  As CW1 explained, "because the Swiss franc is a pegged currency, and because traders all maintained a long position on EUR/CHF, it's clear that once the peg is broken, all the stop losses would trigger, and you're in trouble."

51.     CW1 explained that some high stakes EUR/CHF traders utilized the "martingale strategy" which required traders to add and oftentimes double their bets on losing positions in hopes of regaining all losses when the market moved favorably.  CW1 communicated on a weekly basis with many clients that maintained significant open EUR/CHF positions.  He said that certain of the high stakes EUR/CHF clients informed him that they had "doubled on the downside," meaning they had doubled their position when the EUR/CHF moved to 1.2015 for example, and doubled again when the EUR/CHF went to 1.2005.  CW1 stated that this trading strategy is precisely how some clients built up such massive EUR/CHF positions over time.

52.     In September 2014, Gain Capital and Saxo Bank both announced that they would be increasing margin requirements on Swiss franc pairs.  Saxo Bank, in explaining to its clients why they were raising the margin level from 2% to 8%, stated that increasing pressure on the EUR/CHF floor and the build-up of short CHF positions in the broader market could represent a larger risk should the 1.2 floor give way; as Saxo Bank stated, "We believe any breach of the 1.2000 peg could see a significant appreciation of CHF" – *i.e.*, the risk that ultimately came to pass on January 15, 2015.  This information from Saxo Bank was reported on September 2, 2014, by *Finance Magnates*, on-line, in a website available to foreign exchange traders.  In a September 16, 2014 post, *Finance Magnates* similarly described the reasoning behind the Gain Capital increase in required margin collateral for the EUR/CHF pair as follows: "[T]he increasingly high risk associated with the one-sided exposure of retail market participants is forcing another company to change its leverage policy towards the Swiss franc peg to the euro."

53.     CW1 explained that FXCM would necessarily know about the changes in margin requirements at Gain Capital and Saxo Bank.  As a result of Gain's and Saxo's announcements, there was a significant and almost immediate influx of retail customers that had previously traded through the Gain and Saxo platforms, to FXCM, which had not increased margin requirements on the Swiss franc pairs.

54.     As CW1 stated, retail FX customers consistently seek higher leverage as a matter of course.  Since spreads in the FX market are so minimal, the use of leverage is necessary to achieve meaningful gains on trades.  As such, providing more leverage was a critical marketing strategy by which FXCM was able to obtain significant market share, in general and with regard to the EUR/CHF pair specifically.  As CW1 explained, "it was easy [for FXCM] to get those people in the market trying to find a broker that offers that high leverage."  CW1 noted that these

customers included "really big clients" that traded and maintained highly leveraged large positions on EUR/CHF.

55.     In further explaining how Defendant Niv necessarily knew about the actions by Gain Capital and Saxo Bank, CW1 stated that each of FXCM's 20 worldwide offices was required to submit via email a "Shift Report" at the end of each shift (*i.e.*, the close of business). These reports provided a summary of significant events or issues that had occurred during the shift.   At times the reports would include very specific information about particular clients, including client concerns, complaints, issues, etc.  Shift Reports were also the primary method for branches "to voice their concerns" or to bring up a new proposal such as increasing leverage on a particular currency pair to attract more customers.  Recipients of the report were "all of top management," including Drew Niv, and CW1 said he was "99% sure" that Gain's and Saxo's reduction of leverage on EUR/CHF in September 2014 was raised and discussed in one or more of these reports.

56.     CW1 further noted that he knew that Niv reviewed Shift Reports because at times Niv would "reply all" to Shift Report submissions.  For example, if an office reported that it had not been able to secure a large $10 million client, Niv would reply "all" to provide instruction to the email recipient group as to how to close the client and bring them on board, by pointing out the benefits of the FXCM platform, etc. Niv would also at times respond to the specific managing director submitting the report, including to CW1, or to a smaller group of personnel, depending on the issue raised.

57.     CW1 opined that the de-pegging of the Swiss franc was "something that FXCM could have seen coming," explaining that, "[o]ur competitors had raised margin rates on Swiss franc pairs [*i.e.*, EUR/CHF, USD/CHF, etc.] and FXCM didn't."

58.     Most importantly, CW1 described how, in late 2014, he and other FXCM officers had specifically and repeatedly warned Callan, the FXCM CEO of Europe, and Niv's direct report for Europe's operations, about the massive risks of the EUR/CHF customer accounts. CW1 stated that, for several months prior to his December 2014 departure, he communicated on a regular basis with his direct supervisor and Callan about the massive market exposure due to EUR/CHF open positions. As CW1 explained, "I said to them 'here's something piling up, it's getting worse and worse and we should take care because if that 120 peg is removed, it [*i.e.*, the euro's value] will drop dramatically." He further warned FXCM executives at the time that, "if you look at our own book, all the people [customers] have their stop-losses just below the 120 [peg], so there will not be any liquidity and we may get 100 pips of slippage."

59.     According to CW1, he had informed Callan that, if there was no liquidity, the next executable price could be 110 (*i.e.*, 1.10) 105 (*i.e.*, 1.05) or even worse, and that if there were no buyers of the euro against the Swiss franc (*i.e.*, no liquidity), then "the prices will be terminal" which will lead to massive client losses.  CW1 stated that he had explained to Callan that because FXCM maintained a no debit policy where client losses could not go below zero, FXCM would have to bear those negative balance losses.

60.     As CW1 stated, Callan replied, "[y]ou take care of your sales; the risk is being managed by the Dealing Department, which you're not a part of."  CW1 explained that the Dealing Room was the group in New York City that would know FXCM's worldwide exposure on EUR/CHF, and would have likely passed that information on to Niv, since Niv was ultimately responsible for risk measures at the Company.  CW1 noted that Callan's reply captured the general attitude and position of FXCM's highest ranking executives.  As CW1 explained,

FXCM's senior executives consistently encouraged its personnel to grow revenue, but were dismissive about any concerns relating to potential risk and market exposure.

61.     CW1 stated that he had informed Callan via email that, within the German-speaking markets, FXCM clients had consistent exposure on the EUR/CHF pair, which in total equated to a "three-digit million number."  He further said that he explained to Callan that the exposure in the German market alone was substantial.  CW1 also noted that Callan, as CEO of Europe, would also know that there was even more exposure on EUR/CHF in other European markets.

62.     According to CW1, Callan, at one point, replied to his concerns stating that the Dealing Room was not going to reduce leverage on the EUR/CHF across the book.   In November 2014, however, after several weeks in which CW1 had expressed concern on a weekly basis to Callan about the EUR/CHF massive market exposure, Callan finally asked that CW1 provide him with a list of the top five to ten retail customers in the German-speaking market (i.e., those that CW1 oversaw), which had the most market exposure on the pair.  CW1 obliged and provided the list via email stating to Callan, "here's your risk, get rid of it," meaning reduce the leverage for these individual customers. However, as of the time CW1 left in late December 2014, the leverage for these clients had not been reduced.

