UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------------------------X
RETIREMENT BOARD OF THE
POLICEMEN'S ANNUITY AND BENEFIT
FUND OF CHICAGO ON BEHALF OF THE
POLICEMEN'S ANNUITY AND BENEFIT
FUND OF CHICAGO, Individually and on
Behalf of All Others Similarly Situated,

                Plaintiff,                                              15-CV-3599 (KMW)
                                                                    **Opinion and Order**

-against-

FXCM INC., DROR NIV, and
ROBERT LANDE,

                Defendants.
----------------------------------------------------------X

KIMBA M. WOOD, United States District Judge:

       Plaintiff, Retirement Board of the Policemen's Annuity and Benefit Fund of Chicago, on Behalf of the Policemen's Annuity and Benefit Fund of Chicago, brings this putative class action against FXCM, Dror Niv, and Robert Lande (collectively "Defendants").

       Plaintiff asserts claims under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"). (Compl. ¶¶ 1, 128-140 [Doc. No. 50]). Plaintiff alleges that Defendants made materially false or misleading statements relating to FXCM's business model and risk management practices, and that these statements misled investors about the risky nature of FXCM's business, causing hundreds of millions of dollars in losses to class members.

       At its heart, this case is about FXCM's significant losses during an unpredictable market event. In 2011, the Swiss National Bank ("SNB") pegged the Swiss Franc to the Euro at 1.2:1, meaning that 1 Euro would be worth at least 1.2 Swiss Francs. *Id.* ¶ 11. On January 15, 2015, to

1

investors' great surprise, the SNB suddenly removed this peg; prices and liquidity changed rapidly as the value of the Swiss Franc rose in relation to the Euro. *Id.* ¶¶ 6-7.  As a result of this abrupt change in the SNB's policy, FXCM lost $275 million.  *Id.* ¶ 36.  Plaintiff attributes FXCM's loss to its allegedly risky business model and lack of a risk management department.  Plaintiff alleges that Defendants' statements regarding the riskless nature of FXCM's business model and its risk management controls were materially false or misleading.

Defendants have moved to dismiss the Complaint [Doc. No. 50] pursuant to the Private Securities Litigation Reform Act, 15 U.S.C. § 78u–4, and the Federal Rules of Civil Procedure 8(a), 9(b), and 12(b)(6).  Defendants attribute FXCM's large loss to the SNB's surprise decision, market dysfunction, and lack of liquidity. Although Plaintiff argues that this case is unrelated to the "timing" of the SNB's actions, Plaintiff's allegations suggest otherwise.  As set forth below, because Plaintiff failed to plead scienter with the requisite specificity, Defendants' Motion is GRANTED in its entirety.  Plaintiff is granted leave to re-plead its Complaint within thirty days of this decision.

## I. BACKGROUND

### A. The Parties

Plaintiff is an institutional investor that purchased FXCM common stock between June 11, 2013 and January 20, 2015, inclusive (the "Class Period").  (Compl. ¶¶ 1, 17).  Plaintiff brings this putative class action on behalf of all those who purchased or otherwise acquired FXCM stock during the Class Period and were damaged thereby.  *Id.* ¶ 115.

Defendant FXCM was one of the first currency brokerage firms to serve retail customers, and during the Class Period it was one of the largest retail foreign exchange ("FX") firms in the world. *Id.* ¶¶18, 23.  FXCM provides customers with trading and related services on its

sophisticated on-line technology platform. *Id.* ¶ 24.  Using its proprietary technology platform, FXCM facilitates billions of dollars of FX trades. *Id.* ¶ 2.  The company is headquartered in New York, NY, and its stock is traded on the New York Stock Exchange under the symbol "FXCM." *Id.* ¶18.  FXCM is structured as a holding company for operating subsidiaries in New York, the United Kingdom, Hong Kong, and other locations.[1] *Id.* ¶ 18.

Defendant Dror Niv is one of the founders of FXCM, and was CEO and Chairman of the Board of Directors during the Class Period. *Id.* ¶ 19.  Defendant Robert Lande is also one of the founders of FXCM, and was the company's CFO during the Class Period. *Id.* ¶ 20.

B. The FX Market and FXCM's Business Model

Participants in the FX market make bets on price fluctuations of various currency pairs, for example the Dollar versus the Euro or the Euro versus the Swiss Franc ("EUR/CHF"). *See id.* ¶ 25.  When a trader buys one currency, or trades "long," s/he simultaneously sells another. *Id.*  FXCM allowed customers to trade 59 currency pairs. *Id.* ¶¶ 24, 25.