63.     As CW1 explained, in his last week at FXCM, and exasperated at this point by Callan's failure to act, he told Callan, "do whatever you want, but this is where your risk is," indicating the list of customers he had provided, and "don't come back to me complaining, if you lose out."  CW1 explained that he felt compelled to bring this issue to the attention of Callan, as it was in the best interest of the Company to do so.  CW1 stated that, because he was leaving FXCM, he was able to speak very emphatically with Callan, and did so.

64.     CW1 also explained that the Managing Directors for the UK and France likely also raised concerns about the EUR/CHF pair to Callan and the Dealing Department.  He noted that, along with customers based in France, the French managing director also oversaw FXCM's operations in the French-speaking section of Switzerland.  CW1 stated that there were "at least a couple" of high stakes Swiss traders with significant EUR/CHF exposure that were under the purview of FXCM's French managing director.

65.     According to CW1, the German-speaking markets (Germany, Austria, and Switzerland) "account[ed] for a very high percentage" of the market exposure and ultimately the losses arising from the decoupling.  CW1 estimated that only about 5% or less of clients in the German-speaking markets traded EUR/CHF.  However, a subset of those 5% had massive open long positions on EUR/CHF, with the highest leverage allowed in that market, 400:1.  CW1 explained that the majority of losses came about due to open positions of approximately 20 to 40 retail traders.  CW1 estimated that there were only about 100 or so additional retail customers in the German market that traded EUR/CHF.  CW1 recalled that one customer alone maintained an open position of approximately $200 million (which at 400:1 would have required $500,000 margin).  He noted that, for high stakes retail customers, maintaining $1 million in their FXCM trading account was "not a lot."

66.     CW1 explained that the reason FXCM's losses were significantly more than its competitors, was that FXCM had attracted clients by offering the highest leverage, which in turn enabled these clients to take significant positions.  He also stated his view that FXCM's no debit policy emboldened traders to take more risks than they otherwise might have.

67.     Finally, CW1 explained that there was much discussion within FXCM as to why Niv had allowed so much exposure on the EUR/CHF pair.  Because Niv's position appeared so

reckless and inexplicable, many expressed the view that the only plausible explanation was that Niv had shorted the EUR/CHF pair in a personal account in some overseas market.

68.     As one of the FXCM research analysts who tracked the FXCM book of business, including for the EUR/CHF pair, noted on FXCM's "Daily FX" on-line marketing tool, during the second week of September 2014 there were short purchases of the EUR/CHF that had shifted the prior week's percentage of euro long positions from 98% of the book to 93%.  This doubled the amount of positions that had shorted the EUR/CHF pair.

69.     CW2 also described participating in a conference call in the summer of 2014 in which all personnel in the office in Plano, Texas, as well as personnel from other offices, including Ornit Niv (Drew Niv's sister), the CEO of Capital Markets, were involved.  CW2 stated that in that call he suggested that FXCM increase margin requirements "to reduce some of the risk."  Ornit Niv replied that such a proposal did not fit with the Company's current business model and that increasing margin requirements would reduce client interest, because "customers come to FXCM because of the leverage."

**FXCM Had No Risk Management Department or Protocols to Manage the Extraordinary Risks Associated with Its Agency Model**

70.     Several confidential witnesses reinforced the information provided by CW1 and CW2 that there was no meaningful risk management at FXCM.  CW4, the Assistant Vice President of Finance based at the Company's New York City offices throughout the Class Period, stated that she knew of no risk initiatives or protocols at FXCM.

71.     CW5, a senior compliance associate in the New York City offices from July 2013 through the Class Period, stated that the Company had no dedicated risk department.  He explained that Janelle Lester, the Chief Compliance Officer, deferred to Niv and rejected CW5's efforts to install robust compliance measures.  CW5 stated that the agency model that FXCM

employed was intrinsically riskier during periods of high volatility.   As CW5 explained, if liquidity providers stopped providing quotes, FXCM had to step into the shoes of the liquidity provider, effectively as the counter-party.   CW5 knew of no dedicated risk department or any robust computerized risk management system.   Instead, the Dealing Desk was chiefly responsible for the Company's financial risk exposures.

72.   CW6 was employed at FXCM prior to the Class Period through April 2014. Early in the Class Period he worked at the New York City headquarters as a senior trade audit associate and later as a project manager to develop computerized algorithmic trading.   After October 2013 he worked as an analyst in the San Francisco office.   In this position he reviewed customer trading activity and other data to assess marketing strategies by demographic, geo-locale and product offerings including the evaluation of specific currency pairs.   At his last position he reported to the vice president of financial services, who reported to Ornit Niv. Throughout his tenure, CW6 interfaced with personnel in the various departments including compliance, the Dealing Room, Sales, Accounting and Information Technology.   He participated in small group meetings with Drew Niv in connection with this Trade Audit work.

73.   CW7 was a Managing Director and Global Head of Sales for institutional sales until September 2014.   He was based in London and reported directly to Niv.   According to CW7, "anything that had to do with risk management was managed directly by the Dealing Desk in New York."

**Defendants' Materially False and Misleading Statements**

74.   Throughout the Class Period, as Defendants played "Russian Roulette" with the Company's continued viability, Defendants publicly downplayed and misled investors about the enormous credit, market, liquidity, operational and regulatory capital risks they were taking, particularly in times of high currency price "volatility."   Defendants repeatedly touted the "low

risks" of their so-called "agency model," and fostered the misleading impression that they were prudently managing the leverage they were permitting their customers to use.  For example, in an interview with *Bloomberg News*, Niv reportedly "recommended using no more than 10:1 leverage," because "Leverage is the enemy."  However, at the same time, Niv was secretly authorizing leverage to FXCM's largest customers of as much as 500:1.  Defendants also pointed to their purportedly high levels of "excess" capital, citing it as the rationale for large increases in the Company's share repurchase program.  In truth, FXCM was severely undercapitalized given its risk from the massive, one-sided bets of its customers on the EUR/CHF pair.  Likewise, Defendants bragged about FXCM's effective "risk management" when, in reality, it was virtually non-existent.  Thus, both market analysts and investors were shocked by the devastating effects that the Swiss decoupling had on FXCM.  As one market analyst (Sandler O'Neill Partners) reported, it "had perceived FXCM's primarily agency based model as low risk, especially compared to peer retail FX broker Gain Capital (GCAP), who operate[d] a principal based model," and noted that, "high leverage [was] the likely culprit."  And, as *FX-Week*, the leading on-line publication serving the foreign exchange industry, summed up the winners and losers, the "SNB fallout highlights [the] danger of agency only models."

**The June 11, 2013, Conference**

75.    On June 11, 2013, at the start of the Class Period, the Individual Defendants attended an industry conference sponsored by JP Morgan.  At the conference, Defendant Niv made the following statements about the relative risks of the Company's "agency" business:

> The story of FXCM . . . it is not just a brokerage firm but also in our space we are the exchange to clearing house . . . .  ***And this is something that has led to actually a relatively low risk model and a model that is much more stable and much more scalable and mostly perfect.***

Defendant Lande added:

I won't go through this a lot.  As Drew talked about, we are an agency model, but we are very thoughtful about risks and the company contains risks in a variety of spots in very tangible ways.