Most retail brokers earn revenue on FX trades by taking the opposite sides of their customers' trades, thereby profiting when their customers suffer losses and suffering losses when their customers profit. *Id.* ¶ 27.  FXCM, in contrast, used what it called an "agency model" for its operations. *Id.*  When a customer wanted to trade a certain currency pair, FXCM would collect the best prices quoted by twelve to sixteen banks and financial institutions that served as liquidity providers—market makers for the trades placed by FXCM's customers. *Id.*  After the customer placed her/his trade with FXCM, FXCM would then serve as an intermediary by contracting with the liquidity provider on behalf of the customer. *Id.*; *see also* (Pl.'s Opp'n to Defs.' Mot. to Dismiss ("Pl.'s Opp'n") at 1, 7 [Doc. No. 59]).  FXCM made money through

---

[1] FXCM's operating subsidiaries are subject to the regulatory requirements of the countries in which they operate. (Compl. ¶¶ 18 [Doc. No. 50]).

3

commissions on trades, usually at a rate of $90 per million dollars traded. (Compl. ¶¶ 27-28). Thus, when the volume of customers' trades increased, so too did FXCM's revenues. *Id.* ¶ 28.

### C. Leverage and the No Debit Policy

In order to encourage trades, FXCM, like other brokers, allowed customers to trade with leverage, which essentially allows a customer to pay less than the full price for a trade. *Id.* ¶¶ 26-29. Customers could deposit money into their FXCM accounts, which served as their margin collateral, and trade on the FX market with amounts much larger than their actual account balances. *See id.* In the United States, the Commodities Futures Trade Commission permitted currency trading with leverage of up to 50:1, allowing a customer with only $100 of margin collateral to trade with $5,000. *Id.* ¶ 26. In Europe, FXCM's "default" leverage ratio was 100:1, and in Australia FXCM permitted customers to trade with leverage as high as 500:1. *Id.* If a customer were trading at 500:1 leverage, an adverse currency price change of .002% would wipe out a customer's entire margin collateral. *Id.*

In addition, FXCM attracted traders to its business by implementing a "no debit" policy. *Id.* ¶ 59. Under this policy, if a customer made a profitable trade, the customer would keep all of the profits, including the portion earned with the leveraged money. *Id.* ¶ 27. However, if a customer made a losing trade, the customer would not be responsible for anything beyond what was in her/his margin collateral account. *Id.* Instead, FXCM was responsible for recouping any negative account balances that accrued as a result of customers' losing leveraged trades.[2] *Id.* Therefore, a customer's risk was limited to the margin collateral in her/his account. *Id.*

---

[2] For example, if a customer had $100 of margin collateral in her/his account and was trading using 50:1 leverage, s/he could trade with $5,000. If the customer's trade position fell by 3% or $150, s/he would have a negative account balance because the $150 loss would be greater than the $100 margin collateral. According to FXCM's agency model, FXCM would be responsible to the liquidity provider for the $50 difference.

4

To protect against negative account balances, FXCM would close out a customer's position if changes in currency prices exhausted that customer's margin collateral. *Id.* ¶ 30. FXCM depended on its technology systems to constantly monitor currency prices and update the values of its customers' accounts. *Id.* FXCM monitored customers' accounts three times per second and automatically closed out a position if a customer's account was at risk of going negative due to a losing trade. *Id.* ¶¶ 30, 76. When the SNB decided to remove the Swiss Franc peg, however, a lack of liquidity and rapid price changes prevented FXCM from closing out customers' positions before they became negative. *Id.* ¶ 30.

D. The SNB's Decisions

On September 6, 2011, the Swiss National Bank announced that it was temporarily pegging the value of the Swiss Franc to the Euro at a rate of 1.20 Swiss Francs to 1 Euro, *id.* ¶¶ 11, 40, i.e., the SNB would purchase Euros in order to ensure that 1.20 Swiss Francs were worth 1 Euro. *Id.* ¶¶ 11, 37, 40. The SNB would allow the Euro's value to increase against the Swiss Franc (for example, a rate of 1.25 Swiss Francs to 1 Euro would be permissible), but the SNB would not permit the value of the Swiss Franc to drop below 1.20 relative to the Euro. *Id.* ¶¶ 48-49. The decision to peg the Swiss Franc precipitated the largest and fastest change in currency price among G-10 currencies in recent decades. *Id.* ¶ 11, 40. On the day of announcement, the price of the Swiss Franc changed more than 8% within minutes of the SNB's decision. *Id.*

While the value of the Swiss Franc remained pegged at 1.20 relative to the Euro, FXCM recommended that customers bet on the Euro versus the Swiss Franc, with a stop-loss order at 1.2:1. *Id.* ¶¶ 5, 48-49. This meant that if the Euro increased in value, the customer would profit. *Id.* If for any reason the value of the Swiss Franc rose, customers could protect themselves by exiting the positions with their stop-loss trade orders. *Id.* Plaintiff alleges that by September

5

2014, FXCM customers held a collective $1 billion position on the Euro-Swiss Franc currency pair. *Id.* ¶¶ 5, 49; (Pl.'s Opp'n at 10).