[Emphasis added].

### The September 11, 2013, Conference

76.     On September 11, 2013, Defendant Lande attended an industry conference sponsored by Barclays.  At the conference, Defendant Lande made the following statements:

*And we also put out a lot of research every day.  FX is an interesting market where we put out tons of pieces in a variety of languages*.  One of our big strengths in China for instance is that we put out a lot of real time research in Chinese which is not something that they are used to seeing.

* * *

*So we have a very in our view low-risk business model.  We're not taking principal risk.  We have a technology platform that has been developed that's very tried and true.*  We do 450,000 to 500,000 trades a day so that's not dissimilar to what TD Ameritrade would do in a day except that we do not have the whole national infrastructure that an equity broker has.

* * *

[W]e stream quotes.  If the best quote at any given time is from let's say UBS you act on that trade, you go long Australian dollars – we hit UBS, we hit you, *we monitor you three times a second that you have enough margin in your account*, and we now have a position sitting open at UBS in Australian dollars if that's what you were doing.

*And like I said before, we think that this model is somewhat unique, being able to stream and act as an agency player.  It aligns ourselves better with our customers.  And if you're a larger customer trading algorithmically as they often do we do disproportionately very well with larger customers* who in the end, a principal-based competitor – if you're a customer doing very well with them they will figure out at some point "Oh yes," get you off their system, widen out spreads or do something because they only make money if you lose money.

*And so we in the end often do very well with these larger – and there are people who trade FX in a very large way.  These larger retail foreign exchange clients almost always end up coming to us in the end.  And we encourage algorithms*

27

*and have all sorts of connectivity for them.  So that's a function of our business model*.

*And like I said before, our technology we think gives us a powerful competitive advantage*.  This is not something that would be easily replicable.  About 30% of our payroll is in IT every year.  We devote a lot of effort in making sure the system is reliable, and keep in mind this is a 24-hour market.  And so as it happens, if there's an earthquake in Japan at 2:00 in the morning you can have an explosion of volume.  So it's very important that the system works, does not crash and we've been very successful in that.

\* \* \*

*Any kind of volatility in the market is all good for FXCM because FX traders tend to engage when there's volatility as opposed to equity traders who tend to disengage.  They do seek this.  In the absence of interest rates volatility is really the other thing that makes things interesting for FX traders.  And so all of this is something that we would benefit from*.

So the stock is up a lot this year in part because of great financial results, but a lot of people now have been attracted to the story that if you're worried a little bit about what might happen in the next year, two years in terms of the environment, *FXCM is a beneficiary of almost any kind of the darker scenarios that you would conjure up for the world.  This is just going to be very positive for currency volatilities*.

[Emphasis added].

### The November 19, 2013, Conference

77.    On November 19, 2013, Defendant Niv attended an industry conference sponsored by KBW Securities.  At the conference Defendant Niv made the following statements:

So investment themes for FXCM is as one.  We are an agency FX player, meaning that we stream 16 quotes from market makers to you, and we just take a markup on that.  Tends to be around $90 to $100 per million on average.  And we just make our money on the volume.  That's different from most of our competitors, who are principal-based competitors.  And so they're taking the other side of the trade, and deciding whether they want to offset that trade or not, based on their own risk parameters.

\* \* \*

And, like I said before, we think that this model is somewhat unique, being able to stream and act as an agency player.  It aligns ourselves better with our customers.

28

And if you are a larger customer trading algorithmically, as they often do, we do disproportionately very well with larger customers.

\* \* \*

Management team has been involved in the Company since founding.  Lots of people have been there since the beginning.  Management owns a huge stake in the Company.  ***So I think you would find that at FXCM, you're very much aligned with management in terms of incentive, and that they are good guardians of risk and likewise of capital.***

[Emphasis added].

78.     The statements above were materially false and misleading because:

(a) The so-called "agency" trading model which FXCM used was, in fact, far riskier than a "principal" model, particularly in light of Defendants' practice of allowing customers massive amounts of leverage and its policy of forgiving customer debit balances;

(b) The Company's research department, in fact, increased and concentrated FXCM's customers' one-sided risks through their strategy recommendations;

(c) The "algorithmic" trading for FXCM's largest customers, which the Company enabled, further increased the risks that fast-moving price changes would accelerate out of control, and overwhelm the Company's ability to effectively close out negative accounts;

(d) Contrary to the statements suggesting the Company had meaningful risk controls, and that Defendants were "good guardians of risk" and capital, FXCM had no independent risk management department, risk protocols or controls.  Instead, decisions to increase the financial exposure of the firm were made by Defendant Niv and the "Dealing Desk," the traders, whose interests conflicted with controlling the Company's risks;

(e) Contrary to Lande's statements, "any kind of volatility" was not beneficial to the Company.  Under a model whose only mechanism for avoiding highly leveraged customer trading losses was to quickly close out negative margin accounts, excessive volatility increased the likelihood of catastrophic losses on the part of FXCM; and

(f) In fact, "darker scenarios" which often led to interference by governments in their currency, increased the likelihood of catastrophic losses on the part of FXCM.

**FXCM's 2013 Annual Form 10-K Filed March 17, 2014**

79.     In filings with the SEC, the Company consistently and falsely touted the "low risk" benefits of its "agency" model and the capabilities of its technology platform and risk management to reduce risk.  For example, the Company's Form 10-K filed with the SEC on March 17, 2014, and signed by the Individual Defendants, contained the following statements:

**Business Overview**

We are an online provider of foreign exchange ("FX") trading and related services to approximately 183,679 active retail customers globally.   We offer our customers access to over-the-counter ("OTC") FX markets through our proprietary technology platform.  In an FX trade, a participant buys one currency and simultaneously sells another, a combination known as a "currency pair."  Our platform seeks to present our FX customers with the best price quotations on up to 59 currency pairs from up to 35 global banks, financial institutions and market makers, or FX market makers, which we believe provides our customers with an efficient and cost-effective way to trade FX.

***We primarily offer our customers what is referred to as an agency model to execute their trades.  Our agency model is fundamental to our core business philosophy because we believe that it aligns our interests with those of our customers and reduces our risks***.  In the agency model, when our customer executes a trade on the best price quotation offered by our FX market makers, we act as a credit intermediary, or riskless principal, simultaneously entering into offsetting trades with both the customer and the FX market maker.  We earn

30

trading fees and commissions by adding a markup to the price provided by the FX market makers.

\* \* \*

**Our Trading Systems**

We offer a number of trading systems, all of which are supported by our sophisticated, proprietary technology infrastructure.  Our technology tracks the balances, positions, profits and losses and margin levels for all account holders in real time.  ***The back office system's real time margin-watcher feature automatically closes out open positions if a customer's account is at risk of going into a negative balance as a result of a trading position losing value and reaching the minimum margin threshold***.

\* \* \*

**Risk management**

***We primarily utilize what is commonly referred to as an agency model***, which we have been offering to customers since July 2007. We have continued to invest in our agency platform, adding additional FX market makers, improving execution and adding features to enhance the trading experience of our customers ***and believe that our commitment to the agency model is one example of our core business philosophy to reduce risks.*** In our agency model, when a customer executes a trade with us, we act as a credit intermediary, or riskless principal, simultaneously entering into trades with the customer and the FX market maker.