On January 15, 2015, the SNB surprisingly announced that it was de-pegging its currency from the Euro and allowing the Swiss Franc to move to its actual market value. (Compl. ¶¶ 6, 31, 32). Within minutes, the price of the Swiss Franc soared by as much as 40% versus the Euro. *Id.* ¶¶ 6, 92. Because of the volatility and extreme EUR/CHF price changes, the liquidity providers on which FXCM relied stopped providing prices and liquidity for the EUR/CHF currency pair. *Id.* ¶¶ 6-7. As a result, FXCM could not close out its customers' accounts before their margin collateral was exhausted. *Id.* ¶¶ 7, 30. By the end of the day, the market price for the Swiss Franc had risen 14% versus the Euro compared to the previous day. *Id.* ¶¶ 6, 92.

Ultimately, FXCM sustained losses of $275 million and had breached its regulatory capital requirements. *Id.* ¶¶ 36; (Pl.'s Opp'n at 12). In order to avoid getting shut down by regulators, FXCM had to agree to a punitive financing agreement with Leucadia National Corporation. (Compl. ¶¶ 8, 34, 94 ). As a result of the losses and the financial agreement with Leucadia, FXCM's stock price plummeted by over 90%, from $14.87 on January 14, 2015 to $1.60 on January 20, 2015. *Id.* ¶¶ 9, 95.

E. <u>Allegations in the Complaint</u>

Plaintiff alleges that Defendants made a number of materially false or misleading statements or material omissions during the Class Period, in violation of Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder. *See id.* ¶¶ 74-99. In particular, Plaintiff alleges that Defendants misled investors about the "low risks" of their "agency" business model, especially in light of FXCM's leverage policies and enormous risks in relation to the EUR/CHF currency pair. *See id.*; Pl.'s Opp'n at 14-21. Further, Plaintiff alleges that Defendants lacked a

risk management department or protocols to manage their risk. *Id.*; (Compl. ¶¶ 74-99). Plaintiff alleges that FXCM's large losses after the SNB's decision revealed a risky business strategy coupled with insufficient risk management procedures, causing hundreds of millions of dollars of losses to Plaintiff and the class. *Id.* ¶¶ 13, 122.

## II. LEGAL STANDARD

### A. Rule 12(b)(6), Rule 9(b), and the PSLRA Pleading Standard

To survive a motion to dismiss pursuant to Rule 12(b)(6), a complaint governed by Rule 8 of the Federal Rules of Civil Procedure "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Iqbal*, 556 U.S. at 678. In assessing whether a complaint meets this standard, a court examines only well-pleaded factual allegations, disregards legal conclusions, and draws all reasonable inferences in favor of the non-movant. *See Allaire Corp. v. Okumus*, 433 F.3d 248, 249-50 (2d Cir. 2006). Ultimately, the court must determine whether the allegations of the complaint "plausibly give rise to an entitlement to relief." *Iqbal*, 556 U.S. at 678.

A complaint that asserts securities fraud, however, must satisfy the heightened pleading requirements of Federal Rule of Civil Procedure 9(b) and the Private Securities Litigation Reform Act ("PSLRA"). 15 U.S.C. § 78u–4; *see ECA & Local 134 IBEW Joint Pension Tr. v. J.P. Morgan Chase Co.*, 553 F.3d 187, 196 (2d Cir. 2009). Rule 9(b) provides that a party alleging fraud "must state with particularity the circumstances constituting fraud." The Second Circuit interprets this rule to require that a complaint: "(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the

statements were made, and (4) explain why the statements were fraudulent." *Rombach v. Chang*, 355 F.3d 164, 170 (2d Cir. 2004) (quoting *Mills v. Polar Molecular Corp.*, 12 F.3d 1170, 1175 (2d Cir. 1993)). Although Rule 9(b) permits "[m]alice, intent, knowledge and other conditions of a person's mind [to] be alleged generally[,]" a plaintiff is required to "allege facts that give rise to a strong inference of fraudulent intent." *Acito v. FMCERA Grp., Inc.*, 47 F.3d 47, 52 (2d Cir. 1995) (quoting Fed. R. Civ. P. 9(b)).

   B. Section 10(b) and Rule 10b-5

Plaintiff's principal claims are brought under section 10(b) of the Exchange Act. To state a claim for securities fraud under section 10(b) and Rule 10b-5, plaintiffs must allege: (1) a material misrepresentation or omission; (2) scienter; (3) connection with the purchase or sale of a security; (4) reliance; (5) economic loss; and (6) loss causation. *Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 341-42 (2005).

## III. DISCUSSION

In this case, the Defendants contest whether the Complaint adequately alleges (1) any actionable misstatements or omissions; (2) scienter; and (3) loss causation.[3] Because Plaintiff fails to adequately plead scienter, the Court grants Defendants' Motion to Dismiss.