Our FX trading operations require a commitment of our capital and involve risk of loss due to the potential failure of our customers to perform their obligations under these transactions. ***In order to minimize the incidence of a customer's losses exceeding the amount of cash in their account, which we refer to as negative equity, we require that each trade must be collateralized in accordance with our collateral risk management policies***. Each customer is required to have minimum funds in their account for opening positions, referred to as the initial margin, and for maintaining positions, referred to as maintenance margin, depending on the currency pair being traded. Margin requirements are expressed as a percentage of the customer's total position in that currency, and the customer's total margin requirement is based on the aggregated margin requirement across all of the positions that a customer holds at any time. Each net position in a particular currency pair is margined separately. Because we do not net across different currency pairs, ***we believe we produce a fairly conservative margin policy. Our systems automatically monitor each customer's margin requirements in real-time and we confirm that each of our customers has sufficient cash collateral in their account before we execute their trades. If at any point in time a customer's trading position does not comply with the***

31

*applicable margin requirement because our predetermined liquidation thresholds have been exceeded, the position will be automatically liquidated in accordance with our margin policies and procedures documented in our customer agreement. We believe this policy protects both us and the customer. We believe that as a result of implementing real-time margining and liquidation processing, the incidence of customer negative equity has been insignificant.*

\* \* \*

*Regulatory capital risk*

Various domestic and foreign government bodies and self-regulatory organizations responsible for overseeing our business activities require that we maintain specified minimum levels of regulatory capital in our operating subsidiaries. If not properly monitored or adjusted, our regulatory capital levels could fall below the required minimum amounts set by our regulators, which could expose us to various sanctions ranging from fines and censure to the imposition of partial or complete restrictions on our ability to conduct business. To mitigate this risk, we continuously evaluate the levels of regulatory capital at each of our operating subsidiaries and adjust the amounts of regulatory capital in each operating subsidiary as necessary to ensure compliance with all regulatory capital requirements. These may increase or decrease as required by regulatory authorities from time to time. *We also maintain excess regulatory capital to provide liquidity during periods of unusual or unforeseen market volatility, and we intend to continue to follow this policy.* In addition, we monitor regulatory developments regarding capital requirements to be prepared for increases in the required minimum levels of regulatory capital that may occur from time to time in the future. As of December 31, 2013, we had $82.5 million in regulatory capital requirements in the aggregate at our regulated subsidiaries and $301.5 million of capital on a consolidated basis.

[Emphasis added].

80.    These statements were materially false and misleading because:

(a) The so-called "agency" model which FXCM used was, in fact, far riskier than a "principal" model, particularly in light of Defendants' practice of allowing customers massive amounts of leverage and its policy of forgiving customer debit balances;

(b) Contrary to the statements suggesting the Company had meaningful risk controls, in fact, FXCM had virtually none.  Instead, decisions to increase the financial

32

exposure of the firm were made by Niv and traders whose interests conflicted with controlling its risks.  As a result, margin collateral levels were set to maximize sales rather than in accordance with "collateral risk management policies," and Defendants well knew that the result was not a "fairly conservative margin policy"; and

(c)  In fact, the capital the Company maintained was not adequate to cover the massive risks the Defendants were taking, particularly in those countries which permitted massive amounts of leverage.

81.    The "Risk Factors" included in the Form 10-K misrepresented that the Company had risk management policies, procedures and practices, and downplayed or wholly concealed its known risks, including for the EUR/CHF pair:

> ***Our risk management policies and procedures may not be effective and may leave us exposed to unidentified or unexpected risks.***
>
> ***We are dependent on our risk management policies and the adherence to such policies by our trading staff.  Our policies, procedures and practices are used to identify, monitor and control a variety of risks, including risks related to market exposure, human error, customer defaults, market movements, fraud and money-laundering.  Some of our methods for managing risk are discretionary by nature and are based on internally developed controls and observed historical market behavior, and also involve reliance on standard industry practices***.  These methods may not adequately prevent losses, particularly as they relate to extreme market movements, which may be significantly greater than historical changes in market prices.  Our risk management methods also may not adequately prevent losses due to technical errors if our testing and quality control practices are not effective in preventing software or hardware failures.   In addition, we may elect to adjust our risk management policies to allow for an increase in risk tolerance, which could expose us to the risk of greater losses.  ***Our risk management methods rely on a combination of technical and human controls and supervision*** that are subject to error and failure.  These methods may not protect us against all risks or may protect us less than anticipated, in which case our business, financial condition and results of operations and cash flows may be materially adversely affected.

\* \* \*

*We are dependent on FX market makers to continually provide us with FX market liquidity.  In the event we lose access to current prices and liquidity levels, we may be unable to provide competitive FX trading services, which will materially adversely affect our business, financial condition and results of operations and cash flows.*

We rely on third party financial institutions to provide us with FX market liquidity.  These FX market makers, although under contract with us, have no obligation to provide us with liquidity and may terminate our arrangements at any time.  We also rely upon these FX market makers to provide us with competitive FX pricing which we can pass on to our customers.  In the event we lose access to the competitive FX pricing and/or liquidity levels that we currently have, we may be unable to provide competitive FX trading services, which will materially adversely affect our business, financial condition and results of operations and cash flows.  When we act as a riskless principal between our customers and our FX market makers, we provide our customers with the best bid and offer price for each currency pair from our FX market makers plus a fixed markup.  When a customer places a trade and opens a position, we act as the counterparty to that trade and our system immediately opens a trade between us and the FX market maker who provided the price that the customer selected.  In the event that an offsetting trade fails, we could incur losses resulting from our trade with our customer.

*In addition, whether as a result of exceptional volatility or situations affecting the market, the absence of competitive pricing from FX market makers and/or the suspension of liquidity would expose us to the risk of a default by the customer and consequently, trading losses.  Although our margining practices are designed to mitigate this risk, we may be unable to close out customer positions at a level where margin posted by the customer is sufficient to cover the customer's losses.  As a result, a customer may suffer losses greater than any margin or other funds or assets posted by that customer or held by us on behalf of that customer.  Our policy is generally not to pursue claims for negative equity against our customers.*

[Emphasis added].

82.     These statements were materially false and misleading, and omitted facts necessary to make the statements not misleading because:

> (a) In fact, FXCM had no risk management department, policies, practices or procedures to identify, monitor or control risks;

(b) FXCM's methods "for managing risk" were entirely in the discretion of Niv and the Dealing Desk and were inconsistent with those followed by FXCM's principal competitors, including with respect to increasing margin collateral in the face of known, potentially catastrophic, trading risks;

(c) There were no functioning technical or human controls or supervision with respect to FXCM's risk;

(d) Defendants concealed the enormous risks that they were knowingly assuming in connection with the EUR/CHF pair including that liquidity would likely be suspended if the SNB removed the cap on its currency; and

(e) FXCM's margin requirements were not designed to mitigate risk but instead to increase sales without regard to the catastrophic risks the excessive leverage entailed.