   A. Scienter

The PSLRA requires plaintiffs to "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u–4(b)(2); *see also Tellabs Inc. v. Makor Issues & Rights. Ltd.*, 551 U.S. 308, 321 (2007) ("The 'strong

---

[3] Defendants attach to their Motion to Dismiss a litany of press releases, articles, and internal presentations that the Court does not and cannot rely on at this stage of the litigation. *Beautiful Jewellers Private Ltd. v. Tiffany & Co.*, No. 06-CV-3085, 2007 WL 867202, at *1 (S.D.N.Y. Mar. 21, 2007) (Wood, J.) (unless the Court converts the motion to dismiss into a motion for summary judgment, Defendant may not introduce evidence that was neither incorporated by reference in the Complaint nor properly the subject of judicial notice).

inference' standard unequivocally raised the bar for pleading scienter.") (internal citation and quotation marks omitted). A court must decide "whether *all* of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard." *Id.* at 322-23 (emphasis in original). To qualify as "strong," the "inference of scienter must be more than merely plausible or reasonable—it must be cogent and at least as compelling as any opposing inference of nonfraudulent intent." *Tellabs*, 551 U.S. at 314; *see also Teamsters Local 445 Freight Div. Pension Fund v. Dynex Capital Inc.*, 531 F.3d 190, 194 (2d Cir. 2008) ("While we normally draw reasonable inferences in the non-movant's favor on a motion to dismiss, [the PSLRA] establishes a more stringent rule for inferences involving scienter.").

In the Second Circuit, "[t]he requisite scienter can be established by alleging facts to show either (1) that defendants had the motive and opportunity to commit fraud, or (2) strong circumstantial evidence of conscious misbehavior or recklessness." *ECA*, 553 F.3d at 198. Motives common to corporate officers, like "the desire for the corporation to appear profitable and the desire to keep stock prices high to increase officer compensation," do not suffice to plead scienter. *Id.*; *Novak*, 216 F.3d at 307-08 (plaintiffs must "allege that defendants benefitted in some concrete and personal way from the purported fraud"). The "motive" showing is often met by allegations that corporate insiders allegedly engaged in misrepresentations in order to sell their own shares at a profit. *ECA*, 553 F.3d at 198 (citing *Novak*, 216 F.3d at 308). A plaintiff who cannot show scienter by alleging motive and opportunity can still "raise a strong inference of scienter under the 'strong circumstantial evidence' prong, 'though the strength of the circumstantial allegations must be correspondingly greater' if there is no motive." *Id.* at 198-99 (quoting *Kalnit v. Eichler*, 264 F.3d 131, 142 (2d Cir. 2001)).

Recklessness is defined as conduct that is, at minimum, "highly unreasonable" and constitutes "an extreme departure from the standards of ordinary care to the extent that *the danger was either known to the defendant or so obvious that the defendant must have been aware of it*." *S. Cherry St., LLC v. Hennessee Grp. LLC*, 573 F.3d 98, 109 (2d Cir. 2009) (emphasis in original) (quoting *In re Carter-Wallace, Inc. Securities Litigation*, 220 F.3d 36, 39 (2d Cir. 2000)); *see also Chill v. Gen. Elec. Co.*, 101 F.3d 263, 269 (2d Cir. 1996) ("An egregious refusal to see the obvious, or to investigate the doubtful" can give rise to an inference of recklessness.).

To properly plead recklessness, a plaintiff may either specifically allege that the defendant had knowledge of facts or access to information contradicting the defendant's public statements, or allege that the defendant failed to check information that s/he had a duty to monitor. *Novak*, 216 F.3d at 308. "Where plaintiffs contend defendants had access to contrary facts, they must specifically identify the reports or statements containing this information." *Id.* "An allegation that a defendant merely ought to have known is not sufficient to allege recklessness." *Kuriakose v. Fed. Home Loan Mortg. Corp.*, 897 F. Supp. 2d 168, 184 (S.D.N.Y. 2012) (Keenan, J.) (quoting *Hart v. Internet Wire, Inc.*, 145 F. Supp. 2d 360, 368 (S.D.N.Y. 2001) (Pollack, J.)). Allegations of "corporate mismanagement" are too vague to support a claim under section 10(b). *Boca Raton Firefighters & Police Pension Fund v. Bahash*, 506 F. App'x 32, 36 (2d Cir. 2012) (quoting *Santa Fe Indus., Inc. v. Green*, 430 U.S. 462, 477 (1977)).