83.     On August 7, 2014, the Individual Defendants held a conference call with analysts to discuss the Company's second quarter 2014 results.  During the call, Defendant Niv made the following statement:

> ***As an agency-model broker, we are not exposed to these levels of market risks***, which are forcing many firms to exit the industry, presenting opportunities for FXCM. As we've said in prior quarters, we do not assume that market conditions will improve. Instead, ***we focus on what makes sense in this environment***; cost controls and opportunities to gain market share organically via new product introductions and through acquisitions of other brokers. ***When volatility does return, and we believe that it never really will, FXCM will be well positioned to prosper for this as we have demonstrated in the past***.

[Emphasis added].

84.     These statements were materially false and misleading because:

(a) The so-called "agency" trading model which FXCM used entailed significant "market risks," because FXCM would likely absorb the bulk of its customers'

trading losses when market prices changed quickly and severely.  This was a risk inherent in the "agency" model, particularly when it was coupled with FXCM's practice of permitting its customers high levels of margin, allowing massive one-sided bets in currencies whose price had been set by government action instead of based on its market value, and where it was FXCM's practice to forgive its customers' negative accounts;

(b) FXCM's practices with respect to its gamble on the EUR/CHF pair clearly made "no sense" given the factors described above, and the warnings of its officers; and

(c) The wholly foreseeable and excessive "volatility" of the EUR/CHF pricing led to FXCM's insolvency, rather than its "prosperity."

**The September 10, 2014, Conference**

85.    On September 10, 2014, Defendant Niv attended an industry conference sponsored by Barclay's.  At the conference Niv made the following statements:

> To show you here a little bit about our growth – this is our customer equity in millions.  FXCM is about a little over five times bigger than what it was in 2008 when it had record earnings **because obviously we do well when volatility is high**.
>
> * * *
>
> **So in sum, it has been since July of last year a historically record depressed trading environment, and – but yet we've been able to continue to grow customer equity, which is I think a testimony to, in particular, that we get larger customers at FXCM than most of our competitors.  Being really the only agency provider of retail foreign exchange – ultimately, if you're a large sophisticated foreign exchange trader, you're probably going to end up at FXCM because of the strength of the agency offering that we have.**

[Emphasis added].

86.    By September 10, 2014, retail customers were flocking to FXCM not because of its so-called "agency model," but because of its reckless practices of permitting massive amounts

of leverage (and forgiving negative balances in customer accounts), even as its competitors, such as Gain Capital and Saxo Bank, were increasing the levels of margin collateral required as the increasing risks of the EUR/CHF pair became apparent.   As CW1 explained, this was particularly apparent to the large sophisticated traders in Europe.   And, by this time, Niv was fully aware of the catastrophic risks that the foreseeable "high volatility" in the EUR/CHF pair entailed, so that it was "obvious" that, in fact, FXCM would not do well if the SNB lifted the cap – all of which Niv omitted from his comments at the Barclay's conference, and which was needed to be disclosed to make his comments not misleading to investors.

87.   A November 12, 2014, article by *BloombergBusiness* quoted comments from an interview with Defendant Niv in which Niv fostered the materially misleading impression that FXCM was not providing excessive leverage to its customers.   The *BloombergBusiness* reporter ascribed the following statement to Niv:

> "Leverage is the enemy; don't overleverage." . . . He [Niv] recommends using no more than 10:1 leverage.  Most clients, he says, use 15:1, and some use much more.

88.   The statements above misled investors about the massive amounts of leverage that FXCM routinely provided to its large customers and concealed the extraordinary risks to FXCM that these practices entailed, including with respect to the EUR/CHF pair.

89.   On November 7, 2014, Defendants filed the Company's third quarter 2014 Form 10-Q, which included the following false and/or misleading statements:

**Credit risk**

Credit risk is the risk that a borrower or counterparty will fail to meet their obligations.   We are exposed to credit risk from our retail and institutional customers as well as institutional counterparties.

All retail customers are required to deposit cash collateral in order to trade on our platforms.   Our policy is that retail customers are not advanced credit in excess of

the cash collateral in their account and our systems are designed so that each customer's positions are revalued on a real-time basis to calculate the customer's usable margin.  Usable margin is the cash the customer holds in the account after adding or deducting real-time gains or losses, less the margin requirements.  ***The retail customer's positions are automatically closed once his or her usable margin falls to zero.  Exposure to credit risk from customers is therefore minimal.  While it is possible for a retail customer account to go negative in rare circumstances, for example, due to system failure, a final stop loss on the account is automatically triggered which will execute the closing of all positions.  For the nine months ended September 30, 2014 and 2013, our credit exposure was $0.3 million and $1.5 million, respectively, as a result of customer accounts that had gone negative.***

\* \* \*

*Market risk*

Market risk is the risk of losses in on- and off-balance sheet positions arising from movements in market prices.  Generally, we incur market risk as a result of trading in our retail business, Lucid and V3.  ***As we predominantly operate our retail business on an agency model with the exception of certain trades of our CFD customers we are not exposed to the market risk of a position moving up or down in value.***  As of September 30, 2014, our net unhedged exposure to CFD customer positions was a 4.4% of total assets.  A 10% change in the value of our unhedged CFD positions as of September 30, 2014 would result in a $10.6 million decrease in pre-tax income.

\* \* \*

*Liquidity risk*

In normal conditions, our business of providing online FX trading and related services is self-financing as we generate sufficient cash flows to pay our expenses as they become due.  ***As a result, we generally do not face the risk that we will be unable to raise cash quickly enough to meet our payment obligations as they arise.***  Our cash flows, however, are influenced by customer trading volume and the income we derive on that volume.  These factors are directly impacted by domestic and international market and economic conditions that are beyond our control.  ***In an effort to manage this risk, we maintain a substantial pool of liquidity.***  As of September 30, 2014, cash and cash equivalents, excluding cash and cash equivalents held for customers, were 13.7% of total assets.

*Operational risk*

Our operations are subject to various risks resulting from technological interruptions, failures, or capacity constraints in addition to risks involving human

error or misconduct.  Regarding technological risks, we are heavily dependent on the capacity and reliability of computer and communications systems supporting our operations.  We have established a program to monitor our computer systems, platforms and related technologies and to address issues that arise promptly.  We have also established disaster recovery facilities in strategic locations to ensure that we can continue to operate with limited interruptions in the event that our primary systems are damaged.  ***As with our technological systems, we have established policies and procedures designed to monitor and prevent both human errors, such as clerical mistakes and incorrectly placed trades, as well as human misconduct, such as unauthorized trading, fraud, and negligence***.  In addition, we seek to mitigate the impact of any operational issues by maintaining insurance coverage for various contingencies.