Courts have refused to accept allegations of "fraud by hindsight" as allegations of scienter. *Novak*, 216 F.3d at 309. The Second Circuit has explained that:

> Corporate officials need not be clairvoyant; they are only responsible for revealing those material facts reasonably available to them. *See Denny v. Barber,* 576 F.2d 465, 470 (2d Cir.1978). Thus, allegations that defendants should have anticipated

10

future events and made certain disclosures earlier than they actually did do not suffice to make out a claim of securities fraud. *See Acito,* 47 F.3d at 53.

*Id.*

Plaintiff's allegations fail to support a strong inference of scienter based on either (1) motive and opportunity; or (2) circumstantial evidence of conscious misbehavior or recklessness.

    *1. Plaintiff Fails to Allege Facts to Support Motive and Opportunity*

Plaintiff alleges that motive and opportunity to commit fraud exist because of (a) Defendants' stock sales, and (b) FXCM's stock repurchase program.

        a.  <u>Stock Sales</u>

First, Plaintiff alleges that Defendant Lande and non-Defendant FXCM employees engaged in insider trading. Plaintiff alleges that between August 9 and August 13, 2013, Lande sold 147,500 shares of FXCM for a total profit of $2,610,837. (Compl. ¶¶ 101-103). One month later, according to Plaintiff, Lande sold another 37,500 shares for a profit of $708,000. *Id.* Plaintiff alleges that the only other time Lande sold stock during his tenure at FXCM was in December 2015, when he sold 68 shares. *Id.*

Plaintiff also alleges that non-Defendants' stock trades were suspicious and provide evidence of scienter. During the Class Period, Eduard Yusupov, a co-founder of FXCM and the Global Head of Dealing at the company, sold shares worth a total of $1.5 million. *Id.* ¶¶ 104-107. Also during the Class Period, William Ahdout, FXCM's original co-founder, Director, and Chief Dealer, sold $14,123,627.64 worth of FXCM shares. *Id.* ¶¶ 108-112.

        b.  <u>Stock Repurchase Program</u>

Second, Plaintiff alleges that FXCM's stock repurchase program also provides evidence of scienter. In November 2014, because of FXCM's strong balance sheet and cash in excess of its regulatory requirements, the Defendants recommended and Board of Directors approved a

11

$50 million increase in the company's stock repurchase program.[4] *Id.* ¶¶ 113-114. Plaintiff alleges that Defendants stood to profit from this program because maintaining high share prices would enable Defendants to cash in their shares at higher prices. *Id.* However, because of SNB's decision, Defendants' alleged plans were disrupted. *Id.*

      c. Analysis

Taken collectively, Plaintiff's allegations fail to support a strong inference of scienter based on motive; even if Plaintiff's allegations did support such an inference, that inference is weaker than the non-fraudulent inferences.

Stock sales support allegations of scienter only when those trades are suspicious in timing or amount. *In re Lululemon Sec. Litig.*, 14 F. Supp. 3d 553, 584-85 (S.D.N.Y. 2014) (Forrest, J.), *aff'd*, 604 F. App'x 62 (2d Cir. 2015). "While 'unusual' executive stock trading under some circumstances may give rise to an inference of fraudulent intent, executive stock sales, standing alone, are insufficient to support a strong inference of fraudulent intent." *In re Bristol-Myers Squibb Sec. Litig.*, 312 F. Supp. 2d 549, 561 (S.D.N.Y. 2004) (Preska, J.) (citation omitted). Indeed, courts have suggested that scienter may *not* be inferred "strongly" when the alleged fraud benefited only a single defendant in a corporate entity. *Stevelman v. Alias Research Inc.*, 174 F.3d 79, 85 (2d Cir. 1999).

Although the profits from the alleged stock sales are considerable, Plaintiff's allegations fail because: (1) Defendant Niv—co-founder, CEO, and Chairman of the Board of Directors of FXCM—never sold a single share; (2) the timing of Lande's sales were not unusual; (3) non-Defendants' sales are insufficient for an inference of scienter; and (4) the allegations regarding FXCM's stock repurchase program are inadequate to buttress Plaintiff's allegations of scienter.

---

[4] As a result of the increase, the value of the stock repurchase program rose to $130 million. *Id.* ¶¶ 113

12

First, Plaintiff does not make any meaningful allegations that Niv had a motive to defraud. Niv did not sell even one of his over 8,000,000 FXCM shares.[5] (Defs.' Mot. to Dismiss at 4, 27 [Doc No. 54]). As a result of the SNB's decision, the value of Niv's personal stock holdings dropped by over $100 million. *Id.* This loss dwarfs, by several orders of magnitude, any alleged gain that the Defendants and non-Defendants experienced from their stock sales. Further, Plaintiff never provides an explanation or even addresses these losses or how they impact its scienter allegations. The most compelling inference from such a large financial loss is that Defendants were caught off-guard by the SNB's decision. *See Acito v. IMCERA Grp.*, Inc., 47 F.3d 47, 53 (2d Cir. 1995) (citing *Denny v. Barber*, 576 F.2d 465, 470 (2d Cir. 1978)) ("[D]efendants' lack of clairvoyance simply does not constitute securities fraud.").