***Regulatory capital risk***

Various domestic and foreign government bodies and self-regulatory organizations responsible for overseeing our business activities require that we maintain specified minimum levels of regulatory capital in our operating subsidiaries.  ***If not properly monitored or adjusted, our regulatory capital levels could fall below the required minimum amounts set by our regulators, which could expose us to various sanctions ranging from fines and censure to the imposition of partial or complete restrictions on our ability to conduct business. To mitigate this risk, we continuously evaluate the levels of regulatory capital at each of our operating subsidiaries and adjust the amounts of regulatory capital in each operating subsidiary as necessary to ensure compliance with all regulatory capital requirements***.  These may increase or decrease as required by regulatory authorities from time to time.  ***We also maintain excess regulatory capital to provide liquidity during periods of unusual or unforeseen market volatility, and we intend to continue to follow this policy***.  In addition, we monitor regulatory developments regarding capital requirements to be prepared for increases in the required minimum levels of regulatory capital that may occur from time to time in the future.  As of September 30, 2014, we had $92.3 million in regulatory capital requirements at our regulated subsidiaries and $288.8 million of capital on a consolidated basis.

[Emphasis added].

90.      In addition, Defendants represented in this report that, apart from certain changes not relevant here, "there have been no material changes in the Company's risk factors from those disclosed in its Annual Report on Form 10-K."

91.      The statements above were materially false and misleading, and omitted facts necessary to make them not misleading, for the following reasons:

(a) In fact, Defendants had knowingly assumed catastrophic and foreseeable credit, liquidity, operational and regulatory capital risks in connection with the Company's one-sided, highly leveraged billion dollar bet on the EUR/CHF pair, and failed to disclose these risks in the Form 10-Q;

(b) Exposure to credit risk was not "minimal" because of FXCM's policy to provide enormous leverage and to forgive customer negative balances, its absence of risk management procedures and controls that permitted the massive one-sided billion dollar bet on the EUR/CHF pair, its promotion of the one-sided massive EUR/CHF bets through its research reports, and the exaggeration of its intra-day losses through its algorithmic trading;

(c) FXCM effectively assumed the downside market risks of its customers because of the practices described in (b) above;

(d) FXCM lacked any operational policies and procedures to monitor and prevent the reckless trading in the EUR/CHF pair;

(e) FXCM's capital was grossly inadequate for the reckless risks it was taking for the EUR/CHF pair; and

(f) In fact, FXCM's known risks had increased dramatically since the filing of the 2013 Form 10-K, as retail customers flocked to FXCM from its competitors, Gain Capital and Saxo Bank, for its massive and unchanged leverage allowed on the EUR/CHF pair.

**The Fog Begins to Lift and the Truth is Revealed**

92.     On January 15, 2015, the SNB announced that it was ending a policy in place since 2011 which capped the Swiss franc-euro exchange rate at 1.20 euros to the Swiss franc and

allowed the franc to trade freely against the euro. The franc jumped as much as 41% against the euro, and closed at a price about 14% higher than the previous day.

93.     After hours on January 15, 2015, the Company announced that – despite its vaunted agency model which supposedly insulated it from counterparty risk – the Company's customers had suffered cumulative losses of $225 million as a result of the aftermath of the announcement by the SNB, and that the Company was in danger of not meeting its regulatory capital requirements.

94.     On January 16, 2015, the Company announced that it had been extended a $300 million loan by Leucadia National Corp. in order to stave off the regulatory default and possible bankruptcy facing the Company.  The terms of the loan were described by Sandler O'Neill Research analyst, Richard Repetto, as "highly punitive" and wiped out nearly all shareholder value in the Company.  Trading of the Company's stock was suspended.

95.     Trading of FXCM stock resumed on January 20, 2015.  That day, the stock price closed at $1.60, down from a close of $14.87 on January 14, 2015.  In all, Company stock dropped **_over 90%_** in three trading days.

96.     The events of January 15 and 16 disclosed the truth about the true and foreseeable risks of FXCM's "agency model," lack of risk management and other reckless practices with respect to permitting its customers to take $1 billion in one-sided positions on a currency whose price was dependent on policy decisions of a central bank, rather than market forces.

97.     Prior to January 15, 2015, the market had been misled by Defendants' misrepresentations about the risks of FXCM's "agency model."  This is apparent from the comments of market analyst Sandler O'Neill Partners, which, on January 16, 2015, reported that it "had perceived FXCM's primarily agency based model as low risk, especially compared to

peer retail FX broker Gain Capital (GCAP), who operate[d] a principal based model."  Sandler O'Neill further reported that "high leverage [was] the likely culprit," and that they had been informed that "FXCM offered clients leverage of 50x (often the standard in the UK for EUR/CHF trades").

98.     On January 20, 2015, David Evans of *Bloomberg Business*, in an article entitled, "How Swiss Shock Humbled King of Leveraged Currency Trading," reported that FXCM's reversal of fortune "has laid bare the risks Niv's firm and its more than 230,000 customers were taking."   That article also quoted from an earlier interview that Evans had had with Niv, suggesting that Niv had been fully aware of the risks.  As Evans reported:

> "Leverage is the enemy," Niv said in on interview with Bloomberg News in May 2014.  "The big move, it's what kills you."
>
> Well, the big move just arrived, via Zurich.  The Swiss central bank's decision to let its national currency float freely against the euro has blown a $225-million hole in FXCM and left Niv, its chief executive, struggling to contain the damage. Turns out, the leverage he'd warned of just eight months ago magnified his customers' bets by as much as 200-to-1.

99.     On February 3, 2015, *FX-Week* posted an article on-line to its foreign exchange customers entitled, "SNB Fallout Highlights Danger of Agency Only Models."  As *FX-Week* reported:

> The diverging fortunes of retail brokers in the wake of the Swiss National Bank's (SNB) decision to remove its EUR/CHF currency floor on January 15 appear to be largely due to whether a company operates an agency or principal execution model.  Brokers relying on agency only models have suffered steep losses and in some cases, such as FXCM's, there were emergency cash injections.  In contrast, principal brokers that act as counterparties to client trades came out of the shock event with flying colours and suffered zero or very small losses.

## ADDITIONAL EVIDENCE OF SCIENTER

100.    In addition to the allegations *above* of Defendants' scienter, there exists further evidence that, when taken together, demonstrates that Defendants acted with the requisite level of scienter.

## Defendant Lande Engages in Insider Trading

101.    To begin with, Defendant Lande engaged in insider trading during the Class Period.  Between August 9 and August 13, 2013 (following his remarks at the JP Morgan conference), Lande sold a staggering 147,500 shares for a total profit of $2,610,837.  One month later, he sold another 37,500 shares for a profit of $708,000 – the day after speaking at the Barclay's conference.  In roughly one month, therefore – as he repeatedly and falsely assured investors about the "low risk" of FXCM's "agency model" – Lande made ***$3,318,837 from insider sales***.

102.    Notably, Lande has made only ***one other sale in his tenure at FXCM***:  of 68 shares in December 2015.  Therefore, his August/September 2013 sales were clearly out of place when considered with his sales at all other times.