Second, Defendant Lande's stock trades in this case are not unusual because they occurred more than a year before the SNB's decision. Lande sold stock in August and September of 2013, more than a year prior to the SNB's January 15, 2015 decision.[6] *See, e.g.*, *Ressler v. Liz Claiborne, Inc.*, 75 F. Supp. 2d 43, 60 (E.D.N.Y. 1998), *aff'd sub nom. Fishbaum v. Liz Claiborne, Inc.*, 189 F.3d 460 (2d Cir. 1999) (because the stock "sales did not closely follow the alleged misstatements and were not temporally related to the bad news, the flurry of transactional activity by these defendants within a limited time period suggests not that there was

---

[5] *See Glaser v. The9, Ltd.*, 772 F. Supp. 2d 573, 587 (S.D.N.Y. 2011) (Holwell, J.) ("When a complaint alleges only 'incomplete information' concerning insider sales, the court is 'free to consider' defendants' SEC filings to fill gaps on motion to dismiss.") (citing *In re eSpeed, Inc. Sec. Litig.*, 457 F. Supp. 2d 266, 290 n.182 (S.D.N.Y. 2006) (Scheindlin, J.).

[6] Plaintiff failed to acknowledge in its Complaint that in March 2014, Lande purchased 7,500 shares for a total of $121,125. *See* Pl.'s Opp'n at 28. Although Plaintiff is correct that the purchase of stock alone cannot counteract the circumstantial evidence of fraudulent intent, *In re MF Glob. Holdings Ltd. Sec. Litig.*, 982 F. Supp. 2d 277, 320 (S.D.N.Y. 2013) (Marrero, J.), here the combination of the timing of Lande's sales and the March 2014 purchase provide more robust counteracting evidence.

fraud, but that the sales were precipitated by some other factor"); *In re Keyspan Corp. Sec. Litig.*, 383 F. Supp. 2d 358, 385 (E.D.N.Y. 2003) (citation omitted) (a period of 4-6 weeks "negate[s] any inference that defendants 'sought to reap the immediate benefit a falsely positive statement had on the market.'"). Plaintiff does not adequately explain why Lande's sales raise a strong inference of scienter when they occurred so long before the seminal event in this case, or why Niv did not sell a single stock if Defendants were so aware of the risks facing FXCM. The timing of Lande's sales and Niv's failure to sell any of his shares both undermine any strong inference of fraudulent intent.

Third, the stock sales of non-Defendants Yusupov and Ahdout do not contribute to an inference of scienter. Plaintiff fails to allege any connection between the alleged fraud and the non-Defendants. *See Alaska Laborers Employers Ret. Fund v. Scholastic Corp.*, No. 07-CV-7402, 2011 WL 3427208, at *2 (S.D.N.Y. Aug. 3, 2011) (Daniels, J.) ("Plaintiff never set forth facts demonstrating that the Individual Defendants engaged in any misconduct with the non-defendant insiders."). Indeed, the only allegations regarding Yusupov and Ahdout pertain to their job titles and stock sales. Without more, the Court cannot take a vast interpretative leap to say that non-Defendants' activities somehow give rise to a strong inference of fraudulent intent on the part of the actual Defendants in this case.

Fourth, Plaintiff's allegations regarding FXCM's stock repurchase program do not buttress its allegations of scienter. Normally, Courts find that share repurchases by a corporate client may negate a finding of scienter. *See, e.g.*, *Tyler v. Liz Claiborne, Inc.*, 814 F. Supp. 2d 323, 338 (S.D.N.Y. 2011) (Holwell, J.); *In re Thoratec Corp. Sec. Litig.*, No. C-04-03168, 2006 WL 1305226, at *11 (N.D. Cal. May 11, 2006) ("Inflating the price of the stock only to repurchase it at the inflated price does not give rise to a strong inference that defendants had a

strong motive to fraudulently prop up Thoratec's stock price."). Plaintiff's conclusory allegations that Defendants maintained inflated stock prices in order to sell their shares at higher prices are devoid of factual support.[7] Moreover, if the alleged misstatements began in June 2013, it is illogical for Defendants to wait until November 2014 to expand their repurchase program. Without more, the Court cannot conclude that the repurchase program strengthens the inference of scienter.

Taken collectively, Plaintiff's allegations fail to support a strong inference that Defendants acted with scienter. At best, Plaintiff's allegations permit a weak inference of scienter—one that is less compelling than the inference that Defendants were blindsided by the SNB's decision.

### 2. *Plaintiffs Fail to Allege Circumstantial Evidence of Conscious Misbehavior or Recklessness*

Because Plaintiff cannot raise a strong inference of scienter by alleging motive and opportunity, the strength of its circumstantial evidence must be stronger in order to plead scienter under the conscious misbehavior or recklessness prong. Plaintiff's allegations fail to meet this standard.