103.    Furthermore, those sales constituted large percentages of his total holdings.  In August, he sold ***70% of his holdings in one day***.  Three days later, he sold ***62% of his holdings***.  One month later, in September 2013, he sold 61% of his holdings.  His only other stock sale (the December 2015 sale of 68 shares), represents a mere 0.5% change in ownership.  The below chart illustrates the unusual nature of his Class Period sales:

**All Sales by Defendant Lande:**

| Sale Date | Number of Shares Sold | Price | Change in Ownership |
|---|---|---|---|
| 8/9/2013 | 81,250 | $17.41 | 70% |
| 8/12/2013 | 56,250 | $17.90 | 62% |
| 8/13/2013 | 10,000 | $18.94 | 29.2% |
| 9/12/2013 | 37,500 | $18.88 | 60.7% |
| 12/21/2015 | 68 | $1.18 | 0.5% |

**<u>Non-Defendant Insiders' Sales Provide Further Evidence of Scienter</u>**

104.     Additionally, the fact that, during the Class Period, non-Defendant Company insiders benefitted personally and directly from the artificial inflation of FXCM stock by selling shares contributes to the strong inference of scienter.

105.     Eduard Yusupov was a co-founder of FXCM and the Global Head of Dealing at the Company during the Class Period.  In the end of November 2014, just after the filing of the misleading Form 10-Q for 3Q2014, Mr. Yusupov sold a total of $1.5 million in shares.

106.     In fact, by November 26, 2014, Mr. Yusupov had sold 100% of his FXCM stock then owned by him.

107.     Notably, Mr. Yusupov had never made a single sale of FXCM stock prior to November 2014.

108.     At the same time, FXCM's original co-founder, Director and Chief Dealer William Ahdout, launched into a spree of insider trading during the Class Period.  At numerous times between March 11, 2013 and December 16, 2014, he sold large amounts of stock.  In many instances, he converted special holding units into regular FXCM Class A common stock to effect the sales.

109.     For example, in August 2013, two weeks after Lande was making his insider sales, Mr. Ahdout sold a total of 300,000 shares of FXCM stock for ***$5,768,640.00.***

110.     In fact, on one day (December 13, 2013) during the Class Period, Mr. Ahdout sold 190,800 shares for a total of $**3,039,124.56**.   This represented a total sale of **100% of his holdings**.

111.     In November 2014, coinciding with Mr. Yusupov's sales, Mr. Ahdout converted 50,000 shares to sell them for more than $800,000.

112.     All told, between March 11, 2013, and December 16, 2014, Mr. Ahdout sold a total of **$14,123,627.64** in FXCM shares.

**Share Repurchase Program**

113.     The Individual Defendants also stood to profit from a share repurchase program that the Company launched in 2011 but increased significantly during the Class Period.   In November 2014, touting the Company's strong balance sheet and cash in "excess" of its regulatory requirements, Defendants recommended to the Board of Directors (which approved) a significant ($50 million) increase in the stock repurchase program for an aggregate of $130 million.

114.     Therefore, by keeping the price of the shares high, Individual Defendants anticipated cashing in on their shares for an increased price, though the sudden SNB decoupling of its currency and the confiscatory sales to Leucadia interfered with that plan.

**CLASS ACTION ALLEGATIONS**

115.     Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a class consisting of all those who purchased or otherwise acquired FXCM common stock during the Class Period (the "Class") and were damaged thereby.   Excluded from the Class are Defendants, the directors and officers of the Company, at all relevant times, members of their immediate families and their legal

representatives, heirs, successors, or assigns, and any entity in which Defendants have or had a controlling interest.

116.    The members of the Class are so numerous that joinder of all members is impracticable.   Throughout the Class Period, FXCM securities were actively traded on the NYSE.   While the exact number of Class members is unknown to Plaintiff at this time and can be ascertained only through appropriate discovery, Plaintiff believes that there are thousands of members in the proposed Class.   Record owners and other members of the Class may be identified from records maintained by FXCM or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

117.    Plaintiff's claims are typical of the claims of the members of the Class, as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

118.    Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation. Plaintiff has no interests antagonistic to or in conflict with those of the Class.

119.    Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.   Among the questions of law and fact common to the Class are:

(a)     whether the federal securities laws were violated by Defendants' acts as alleged herein;

(b)      whether statements made by Defendants to the investing public during the Class Period omitted and/or misrepresented material facts about the business, operations, and management of FXCM;

(c)      whether the price of FXCM common stock was artificially inflated during the Class Period; and

(d)      to what extent the members of the Class have sustained damages and the proper measure of damages.

120.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy, since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in managing this action as a class action.

## LOSS CAUSATION

121.    Defendants' wrongful conduct, as alleged herein, directly and proximately caused the economic loss suffered by Plaintiff and the Class.

122.    During the Class Period, Plaintiff and the Class purchased FXCM securities at artificially inflated prices.  When the misrepresentations that had been made to the market, the information alleged herein to have been concealed from the market, and/or the effects thereof were revealed, the price of the Company's securities significantly declined, causing investors' losses.

## APPLICATION OF PRESUMPTION OF RELIANCE
## (FRAUD-ON-THE-MARKET DOCTRINE)

123.    The market for FXCM securities was open, well developed, and efficient at all relevant times.  As a result of the materially false and/or misleading statements and/or failures to disclose, FXCM securities traded at artificially inflated prices during the Class Period.  Plaintiff and other members of the Class purchased or otherwise acquired the Company's securities, relying upon the integrity of the market price of FXCM securities and the market information relating to FXCM, and have been damaged thereby.

124.    During the Class Period, the artificial inflation of FXCM stock was caused by the material misrepresentations and/or omissions particularized in this Complaint, causing the damages sustained by Plaintiff and other members of the Class.  As described herein, during the Class Period, Defendants made or caused to be made a series of materially false and/or misleading statements about FXCM's business, operations, and financial prospects. These material misstatements and/or omissions created an unrealistically positive assessment of FXCM and its business, financial condition and risks, thus causing the price of the Company's securities to be artificially inflated at all relevant times and, when disclosed, negatively affected the value of the Company stock. Defendants' materially false and/or misleading statements during the Class Period resulted in Plaintiff and other members of the Class purchasing the Company's securities at such artificially inflated prices, and after the truth was revealed, each of them was damaged as a result.

125.    At all relevant times, the market for FXCM securities was an efficient market for the following reasons, among others:

(a)    FXCM stock met the requirements for listing and was listed and actively traded on the NYSE, a highly efficient and automated market;

48

(b)     As a regulated issuer, FXCM filed periodic public reports with the SEC and/or the NYSE;

(c)     FXCM regularly communicated with public investors via established market communication mechanisms, including through regular dissemination of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and

(d)     FXCM was followed by securities analysts employed by brokerage firms who wrote reports about the Company, and these reports were distributed to the sales force and certain customers of their respective brokerage firms.  Each of these reports was publicly available and entered the public marketplace.

126.    As a result of the foregoing, the market for FXCM securities promptly digested current information regarding FXCM from all publicly available sources and reflected such information in FXCM's stock price.   Under these circumstances, all purchasers of FXCM securities during the Class Period suffered similar injury through their purchase of FXCM securities at artificially inflated prices, and a presumption of reliance applies.