Plaintiff attempts to raise a strong inference of scienter based on circumstantial evidence of conscious misbehavior or recklessness by alleging that (1) Confidential Witness 1 ("CW1") warned of the risks of FXCM's approach toward the EUR/CHF pair and the possibility that there would be huge losses if the SNB removed the peg; (2) Defendants knew about FXCM's high-

---

[7] Plaintiff attempts to plead new facts regarding the repurchase program in its Opposition to the Motion to Dismiss. *See* Pl.'s Opp'n at 30 (citing to the November 6, 2014 call transcript). A party may not amend its complaint through statements made in motion papers. *See, e.g.*, *Wright v. Ernst & Young LLP*, 152 F.3d 169, 178 (2d Cir. 1998). Plaintiffs will have the opportunity to include additional allegations and documents if they choose to re-plead.

risk business model and that the SNB's decision could ruin their company; and (3) two of FXCM's competitors raised their margin requirements on the EUR/CHF pair in September 2014, showing the increasing risk from the currency pair.[8]  *See* (Compl. ¶¶ 11, 42, 53, 58-63, 98); (Pl.'s Opp'n at 23-27).

CW1's scienter allegations are fundamentally undermined by the fact that s/he had a "huge" bet against the SNB's removal of the currency peg.  Plaintiff relies heavily on CW1's repeated warnings to Brendan Callan, the CEO of FXCM Europe, that the company was exposed to major risk on the EUR/CHF and could be in peril if the SNB de-pegged the Swiss Franc.  *See* (Compl. ¶¶ 44-67).  However, in an email referenced in the Complaint, CW1—along with expressing concerns about FXCM's margin levels and no debit policy—states: "I personally don't think the peg is in danger. I actually float a huge long position against it."  (Pl.'s Opp'n at 12).  This admission is fatal to Plaintiff's scienter allegations.  Any inference of scienter that could be gleaned from CW1's warnings is undermined by his personal belief that the SNB's peg would remain in place and by his willingness to bet a "huge" amount of his own money based on this belief.

CW1's warnings are also flawed because they significantly underestimated the effect of the SNB's decision.  CW1 stated that if the 1.20 peg was removed, FXCM "may get 100 pips of slippage."[9]  (Compl. ¶ 58).  However, after the SNB's decision, there were, in fact, thousands of

---

[8] Plaintiff also argues that it has properly alleged recklessness because Niv had access to and on occasion would read the daily "Shift Report."  However, these Shift Reports did not contain CW1's warnings to Brendan Callan, the CEO of FXCM Europe.  Plaintiff does not allege that the Shift Reports provided information about the risks of FXCM's model, only that the Reports likely noted that two competitors changed their margin requirements. (Compl. ¶¶ 55-56).

[9] A pip is movement of 1/100 of 1%.  Thus, 100 pips are equivalent to a 1% change.

pips of slippage. Thus, to the extent that FXCM officials believed CW1's warnings, they may have felt confident that they could successfully overcome a 1% change in price.[10]

Plaintiff's allegations that Defendants knew that FXCM was pursuing a high-risk business model, and knew the possible effect of the SNB's decision, fail for two reasons. First, Plaintiff clearly describes why Defendants had confidence in their business model and safeguards. The Complaint notes that "[t]he largest and fastest changes in the currency prices of any G-10 country in recent decades had occurred when the SNB first pegged its currency to the euro in September 2011." *Id.* ¶ 11. Yet, FXCM survived this major market event and became one of the largest FX brokers in the world.[11] *See* (Compl. ¶ 23). Thus, it makes sense that Defendants believed that the same model and safeguards that helped them navigate the SNB's initial decision to peg the Swiss Franc to the Euro would also help them navigate the de-pegging decision. Second, the Complaint and the *Bloomberg Business* article Plaintiff cites are replete with references to the shocking and unexpected nature of the SNB's decision. *See id.* ¶ 98; David Evans, *How Swiss Shock Humbled King of Leveraged Currency Trading*, Bloomberg Business (Jan. 20, 2015), http://www.bloomberg.com/news/articles/2015-01-20/how-swiss-shock-humbled-the-king-of-leveraged-currency-trading. For example, the Complaint describes