## NO SAFE HARBOR

127.    The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this Complaint. The statements alleged to be false and misleading herein all relate to then-existing facts and conditions.   In addition, to the extent certain of the statements alleged to be false may be characterized as forward looking, they were not identified as "forward-looking statements" when made and there were no meaningful cautionary statements identifying important factors that

could cause actual results to differ materially from those in the purportedly forward-looking statements.  In the alternative, to the extent that the statutory safe harbor is determined to apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the speaker had actual knowledge, or was reckless in not knowing, that the forward-looking statement was materially false or misleading, and/or the forward-looking statement was authorized or approved by an executive officer of FXCM who knew, or was reckless in not knowing, that the statement was false when made.

## COUNT I

### Violation of Section 10(b) of the Exchange Act and Rule 10b-5 Promulgated Thereunder Against All Defendants

128.    Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

129.    During the Class Period, Defendants carried out a plan, scheme, and course of conduct which was intended to and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiff and other Class members, as alleged herein; and (ii) cause Plaintiff and other members of the Class to purchase FXCM securities at artificially inflated prices.   In furtherance of this unlawful scheme, plan, and course of conduct, the Individual Defendants, and each of them, took the actions set forth herein.

130.    The Defendants: (i) employed devices, schemes, and artifices to defraud; (ii) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (iii) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the Company's securities in an effort to maintain artificially high market prices for FXCM securities in violation of Section 10(b) of the

Exchange Act and Rule 10b-5. The Individual Defendants are sued either as primary participants in the wrongful and illegal conduct charged herein or as controlling persons as alleged below.

131. The Defendants, individually and in concert, directly and indirectly, by the use, means, or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about FXCM's business, operations, and financial performance and prospects, as specified herein.

132. The Defendants employed devices, schemes, and artifices to defraud, while in possession of material adverse non-public information and engaged in acts, practices, and a course of conduct as alleged herein in an effort to assure investors of FXCM's value, performance, and continued substantial growth. These acts included the making of, or the participation in the making of, untrue statements of material facts and/or omitting to state material facts necessary in order to make the statements made about FXCM and its business operations and financial prospects, in light of the circumstances under which they were made, not misleading. As set forth more particularly herein, Defendants further engaged in transactions, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the Company's securities during the Class Period. Defendants had actual knowledge of the misrepresentations and/or omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose such facts, even though such facts were available to them. Defendants' material misrepresentations and/or omissions were done knowingly or recklessly and for the purpose and effect of concealing FXCM's financial condition from the investing public and supporting the artificially inflated price of its securities. As demonstrated by Defendants' misstatements and/or omissions

concerning the Company's business, operations, financial well-being, and prospects throughout the Class Period, Defendants, if they did not have actual knowledge of the misrepresentations and/or omissions alleged, were reckless in failing to obtain such knowledge by deliberately refraining from taking those steps necessary to discover whether those statements were false or misleading.

133.    As a result of the dissemination of the materially false and/or misleading information and/or failure to disclose material facts, as set forth above, the market price of FXCM securities was artificially inflated during the Class Period.  In ignorance of the fact that market prices of the Company's securities were artificially inflated, and relying directly or indirectly on the false and misleading statements made by Defendants, upon the integrity of the market in which the securities trade, and/or in the absence of material adverse information that was known to or recklessly disregarded by Defendants, but not disclosed in public statements by Defendants during the Class Period, Plaintiff and the other members of the Class acquired FXCM securities during the Class Period at artificially high prices and were damaged thereby.

134.    At the time of said misrepresentations and/or omissions, Plaintiff and other members of the Class were ignorant of their falsity and believed them to be true.  Had Plaintiff and the other members of the Class and the marketplace known the truth regarding FXCM and its business and prospects, which was not disclosed by the Defendants, Plaintiff and other members of the Class would not have purchased or otherwise acquired their FXCM securities, or, if they had acquired such securities during the Class Period, they would not have done so at the artificially inflated prices which they paid.

135.    By virtue of the foregoing, Defendants have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

136.    As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their respective purchases and sales of the Company's securities during the Class Period.

## COUNT II

### Violation of Section 20(a) of the Exchange Act
### Against the Individual Defendants

137.    Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

138.    The Individual Defendants acted as controlling persons of FXCM within the meaning of Section 20(a) of the Exchange Act as alleged herein.  By virtue of their high-level positions, ownership, and contractual rights, participation in and/or awareness of the Company's operations, and/or intimate knowledge of the false statements filed by the Company with the SEC and disseminated to the investing public, the Individual Defendants had the power to influence and control, and did influence and control, directly or indirectly, the decision making of the Company, including the content and dissemination of the various statements which Plaintiff contends are false and misleading.  The Individual Defendants were provided with or had unlimited access to copies of the Company's reports, press releases, public filings, and other statements alleged by Plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

139.    In particular, the Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Company and, therefore, are presumed to have had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.

53

140.    As set forth above, FXCM and the Individual Defendants violated Section 10(b) and Rule 10b-5 by their acts and/or omissions as alleged in this Complaint.  By virtue of their positions as controlling persons, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act.  As a direct and proximate result of the Individual Defendants' wrongful conduct, Plaintiff and other members of the Class suffered damages in connection with their purchases of the Company's securities during the Class Period.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff prays for relief and judgment, as follows:

A.    Determining that this action is a proper class action under Rule 23 of the Federal Rules of Civil Procedure, with Plaintiff serving as Class representative;

B.    Awarding compensatory damages in favor of Plaintiff and the other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

C.    Awarding Plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

D.    Such other and further relief as the Court may deem just and proper.

## JURY TRIAL DEMANDED

Plaintiff hereby demands a trial by jury.

Dated: January 11, 2016                    Respectfully submitted,

                                        **SCOTT+SCOTT, ATTORNEYS AT LAW, LLP**

                                        /s/ Beth A. Kaswan

Beth A. Kaswan
Deborah Clark-Weintraub
Thomas L. Laughlin
Donald A. Broggi
The Chrysler Building
405 Lexington Avenue, 40th Floor
New York, NY 10174
Telephone: 212-223-6444
Facsimile: 212-223-6334
bkaswan@scott-scott.com
dweintraub@scott-scott.com
tlaughlin@scott-scott.com
dbroggi@scott-scott.com

David R. Scott
Amanda F. Lawrence
**SCOTT+SCOTT, ATTORNEYS AT LAW, LLP**
156 South Main Street
P.O. Box 192
Colchester, CT  06415
Telephone:  (860) 537-5537
Facsimile:  (860) 537-4432
david.scott@scott-scott.com
alawrence@scott-scott.com

*Counsel for Plaintiff Retirement Board of the Policemen's Annuity and Benefit Fund of Chicago on Behalf of the Policemen's Annuity and Benefit Fund of Chicago*

## CERTIFICATE OF SERVICE

I hereby certify that on January 11, 2016, I caused the foregoing to be electronically filed with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the email addresses denoted on the Electronic Mail Notice List.

I certify under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed this 11th day of January, 2016, at New York, New York.

/s/ Beth A. Kaswan
Beth A. Kaswan
SCOTT+SCOTT, ATTORNEYS AT LAW, LLP
The Chrysler Building
405 Lexington Avenue, 40th Floor
New York, NY 10174
Telephone: 212-223-6444
Facsimile: 212-223-6334
bkaswan@scott-scott.com