---

[10] Defendant points out that CW1 also allegedly told Callan that if the SNB removed the peg and there was no liquidity, "the prices will be terminal." (Compl. ¶ 59). However, this warning is contradicted by the fact that CW1 did not believe the peg was in danger and wagered his money that it would not be removed in the near future.
    Furthermore, CW1 is never linked to Niv or Lande. Instead, all of his warnings were issued to Callan, who allegedly reported directly to Niv because he was her superior. There is no allegation that Callan reported any of CW1's concerns to Niv or Lande. *See, e.g.*, *In re Wachovia Equity Sec. Litig.*, 753 F. Supp. 2d 326, 352 (S.D.N.Y. 2011) (Sullivan, J.) ("[T]here is no allegation that any CW met the Individual Defendants, reported any concerns, received any instructions, or made any personal contact with them during the Class Period. The absence of such communication undermines the inference that Defendants recklessly disregarded the truth."); *In re PXRE Grp., Ltd., Sec. Litig.*, 600 F. Supp. 2d 510, 537 (S.D.N.Y.) (Sullivan, J.), *aff'd sub nom. Condra v. PXRE Grp. Ltd.*, 357 F. App'x 393 (2d Cir. 2009) (Plaintiff failed to plead scienter because there is no allegation that confidential informant's concerns were brought to the attention of the individual defendants); *Malin v. XL Capital Ltd.*, 499 F.Supp.2d 117, 141 (D. Conn. 2007).

[11] Similarly, FXCM was able to halt its clients' trading on the United States dollar versus Russian Ruble when turmoil in Russia had caused the Ruble's value to fluctuate greatly in the preceding weeks. *See* (Compl. ¶ 28).

17

the SNB's decision as "a surprise" and a "shock event," stating that investors were "shocked by the speed and scale of the exchange rate moves that followed." (Compl. ¶ 11, 32, 98-99). Indeed, the Complaint notes that on December 19, 2014, FXCM research analyst Kristen Keir said that "[a]t some point we believe market forces will force the SNB to abandon the floor, but that looks a long way off." *Id.* ¶ 39. The Court cannot find conscious misbehavior or recklessness when Defendants' business model had a successful track record and market investors were shocked by the SNB's decision.

Finally, Plaintiff's allegations that two out of three of FXCM's major competitors raised their margin requirements on the EUR/CHF provide no information about Defendants' conduct or knowledge. *See* (Pl.'s Opp'n at 4, 10, 25). The fact that four different companies took two different views about risks and how to adjust their exposure is hardly evidence sufficient to impute scienter. *See In re Wachovia Equity Sec. Litig.*, 753 F. Supp. 2d 326, 356 (S.D.N.Y. 2011) (Sullivan, J.) ("In any event, that Wachovia's practices were distinguishable from those of their competitors in some ways and not in others is not fraud, especially when Defendants made no attempt to represent otherwise. Accordingly, the Court cannot impute an inference of recklessness to Defendants based on the purported tension between two lending practices."). Plaintiff seeks to characterize Defendants' failure to raise margin levels as evidence of their conscious misbehavior or recklessness, but any such inference is undermined by a lack of information regarding whether other brokers also raised their margin levels and the fact that one of FXCM's major competitors did *not* raise its margin requirements. Because Plaintiff is unable to allege scienter based either on motive and opportunity, or on circumstantial evidence of

conscious misbehavior or recklessness, the Complaint fails to properly allege securities fraud under Section 10(b) of the Exchange Act and Rule 10b-5.[12]

B. Loss Causation

Because Plaintiff fails to adequately plead scienter, the Court need not reach the issue of loss causation. *See, e.g.*, *In re UBS AG Sec. Litig.*, No. 07-CV-11225, 2012 WL 4471265, at *22 (S.D.N.Y. Sept. 28, 2012) (Sullivan, J.) *aff'd sub nom. City of Pontiac Policemen's & Firemen's Ret. Sys. v. UBS AG*, 752 F.3d 173 (2d Cir. 2014) (Because Plaintiffs' inability to plead scienter is fatal to their Section 10(b) claim, "the Court need not reach the UBS Defendants' arguments regarding . . . loss causation.").

C. Plaintiff's Other Claims

Because the Court concludes that Plaintiff fails to allege scienter, Plaintiff's claims under Section 20(a) of the Exchange Act also fail.

D. Leave to Re-plead

Rule 15(a) provides that leave to amend a complaint "shall be freely granted when justice so requires." *See also ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 108 (2d Cir. 2007) ("District courts typically grant plaintiffs at least one opportunity to plead fraud with greater specificity when they dismiss under Rule 9(b)."). The Court grants Plaintiff thirty days from the date of this Opinion and Order in which to re-file its Complaint.

---

[12] Because the Court agrees with Defendants that Plaintiff has failed to allege a strong inference of scienter, the Court does not address Defendants' remaining arguments regarding material misrepresentations or omissions.

## IV. CONCLUSION

For the foregoing reasons, Defendants' Motion to Dismiss is GRANTED. Plaintiff is given thirty days to file an amended complaint, should it choose to do so. This Opinion resolves docket numbers 53 and 56.

SO ORDERED.

DATED: New York, New York
August 18, 2016

/s/
KIMBA M. WOOD
United States District Judge