## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

RETIREMENT BOARD OF THE
POLICEMEN'S ANNUITY AND BENEFIT
FUND OF CHICAGO ON BEHALF OF
THE POLICEMEN'S ANNUITY AND
BENEFIT FUND OF CHICAGO,
Individually and on Behalf of All Others
Similarly Situated,

              Plaintiff,

    v.

FXCM INC. and DROR NIV,

              Defendants.

Case No: 1:15-cv-03599-KMW

**SECOND AMENDED AND
CONSOLIDATED CLASS
ACTION COMPLAINT**

JURY TRIAL DEMANDED

Plaintiff Retirement Board of the Policemen's Annuity and Benefit Fund of Chicago on Behalf of the Policemen's Annuity and Benefit Fund of Chicago, by and through the undersigned attorneys, alleges the following upon information and belief, except as to those allegations concerning Plaintiff, which are alleged upon personal knowledge.  Plaintiff's information and belief is based upon, among other things, counsel's investigation, which includes, without limitation: (1) a review and analysis of regulatory filings by FXCM Inc. ("FXCM" or the "Company") with the U.S. Securities and Exchange Commission ("SEC"); (2) a review and analysis of press releases and media reports issued by and about the Company; (3) a review of the Order Instituting Proceedings Pursuant to Sections 6(c) and 6(d) of the Commodity Exchange Act, Making Findings, and Imposing Remedial Sanctions dated February 6, 2017 in the matter *In re Forex Capital Markets, LLC, FXCM Holdings, LLC, Dror Niv, and William Ahdout*, CFTC Dkt. No. 17-09; (4) a review of the complaint and decision of the Business Conduct Committee ("BCC") of the National Futures Association ("NFA") dated February 6, 2017 in the matter *In re Forex Capital Markets, LLC, William Ahdout, Dror Niv, and Ornit Niv*, NFA Case No. 17-BCC-001; (5) a review of the Memorandum in Opposition to Defendants' Partial Motion to Dismiss First Amended Complaint filed by the Commodity Futures Trading Commission ("CFTC") in *CFTC v. Forex Capital Markets, LLC*, No. 1:16-cv-06551(KBF) [ECF Nos. 59, 59-1-59-34] ("the CFTC action"); (6) the sworn testimony of three current or former senior managers at FXCM and FXCM business records that had been attached to and filed with a Declaration of Saadeh Al-Jurf in the CFTC action[1]; (7) a review of the Consent Order of Permanent Injunction, Civil Monetary Penalty, and Other Equitable Relief entered in the CFTC action on February 13,

---

[1]     The three transcripts (Joshua Rosenfeld ("Rosenfeld"), Paresh Patel ("Patel") and Janelle Lester ("Lester")) were attached as Exhibits 4, 5 and 6, respectively, to the Declaration of Beth A. Kaswan ("Kaswan Decl.") filed in this action on February 28, 2017 (ECF No. 81).  The testimony as cited in this Complaint is incorporated by reference as though specifically quoted herein.

2017; (8) a review of other publicly available information concerning FXCM; and (9) information developed from confidential witnesses. Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## SUMMARY OF THE ACTION AND OVERVIEW

1.       This is a securities fraud class action brought on behalf of all purchasers of FXCM common stock between March 17, 2014 and January 20, 2015, inclusive (the "Class Period"), asserting claims under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5 promulgated thereunder against FXCM and its chief executive officer ("CEO"), Drew Niv.

2.       During the Class Period, Defendant FXCM, through its operating subsidiaries in the United States ("FXCM-US"), and Europe ("FXCM-UK"), Asia, and other locations (collectively, "Non-US FXCM"), through its proprietary technology platform, facilitated billions of dollars of on-line, over-the-counter, foreign exchange ("FX") trading by "retail" customers. FXCM-US and its separately regulated Non-US FXCM companies conducted these operations with tiny amounts of cash on hand and regulatory capital, relative to its customers' billions of dollars of net notional open positions ("NoP").

3.       Unbeknownst to investors, FXCM-US was liable to its own banks for these trades contrary to Defendants' assurances that FXCM was acting as a mere agent, or middleman, on trades between its retail customers and other "market-makers," or "liquidity providers." These false assurances misled investors to believe that FXCM was not taking the trading or "market" risks associated with its customers' highly speculative FX trading. Defendants also misled investors by falsely assuring them that FXCM kept "substantial liquidity" and "excess" regulatory capital to respond to unforeseen or unusual market events, and that the "credit risk"

that its customers would not pay negative account balances due FXCM, associated with permitting customers to trade on margin, was "minimal."

4.     Thus, throughout the Class Period, in reports and presentations to FXCM shareholders and potential investors and in regulatory filings, FXCM differentiated itself from other retail FX brokers by claiming that, in connection with its trades with retail FX customers, it primarily operated an "agency model" that did not entail taking "market risk," which it defined as the "risk of a position moving up or down in value" normally associated with the trading of FX pairs with retail customers, and which required far more cash and capital than FXCM-US maintained.

5.     For example, FXCM's 2013 Form 10-K stated:

> Under our retail agency FX offering, trading revenue is earned by adding a markup to the price provided by FX market makers generating trading revenue based on the volume of transactions. . . . Under the agency model, when a customer executes a trade on the best price quotation presented by the FX market maker, ***we act as a credit intermediary, or a riskless principal, simultaneously entering into a trade with the customer and the FX market maker.  This agency model has the effect of automatically hedging our positions and eliminating market risk exposure***.

[Emphasis added].  The Form 10-K also described its customer margin requirements policy as "fairly conservative."

6.     Indeed, in FXCM's 2013 Form 10-K, and each of its quarterly Form 10-Qs during the Class Period, including its third quarter 2014 ("3Q 2014") Form 10-Q filed on November 7, 2014, FXCM (a) flatly denied that it took "market risk" on its customers' trades ("we operate predominantly on an agency execution model and are not exposed to the market risk of a position moving up or down in value"); (b) asserted that FXCM had "minimal" exposure to "credit risk" for its customers' trades, because retail customers were required to deposit cash collateral for their trades and their accounts were quickly and automatically closed when their collateral was

exhausted; (c) asserted that it maintained "a substantial pool of liquidity" to manage risks to its cash flow associated with the effects of international market and economic conditions beyond FXCM's control; and (d) asserted that FXCM maintained "excess regulatory capital" in order to "provide liquidity during periods of unusual or unforeseen market volatility."

7.    Each of these statements was materially false and misleading, and denied or omitted key risks that were required to be disclosed because the impression left by these statements was otherwise materially misleading.  In truth, FXCM operated a high risk retail trading business as an "at risk" principal, without "eliminating" its exposure to market risk through "hedges" that effectively offset the market risk, and with grossly inadequate liquidity and regulatory capital given its own net multi-billion dollar exposures on its own trades with its banks (the so-called "liquidity providers").  Defendants also authorized FXCM's retail customers, particularly those outside the U.S., to trade with extremely little margin collateral, often as little as 1 euro of margin collateral for a 400 euro currency pair trade ("1:400").  Thus, while FXCM was not exposed to market risk by virtue of taking the *opposite* side of its customers' trades, it nevertheless was exposed to market risks on its own trades with its banks on the side that mirrored its customers' trades with FXCM, to the extent losses on these trades exceeded the nominal amounts of margin collateral that FXCM required of its retail customers.

8.    As the sworn deposition testimony of FXCM current and former managers and business records produced by FXCM-US in the CFTC action shows, FXCM's own trading risks were, in fact, not "offset" or "hedged" "one-for-one" by its retail customers' losses on their corresponding trades with FXCM because of (1) the extraordinary levels of margin FXCM permitted its customers, and (2) FXCM's "guarantees" that customers would not suffer the losses associated with their negative account balances.  FXCM's client agreements stated:  "Trader [the

retail customer] will not be responsible for debit balances directly resulting from trading activity." Thus, because FXCM had agreed, up front, with its clients that FXCM, ***not*** the clients, was responsible for those trading losses, FXCM's risk was market risk, which was far from "minimal," not "credit" risk for those few customers who were unwilling to pay their obligations when served with margin calls, as Defendants represented. While FXCM sought to limit its own unhedged losses by quickly and automatically disposing of losing FX positions in their customers' accounts, that action was no different than any principal who attempts to limit its losses through a "stop loss" instruction, and did not alter the fact that it was FXCM, not its clients, that held most of the exposure for changes in the market prices of the FX pairs that its clients traded.

9.      Neither the extraordinarily high levels and amount of margin FXCM provided its retail customers, particularly those trading outside the U.S., nor FXCM's agreement to assume the lion's share of its customers' trading risks above their minimal margin deposits, was disclosed in FXCM's SEC filings during the Class Period, and the omission of this information caused all the filings to be materially false and misleading. The false and misleading impression created by the asserted adequacy of FXCM's regulatory capital was further heightened by FXCM's misleading omission that its U.S. subsidiary was on the hook to its banks for the full amount of the billions of dollars of NoP arising from the retail trades of its Non-US affiliates. This was especially true given that FXCM-US calculated and held regulatory capital by reference to only the amount of its ***own*** retail customers' account balances.

10.      FXCM's 3Q 2014 Form 10-Q also fraudulently omitted the necessary disclosure that FXCM-US had accumulated a highly margined net long and largely unhedged $2.2 billion NoP with its own banks for trades of the euro to Swiss franc ("EUR/CHF") currency pair. This

undisclosed exposure represented a known, concrete, and severe "market" risk because of the exceptionally high potential volatility of the EUR/CHF pair, which ultimately materialized to devastating effect on January 15, 2015, when the Swiss National Bank ("SNB") lifted the artificial cap on its currency and its price increased 15%, with little customer margin collateral available to offset or "hedge" FXCM-US's enormous margin calls and losses on trades with its banks.

11.     As Niv stated in an interview he gave in February to explain the January 15, 2015 losses:

> In FXCM's non-dealing-desk execution system, trades are matched one for one with a liquidity provider.
>
> For example when a client enters a EUR/CHF trade with FXCM, FXCM has an identical trade with one of our liquidity providers.  When a client profits in the trade, FXCM gives the profits to the customer.  However, ***when the client is not profitable on that trade, FXCM ends up having to pay an equivalent amount of the loss to the liquidity provider.***

*See* Ex. 1 (emphasis added), attached hereto and incorporated herein by reference.

12.     Niv then, however, provided the additional misleading explanation that this situation had arisen because, with respect to the SNB event, "clients could not cover their margin call with FXCM," when in fact FXCM clients did not have any obligations to FXCM for their negative accounts under their customer agreements.  *See* Ex. 1.  These statements were then amplified in a March 11, 2015 presentation to investors which offered the following explanation for how FXCM had come to suffer losses in excess of brokers who had traded with their retail customers as "principals" on the trades:

> Remember when a client profits in the trade, FXCM gives the profits to the customer.  However, when the client is not profitable on that trade, FXCM ends up having to pay the equivalent amount of the loss to the liquidity provider.

Why didn't it happen to the brokers? ***Many other brokers run a dealing desk, thus they are on the opposite side of their client trades.*** As clients lose money, the Dealing Desk broker profits. In this case, many traders lost money, as clients were mainly long EUR/CHF throughout the industry, which means these brokers made huge profits.

*See* Ex. 2 (emphasis added), attached hereto and incorporated herein by reference. Thus, the reason that FXCM lost so much money was that it held a net "long" exposure on the EUR/CHF pair – the same side bet as its clients.

13.     While many industry participants were "shocked" by the actions of the SNB in suddenly lifting the cap, which it had imposed on pricing of the EUR/CHF pair over three years earlier, and by the intensity of the price dislocation that immediately followed, both FXCM investors and analysts following FXCM stock were also surprised to learn that FXCM was exposed to this type of market risk, and the magnitude of FXCM's losses, given Defendants' repeated touting of FXCM's low risk "agency model," and Defendants' failure to disclose the extent to which FXCM had permitted its customers to trade on margin at FXCM's expense. As *BloombergBusiness* put it in a January 20, 2015 article, "FXCM's reversal of fortune has laid bare the risks Niv's firm and its more than 230,000 customers were taking." *See* Ex. 3, attached and incorporated by reference herein.

14.     The false and misleading impression that FXCM's retail clients, rather than FXCM itself, would be the ones at risk when customers traded at excessive margin, and that FXCM was prudently monitoring and limiting margin exposures had been further reinforced by Niv's statements to *Bloomberg News* that were published in November 2014. There, *Bloomberg* published Niv's warnings on leverage:

"Leverage is the enemy; don't overleverage," FXCM's Niv says. He recommends using no more than 10:1 leverage. "Most clients, he says, use 15:1, and some use much more."

*See* Ex. 4, attached and incorporated by reference herein.  At the same time of these statements, Niv was personally approving margin to Non-US customers of 400:1 on the high risk EUR/CHF currency pair, knowing full well that FXCM would "own" all losses for price movements exceeding 1/4 of 1% for these trades.

15.    With the intensive regulatory scrutiny and outrage that followed reports of FXCM's enormous losses when the SNB lifted the cap on the EUR/CHF pricing, and in interviews with analysts, presentations to investors and in SEC reports filed after January 15, 2015, including in the Company's 2014 Form 10-K (and, indeed, in prior motions filed with this Court in this case), FXCM and Niv attempted to deflect blame by characterizing the SNB's lifting of the cap as a purportedly "Black Swan" event, that had generated "historic market dysfunction," in which FXCM's liquidity providers purportedly stopped providing pricing and liquidity.  According to this story, FXCM suffered unforeseeable and massive losses because FXCM customer positions on the EUR/CHF pair had to be closed out at wildly gyrating and highly dislocated prices (rather than because FXCM had been caught short and faced margin calls on its own trades for the actual 15% difference in the market price of the EUR/CHF times the enormous $2 billion position that had been accumulated).  In seeming support for this defense, FXCM reported in its 2014 Form10-K that the events of January 15, 2015 "generated debit balances owed to us of $276.0 million" for FXCM's 3,000 clients holding "slightly over $1 billion in open positions on EUR/CHF," and that "those same clients held approximately $80.0 million of collateral in their accounts" – meaning that the trading loss for the change in prices of the EUR/CHF pair on January 15, 2015, was more than 30% ($276 plus $80 million/$1 billion).

16.    This, however, was a complete fabrication and cover-up.  In a February 2015 e-mail, Niv himself admitted that the two banks responsible for the bulk of FXCM's margin calls,

Citibank and Deutsche Bank, "NEVER turned us off," *see* Ex. 5 attached hereto and incorporated herein; and Janelle Lester, FXCM's former chief compliance officer, testified in her CFTC deposition that the Company's "seatbelt" technology had prevented FXCM's customers from trading at dislocated prices on January 15th.  Lester Tr. 129:16-130:15.

17.     That FXCM's losses had ***not*** resulted from a once-in-a-lifetime and unforeseeable "Black Swan" event that had forced trades by FXCM's retail customers at extremely dislocated prices is now fully apparent from the transcripts of testimony of the three FXCM senior managers that the CFTC filed in the CFTC action, as well as in similarly filed business records of FXCM that had been prepared contemporaneously with the January 15th events.

18.     That FXCM customers had accumulated a ***$2.2 billion*** position on the EUR/CHF pair – instead of the $1 billion reported by FXCM in its SEC filings – is reflected in the FXCM schedules turned over by FXCM to the CFTC, which had been generated by FXCM on or about January 15, 2015.  *See* Ex. 6 attached hereto and incorporated herein by reference.  Also, Patel, an FXCM operations manager, testified that, on January 15, 2015, he had quickly calculated, and reported to Niv, the upper limits of FXCM's losses as $300 million, by multiplying FXCM's $2 billion EUR/CHF position times the 15% change in the price of the EUR/CHF pair (rather than multiplying the change in price times a $1 billion EUR/CHF aggregate position, or using EUR/CHF's gyrating prices in calculating FXCM's potential losses).  Patel Tr. 51:16-52:20. The CFTC, in its brief opposing the motion to dismiss the CFTC action, similarly performed the math that FXCM's margin calls from its banks had resulted from "multiplying the 15% drop in value in the EUR/CHF pair to the $2 billion EUR/CHF position."

19.     Rosenfeld, FXCM's managing director of finance and risk, in his CFTC testimony, explained how, as of January 14, 2015, FXCM-US had calculated $30 million of required regulatory capital on what was then $7.9 billion of NoP, including $2.2 billion on the EUR/CHF pair.   Rosenfeld Tr. 40:9-41:15; 71:14-72:1.   *See also* Ex. 7, attached hereto and incorporated herein, for the January 14, 2015 calculation of FXCM-US's required regulatory capital.   The regulatory capital of FXCM-US had been exhausted on January 15, 2015, in part, because FXCM-US placed trades with its banks for the amounts of the aggregate EUR/CHF positions taken by retail customers of FXCM-UK (as well as other Non-US FXCM affiliates), where most of the client trading losses on the EUR/CHF pair had occurred.   However, as Rosenfeld explained, FXCM-US did not receive margin collateral from FXCM-UK to offset its exposure on these trades, nor did FXCM-US calculate its needed "liquidity" or regulatory capital by considering amounts due clients in other countries or its exposure for "hedging" those highly margined accounts.   Rosenfeld Tr. 85:12-88:22.   As a result, FXCM-US held neither cash nor "excess regulatory capital" that could begin to cover the margin calls for the aggregate $2.2 billion EUR/CHF position.   As reported in FXCM's 2014 Form 10-K, as of December 31, 2014, FXCM-US had a total of only $69.5 million of regulatory capital, including its "excess" regulatory capital, a grossly inadequate amount given its market exposure.   Indeed, as Patel admitted in his CFTC testimony, a broker with this level of capital which "was not offsetting every position one-to-one," could have held the market risk with respect to only $140 million of notional value.   Patel Tr. 64:5-65:6.   As noted above, FXCM, which as explained above was ***not*** offsetting its customers' positions one-to-one, held the market risk with respect to a staggering $7.9 billion in notional exposure, including $2.2 billion in exposure with respect to the volatile EUR/CHF pair.

20.     The testimony of Patel, along with the transcript of a chat that he had on January 16, 2015, also provide damning and direct evidence of Niv's "scienter."   In particular, this evidence shows that Niv knew in September 2014 that FXCM's major competitors had increased their customers' required margin collateral to trade the increasingly risky bet on the EUR/CHF pair, Patel Tr. 37:4-11; 49:6-50:6; 58:10-18, and that Niv made a knowing choice to maintain FXCM's lesser customer margin collateral requirements (Patel chat: "then I sent to drew to raise margins and he said no.").   The transcript of the Patel chat is attached as Ex. 8 and is incorporated herein by reference.

21.     As the information orally provided to Plaintiff by CW1 along with his November 14, 2014 e-mail that was produced by Defendants earlier in this litigation, shows, when FXCM offered retail customers the opportunity to trade with a lower level of margin collateral – particularly when coupled with FXCM's "no debit" account policy – large investors in Europe immediately shifted their EUR/CHF business to FXCM-UK, and most of this was at the most extreme margin levels.   As CW1's November 14, 2014 e-mail states, "I have people opening accounts to shift their exposure to us that they have with some other broker (who requires higher margin) . . . these typically with 1:400."   The November 14, 2014 e-mail is attached as Ex. 9, and is incorporated by reference herein.

22.     Defendants have argued that Plaintiff's claims of fraud on the part of Niv are implausible because he lost large on his own shares of stock in FXCM, and reported no insider sales of FXCM stock on Form 4's filed with the SEC.   According to Defendants, Niv, like so many in the market, was blind-sided by a "Black Swan" event.   The newly revealed CFTC evidence demonstrates, however, that instead Niv always knew and understood the threats posed by permitting FXCM customers to accumulate a large highly margined position on the volatile

EUR/CHF pair, yet took a calculated gamble, and that when FXCM lost its bet, Niv and others acted to cover up their culpability.

23.     As is more fully described below, Defendants made fraudulent statements and omissions about the Company's true business risks, and once the risks materialized, they resulted in massive losses to FXCM and to Plaintiff and the Class that are properly recovered in this action.

## JURISDICTION AND VENUE

24.     The claims asserted herein arise under Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§78j(b) and 78t(a) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. §240.10b-5).  This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §1331 and Section 27 of the Exchange Act (15 U.S.C. §78aa).

25.     Venue is proper in this District pursuant to 28 U.S.C. §1391(b) and Section 27(c) of the Exchange Act (15 U.S.C. §78aa(c)).  At all relevant times, FXCM's headquarters were located at 55 Water Street, Floor 50, New York, NY 10041, which is in this District.  Throughout the Class Period, FXCM shares had been offered and traded on the New York Stock Exchange ("NYSE"), located in this District.  Many of the acts charged herein, including the preparation and dissemination of materially false and misleading information, occurred in substantial part in this District.

26.     In connection with the acts alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications, and the facilities of the national securities markets.

## PARTIES

27.     Plaintiff Retirement Board of the Policemen's Annuity and Benefit Fund of Chicago on Behalf of the Policemen's Annuity and Benefit Fund of Chicago ("PABF"), as set forth in the certification previously filed in this action, and incorporated by reference herein, purchased FXCM common stock during the Class Period and suffered damages as a result of the federal securities law violations and false and/or misleading statements and/or material omissions alleged herein.

28.     Defendant FXCM is headquartered in New York, NY and incorporated in Delaware.  On February 27, 2017, FXCM changed its name to Global Brokerage, Inc.  FXCM's common stock was traded on the NYSE under the ticker symbol "FXCM," until September 25, 2016, when its securities began to trade on the NASDAQ under the symbol "FXCM."  On February 27, 2017, the Company adopted the ticker symbol "GLBR."  FXCM maintains a holding company that owns a 50.1% interest in FXCM Group, LLC (the "Group").  The remaining 49.9% membership interest in the Group is held by Leucadia National Corporation ("Leucadia").  As the managing member of the Group, FXCM operates and controls the business and affairs of the Group and, through the Group and its subsidiaries located in New York, the United Kingdom ("UK"), Hong Kong and other locations, conducts its business.  As a holding company, almost all of the funds generated from FXCM's operations are earned by its operating subsidiaries.  FXCM accesses these funds through receipt of dividends from its subsidiaries.  These subsidiaries are subject to the differing margin, regulatory and capital requirements of the countries in which they operate.  Since 2010, when it went public, FXCM has been managed and controlled by a small group of five to six founders who, for all relevant times, retained a controlling interest in its stock.  Pursuant to CFTC February 2017 consent

orders, neither FXCM-US nor any of FXCM's other subsidiaries are any longer authorized to operate in the United States.

29.     Defendant Dror "Drew" Niv ("Niv") is one of the founders of FXCM and is and, at all relevant times during the Class Period, was the CEO and Chairman of the Board of Directors.  At all relevant times, Niv worked in FXCM's New York office.

30.     Defendants FXCM and Niv are collectively referred to herein as the "Defendants."

## SUBSTANTIVE ALLEGATIONS

### Background

31.     FXCM was one of the first currency brokerage firms to serve retail customers, which during the Class Period constituted about 5-7% of the overall global foreign currency market.  The daily global trading of foreign exchange exceeds $1 trillion a day and is highly speculative.  The vast majority of retail customers (approximately 72%) lose money betting on changes in the prices of foreign currencies.   Retail traders are more likely to trade when currencies are volatile, because it increases the potential for gain on their bets, as does trading on margin.  Most retail customers trade on margin, and the amount of margin an FX company permits its customers is a major competitive factor in determining a broker's market share of the retail FX business.  During the Class Period, FXCM was the largest retail FX broker in the United States and one of the largest in the world.  Gain Capital was one of the two largest competitors of FXCM-US; Saxo Bank was the largest competitor of Non-US FXCM companies serving retail customers trading in FX.

32.     FXCM provides trading and related services to individuals and institutions who trade over the counter on its sophisticated on-line technology platform.  The platform includes

training programs teaching the fundamentals of trading currencies, and includes daily articles referred to as the "Daily FX," by FXCM's in-house research analysts who provide tips and proposed trading strategies to promote increased interest in trading by potential retail customers.

33.     In an FX trade, a participant buys one currency – *i.e.*, trades "long" – and simultaneously sells another, a combination known as a "currency pair."  During the Class Period, FXCM permitted its customers to trade up to 59 currency "pairs," including euros to Swiss francs ("EUR/CHF").  More than 50% of FXCM's FX trading occurred in seven currency pairs, including the EUR/CHF.

34.     As noted above, as a holding company, FXCM conducted its business through a series of operating subsidiaries located in the United States, the UK, Hong Kong and various other locations.   Each subsidiary was subject to different regulatory oversight and capital requirements imposed by its local government and regulator.  Some, like the United States, also imposed limits on the amount of margin or leverage FXCM could provide to its customers.  Thus, *e.g.*, in the United States, where FXCM's principal offices had been located before February 2017, when FXCM entered into consent orders with the CFTC and NFA, and where, during 2014, FXCM customers conducted approximately 13% of FXCM's trades through its U.S. subsidiary, FXCM-US, the CFTC permitted retail trading of pairs of currency with margin collateral of no less than one-to-fifty dollars traded ("1:50," or leverage of "50:1"), depending upon the currencies being paired.  When a customer used leverage of 50:1, it deposited margin collateral of only 2% of the value of its trades, which meant that a currency movement in the wrong direction of more than 2% would exhaust the collateral in the customer's account and its account would have a negative, or "debit" balance.

35.     While ordinarily having a "debit" or "negative" balance would mean that the customer would receive margin calls and owe FXCM money, *see, e.g.*, Ex. 1, FXCM in its contracts with retail customers, agreed that its customers were not responsible for trading losses in excess of the collateral in their margin accounts ("trader will not be responsible for debit balances resulting from trading activity").   FXCM also aggressively marketed to potential customers that it "guaranteed" that their losses would be limited to the amount of margin collateral in their accounts.   This, the CFTC found in its Consent Order entered in the CFTC action, violated its regulations, particularly Reg. 5.16, which barred any Retail FX Dealer from representing to customers that it guaranteed against customer losses.

36.     Trades in the UK, Hong Kong and other less regulated jurisdictions were not subject to the margin requirements set by the CFTC.   As CW2, an Operations Associate in Plano, Texas, throughout the Class Period until September 2014, explained, FXCM set the "default" for required margin collateral for offshore accounts at 1:100, but permitted customers in jurisdictions that permitted higher leverage to request and receive much higher levels of leverage.   Thus, *e.g.*, CW2 noted that customers in Australia were permitted to trade with leverage of as much as 500:1.   Leverage of that amount meant that an adverse currency price change of as little as 1/5 of 1% would wipe out the positive balance of a customer's account for that pair.   As a November 2014 e-mail written by CW1 and produced by Defendants in this action, Ex. 9, shows, in the fall of 2014 many FXCM-UK customers traded the EUR/CHF pair with 400:1 leverage.

37.     Significantly, although the margin collateral requirements of Non-US FXCM companies were much less than those for FXCM-US, as the testimony of Rosenfeld reflects and internal FXCM documents confirm, the market risk attributed to **all** customer positions held by

Non-US FXCM companies was funneled through FXCM-UK to FXCM-US (technically, FXCM-UK "traded" with FXCM-US for the aggregate amount of Non-US retail customer positions), and FXCM-US entered into the mirror trades with its banks for the aggregate FXCM Group. *See* Rosenfeld Tr. 85:12-86:20.

38.     FXCM-US traded with its banks on the same highly leveraged terms that the various Non-US FXCM companies had permitted their customers (except that the banks had no policy to forgive FXCM-US's negative account balances, and FXCM-US was subject to margin calls when the value of its collateral dropped below zero).   This exposed FXCM-US to significant and unhedged market risks because, as noted above: (a) the margin collateral required of Non-US customers was much lower than the amounts required by U.S. regulators; (b) the Non-US FXCM companies did not deposit margin collateral for their customers' trades with FXCM-US; (c) FXCM-US did not factor in the balances in customer accounts at FXCM-UK and the other Non-US FXCM companies when calculating its daily required regulatory capital; and, finally (d) FXCM-US did not consider the amount of these Non-US customer liabilities, or FXCM-US's exposure to its banks for "hedging" the outstanding aggregate position, in determining the amount of cash (or liquidity) it needed on hand.

39.     Instead, as Rosenfeld testified, in handling the inter-company FXCM accounts for FXCM-US, he generally sought to retain just $20 million of cash from amounts due FXCM-UK to cover any short term capital requirements, regardless of the amounts that FXCM-US had at risk for the Non-US FXCM retail customers.   Nor did FXCM conduct "stress testing" for these exposures. *See* Rosenfeld Tr. 75:2-76:2; 79:15-81:20; 85:12-88:22; 90:4-21; 91:8-92:12; 92:22-93:20; and 112:1-12.

**FXCM Held Substantial Market Risk on Its So-Called "Agency" Trading Model**

40.     While most retail brokers earn their trading revenues by taking the opposite side of their retail customers' trades, FXCM represented that it followed a significantly lower-risk "agency" model.   As described by Defendants, independent financial institutions called "liquidity providers" served as the market makers for trades by FXCM's customers, and alone held the "principal" risk on the opposite side of its retail customers' trades, while FXCM served only as the "broker-intermediary" that "sen[t] the order to the liquidity provider."

41.     In fact, however, FXCM was an actual party at risk on the trades, taking the ***same side*** market risk as its customers, for all amounts beyond its customers' nominal margin collateral.   As FXCM's client agreements stated, "Trader [FXCM's customer] will not be responsible for debit balances directly resulting from trading activity" – meaning that there was no debtor-creditor relationship between FXCM and its retail customers.   FXCM "owned" the risk, and its exposure as a counterparty on the trades with its banks was unhedged, for all FX pairs whose value dropped more than the amount of collateral in its customers' accounts.

42.     FXCM-US acted as the counterparty on at least two simultaneous trades.   The first trade was between an FXCM company and its retail customer.   When a customer placed a trade and opened a position, FXCM took the other side of its customer's trade, at a price furnished by one of its banks, the so-called "liquidity providers," including, *e.g.*, its primary brokers, Citibank and Deutsche Bank, plus a mark-up reflecting FXCM's "commission."   So, for example, if its customer's trade was long the euro versus the Swiss franc (*i.e.*, betting that the price of the euro would rise relative to the price of the Swiss franc), FXCM, as the counterparty on the other side of that trade, would be short the euro (*i.e.*, betting that the price of the euro would decline in relation to the price of the Swiss franc).

43.     The second trade, executed simultaneously with the trade between FXCM and its customer *and using equivalent amounts of leverage*, was between FXCM-US and its banks, at the price furnished to the customer (less the mark-up).   Continuing with the above example, FXCM's trade with the bank would be long the euro (the opposite of the position it took with its customer), and the bank, as the counterparty on the other side of FXCM's trade, would be short the euro.

44.     In fact, as Rosenfeld testified, for Non-US retail customers, there was a set of at least three simultaneous trades and sometimes more, because all of the trading to offset retail customer trades with the various FXCM affiliates occurred through FXCM-US as the sole counterparty with the banks.   FXCM-UK would collect and funnel all the Non-US positions to FXCM-US, *i.e.*, FXCM-UK would hedge the Non-US customer trades with FXCM-US, without depositing with FXCM-US any margin collateral for FXCM-UK's customer trades.   Then FXCM-US would trade with its banks for the full amount of FXCM's US and Non-US customer positions.   Rosenfeld Tr. 85:16-22 ("FXCM U.S. is like the clearinghouse of trades for its affiliates.").

45.     Although FXCM represented in its SEC filings that the combination of these two trades (*e.g.*, the trade between FXCM and its customer, on the one hand, and the trade between FXCM and its bank, on the other) had the effect of automatically "hedging" the Company's positions and "eliminating" all market risk to FXCM, in fact, as Defendants knew or recklessly disregarded, the Company's client contracts and its marketing of its "no debit" account policy, which limited retail customers' liability and losses on their trades with FXCM to the amount of their minimal margin collateral, meant that FXCM, which had no equivalent arrangement with its banks, received and had to pay margin calls and absorb the associated losses for its own trades

with the banks, without offset, when adverse changes in the market prices of a currency pair exhausted FXCM's own minimal collateral deposited with its banks.

46.     During the Class Period, FXCM's and particularly FXCM-US's market risk – the risk associated with changes in the market prices of the FX pairs that FXCM retail customers bought – was substantial due to the huge amounts of leverage Non-US FXCM companies afforded their customers in order to drive revenue.   Although Niv, in an interview with *Bloomberg News*, had acknowledged that, "leverage is the enemy," and that a "big move" in currency prices is "what kills you," Niv approved extraordinarily high amounts of leverage for FXCM's largest customers, because FXCM earned its revenues as commissions calculated on the full amount of the customers' trades, and retail customers were more willing to trade when their potential gains were higher because of higher leverage, particularly for highly volatile currencies, and where their downside risk was limited.

47.     The prices of FX pairs were more likely to increase quickly and significantly with the higher "wins" to retail customers when currency prices were volatile.  Thus, customers traded more as volatility increased, and FXCM's commission revenues increased in periods of high volatility in currency prices, though FXCM's exposure to loss on highly margined "volatile" pairs was much higher as well.

48.     Shortly after the January 15, 2015 debacle, Niv in a February 2015 interview, confirmed that this was, in fact, how FXCM's supposed "agency" or "no dealing-desk" model operated, and that the model had failed to "hedge" or eliminate FXCM's margin calls and losses with FXCM's own banks when the market price of the EUR/CHF pair changed (although Niv also falsely asserted that FXCM's customers received margin calls for their purported obligations to FXCM which they were unable to pay):

In FXCM's no dealing-desk execution system, trades are matched one for one with a liquidity provider.

For example, when a client enters a EUR/CHF trade with FXCM, FXCM has an identical trade with one of the liquidity providers.  When a client profits in the trade, FXCM gives the profits to the customer.  However, when the client is not profitable on that trade, FXCM ends up having to pay an equivalent amount of the loss to the liquidity provider.

***In the case of the SNB event, while clients could not cover their margin call with FXCM, we still had to cover the same margin call with our liquidity providers.  The failure of the banks to provide pricing during the event ultimately resulted in some clients having negative balances with FXCM.***

*See* Ex. 1 (emphasis added).  In a later March 2015 investor presentation, Defendants explained how this business structure had resulted in FXCM incurring higher losses than brokers taking the *opposite* side of their clients' trades:

Remember when a client profits in the trade, FXCM gives the profits to the customer.  However, when the client is not profitable on that trade, FXCM ends up having to pay the equivalent amount of the loss to the liquidity provider.

Why didn't it happen to the brokers?  Many other brokers run a dealing desk, thus they are on the opposite side of their client trades.  As clients lose money, the Dealing Desk broker profits.  In this case, many traders lost money, as clients were mainly long EUR/CHF throughout the industry, which means these brokers made huge profits.

*See* Ex. 2.

49.     As Defendants, and particularly Niv, fully understood, sudden and severe changes in currency prices – what Niv called the "big move" in the May 2014 interview with David Evans, a reporter at *Bloomberg News*[2] – could cause FXCM massive losses on its trades with its banks due to their highly leveraged nature and FXCM's agreement to assume the trading losses associated with its clients' negative account balances.

---

[2]     Evans reported Niv's comments about the "big move" in articles he published ***after*** the SNB's decoupling of the euro.

50.     This risk was both very real and well known to Defendants, and was not limited to extreme "Black Swan" or extraordinary events.  For example, between December 12 and 15, 2014, FXCM-US had experienced a 23% reduction in its excess net capital (from $94 million to $72 million) due to losses it had incurred to Citibank for margin calls, as a result of volatility in the Japanese Yen and the Russian Ruble.  A little more than a week later, FXCM-US's excess net capital dropped by almost 50% (from approximately $26 million to approximately $14 million), once again due to "large hedging losses from affiliate retail customer trades."  As a result of these quick and severe capital losses, the NFA required FXCM-US to provide a weekly capital calculation as of Friday at 5:00 p.m. of the prior week by 2:00 p.m. each Monday.  In addition, NFA was required to be notified of any material changes to excess capital (*i.e.*, more than 10%) during the week.  *See* Ex. 10, attached hereto and incorporated herein.

**FXCM Loses Its $2.2 Billion Gamble on the EUR/CHF Pair**

51.     FXCM's business came crashing down on January 15, 2015, when the SNB decoupled its currency from the euro and lifted the 1.2:1 cap.  By this time, as Defendants knew, or recklessly disregarded, through emails prepared by the finance department concerning FXCM-US's daily capital reports for the NFA reflecting cash and customer liabilities and emailed to senior executives, FXCM's retail customers had open positions on the EUR/CHF pair of $2.2 billion, meaning that FXCM-US had amassed its own staggering long euro position of the same amount.

52.     Significantly, this was more than double the $1 billion in open EUR/CHF positions FXCM later claimed its retail customers had, when attempting to explain to investors how FXCM could have suffered a massive $276 million loss from their customers' negative accounts when the SNB lifted the cap on its currency.  *See* FXCM's 2014 Form 10-K at 40 ("At

the time of the SNB announcement over 3,000 of our clients held slightly over $1 billion in open positions on EUR/CHF.  Those same clients held approximately $80.0 million of collateral in their accounts.").  Patel's testimony, however, shows that FXCM's customer positions on the EUR/CHF amount to about $2 billion – rather than $1 billion – as reported by FXCM in its 2014 Form 10-K, and that the currency pair's price had moved 15%.  As Patel testified, his immediate and rough calculation of $300 million as the upper limits of FXCM's loss for this pair and which he conveyed to Niv on January 15th, after the cap was lifted, was based on multiplying the $2 billion position times the 15% change in the price of the EUR/CHF pair.  *See* Patel Tr. at 51:18-54:9.  Schedules produced by FXCM to the CFTC show that, on January 15, 2015, the notional value of FXCM customer positions on the EUR/CHF pair was $2.2 billion.  Ex. 6.  Finally, in its brief opposing the motion to dismiss the CFTC action, and armed with all the documents produced by FXCM about its exposure and margin calls for this pair, the CFTC performed the same calculation in determining the source of FXCM's losses, or "multiplying the 15% drop in value of the EUR/CHF to the $2 billion EUR/CHF position."  CFTC Br. at 12.

53.     FXCM reported in a press release issued on January 15, 2015, that,

[D]ue to unprecedented volatility in EUR/CHF pair after the Swiss National Bank announcement this morning, clients experienced significant losses, generated negative equity balances owed to FXCM of approximately $225 million.

As a result of these debit balances, the company may be in breach of some regulatory capital requirements.

We are actively discussing alternatives to return our capital to levels prior to today's events and discussing the matter with our regulators.

54.     On January 16, 2015, FXCM announced its financing deal with Leucadia, along with the confiscatory terms of its associated letter agreement.

<u>Amended and Restated Letter Agreement</u>

The Amended and Restated Letter Agreement provides, among other things, that Holdings and Newco [a newly created FXCM subsidiary] will pay in cash to Leucadia and its assignees a percentage of the proceeds received in connection with certain transactions, including sales of assets (subject to certain limited exceptions), dividends or distributions, the sale or indirect sale of Newco (whether by merger, stock purchase, sale of all or substantially all of Newco's assets or otherwise), the issuance of any debt (subject to certain limited exceptions) or equity securities, and other specified non-ordinary course events, such as certain tax refunds and litigation proceeds.

The Amended and Restated Letter Agreement allocates proceeds as follows:

| **Aggregate amount of proceeds** | **Leucadia** | **FXCM Holdings** |
|---|---|---|
| Amounts due under Leucadia term loan, including fees | *100%* | 0% |
| Next $350 million | *50%* | 50% |
| Next amount equal to 2 times the balance outstanding on the term loan and fees as of April 16, 2015, such amount not to be less than $500 million or more than $680 million | *90%* | 10% |
| All aggregate amounts thereafter | *60%* | 40% |

\* \* \*

In addition, the Amended and Restated Letter Agreement provides that beginning in three years and thereafter, upon the request of Leucadia or its assignees, the Company, Holdings and Newco will cause the sale of Holdings, Newco and/or any of their respective subsidiaries' assets or equity interests for cash at the highest reasonably available price. Upon the occurrence of such event, Newco will pay Leucadia and its assignees in accordance with the methodology described above.

55.    FXCM suffered larger losses on the EUR/CHF trading than any published by any other retail trader of foreign currency. In its 2014 Form 10-K filed March 16, 2015, FXCM changed its estimate of loss for the customer "debit balances" from the $225 million it had announced on January 15 to $276 million, although, as noted above, it falsely represented that its customers had open positions on EUR/CHF of only slightly in excess of $1 billion. Accordingly, with its customers' reportedly $80 million of margin collateral for this pair (assuming that that

number was truthfully reported), FXCM's customers' trading losses on this pair had exceeded $350 million, or approximately 16% of their actual original open positions of $2.2 billion, rather than the 35% loss on their trades that using the $1 billion of open positions implied – and which put the lie to Defendants' claims that FXCM's losses had resulted from closing out customers' balances at highly dislocated prices during a "Flash Crash."

56.     The 1Q 2015 Form 10-Q also reported that FXCM had suffered $292 million in losses as a result of its "letter agreement" with Leucadia – meaning that, as a practical matter, the events of January 15-16, 2015, had wiped out virtually the entirety of FXCM's shareholders' equity.  As FXCM reported in its Form 10-Q, its $643 million in shareholder equity at December 31, 2014, had become a deficit of $87 million as of March 31, 2015.  By May 2015, Leucadia was telling its own shareholders that its investment in FXCM had tripled in value.

**Defendants Knowingly Took a Huge and Calculated Risk By Allowing FXCM's Customers to Place a $2.2 Billion, One-Sided, Highly Leveraged Bet on the Volatile EUR/CHF Pair**

57.     Although the precise timing of the SNB's inevitable decoupling of its currency from the euro was unknown, that it would occur was a certainty.  The SNB had always maintained that the cap was a temporary measure, and even FXCM's own research analysts recognized that the Company was playing with fire by holding a huge, leveraged one-sided position in the EUR/CHF pair because it was only a matter of time until the SNB lifted the cap on its currency.  FXCM's losses resulted from "market risk" as applied to a huge, highly margined position on a volatile currency, and where FXCM's available "liquidity" and capital was grossly inadequate for the risks that Defendants knowingly assumed.

58.     Thus, *e.g.*, David Rodriguez stated in his "Daily FX" research reports dated September 4, 2014, and September 11, 2014, respectively:

***Euro/Swiss Franc Positions at Record Long – Where's the SNB?***

EURCHF – Incredibly one-sided positions warn that the Euro is at a major inflection point versus the Swiss Franc.  The key question is: will the Swiss National Bank intervene as the exchange rate nears SFr1.20?

**Trade Implications – EURCHF**:  We've seen up to 98 percent of open positions long the Euro versus the Swiss Franc – a new record.  The last time we saw anything similar was in 2012 when the Euro similarly traded near SFr1.20 for months on end.  In that instance, the Swiss National Bank ably defended its stated SFr1.20 price floor.  The critical question remains: will they once again give traders a free ride?

***Euro Very Likely to Test 1.20 Versus Swiss Franc***

EURCHF – Retail traders remain near their most long the Euro versus the Swiss Franc on record, and it seems almost inevitable that the EURCHF tests the Swiss National Bank's stated floor at SFr1.20.

59.     Likewise, FXCM's research analyst, Kristen Keir, reported on December 19, 2014, that although she continued to recommend buying the EUR/CHF long at the 1.2 level, "[a]t some point we believe market forces will force the SNB to abandon the floor, but that looks a long way off."

60.     In addition, Defendants knew that the most extreme currency price changes among "G-10" currencies in recent history prior to January 15, 2015, had also occurred with the EUR/CHF pair, specifically on September 6, 2011 when the SNB first introduced the 1.2 cap during a Eurozone crisis.  On that day, the price of the Swiss franc changed more than 8% within minutes of the SNB's announcement.  Even had the price of the EUR/CHF pair changed only this same amount when the SNB lifted the cap, it would have wiped out the entire regulatory capital maintained by FXCM-US, and indeed, all of FXCM's excess regulatory capital, because of the huge $2.2 billion aggregate position that FXCM-US had with its banks.  And because the SNB had installed the cap in 2011, three years earlier, there was no reason to believe that the capped price bore any relationship to the currency's current market value.

61.     Thus, it was only a matter of when, not whether, the SNB would remove the cap, with little doubt that, when that occurred, the resulting price changes would quickly wipe out the scant margin collateral in FXCM customer accounts, and that FXCM itself would suffer the lion's share of the trading losses attributable to the change in the price of the pair to its true market price versus the price set by the SNB in 2011.

62.     CW3, an FXCM Operations Specialist until November 2014, who provided client and trade support, explained that he had realized in late 2013 that once the SNB removed the 1.2 benchmark, FXCM would not be able to cover all the open positions of its clients. He knew this because he was able to view all open positions on the EUR/CHF currency pair at any given time, through FXCM's back office system. He also was able to see that most clients had stop-loss orders on their trades that had been "set at exactly 120 – the benchmark."

63.     CW3 explained that he had assisted in establishing FXCM branches in Germany and France and had set up all operational procedures for both. He noted that French-based customers had not engaged in trading the EUR/CHF pair to the extent that German customers had.

64.     CW3 stated that he spoke to the then Managing Director of FXCM Germany, CW1, in December 2013 about the serious risk associated with the EUR/CHF pair.

65.     Information provided by CW1, who was formerly employed as a FXCM Managing Director in Germany from the start of the Class Period through December 2014, demonstrates that the Defendants in this case fully understood that they were taking on risks of enormous trading losses, by continuing to provide massive amounts of leverage for the huge and increasing one-sided book of open EUR/CHF customer accounts through the close of 2014 (even

if CW1's estimates of how much the price of the pair might move varied from conversation to conversation).

66.    CW1 reported to the European-based executive who oversaw retail sales for Europe, and who reported to the CEO of Europe, Brendan Callan.  Callan was one of the original founders of FXCM and reported directly to CEO Drew Niv.  As the Managing Director of FXCM Germany, CW1 oversaw all operations for FXCM in German-speaking countries including Germany, Austria, and the German-speaking portion of Switzerland.

67.    CW1 interfaced with FXCM's "Dealing Department" in New York City on a fairly regular basis, many times with regard to specific clients, and other times relating to broader initiatives.  For example, CW1 would inquire as to why the Dealing Department widened or decreased the spread on certain currency pairs, or he at times requested to review the trading data prior to execution of a particular client's trade.  The global head of the Dealing Department was Eduard Yusupov, and its chief dealer was William Ahdout.  Both were co-founders of FXCM and sold massive amounts of stock in November and December 2014.

68.    Through CW1's ongoing interactions with the Dealing Department, CW1 came to realize that Defendant Niv was ultimately responsible for the Company's risk management practices and decisions – so that Niv himself would know the extraordinary amounts of leverage with which CW1's customers were trading the EUR/CHF pair.  For example, CW1 recalled that there were frequently client issues relating to contract for differences ("CFDs") trades. He explained that some FXCM customers in the German-speaking market traded on the German DAX index, via CFDs. Oftentimes CW1 would complain to the Dealing Department that the department had widened the DAX CFD spread. If spreads offered by FXCM were wider than what its competitors offered, it sometimes caused clients to trade using competitor platforms.

The reply from the Dealing Desk was "we would [narrow the spread] if we could, but Drew [Niv] didn't let us." CW1 explained that maintaining wider spreads was a method for FXCM to minimize risk.

69.     According to CW1, the trading strategy adopted by the overwhelming majority of retail customers trading EUR/CHF was to maintain an open long position, with a stop loss order set just below the 120 mark. This strategy worked under the assumption that the 120 peg would hold, CW1 explained. For example, customers would buy EUR/CHF at 1.2010 or 1.2015. Assuming the 120 peg held, the downside risk of this trade was very small. With a stop loss order in place at or around 120 (enabling the trader to exit the position in the event the peg was removed), the total potential downside would only be about .0015% or 15 "pips." However, the potential upside was significant.

70.     As CW1 further explained, if the value of the pair rose to 1.2020 or 1.2030, as it sometimes did, then a client would stand to reap significant gains. Using 400:1 leverage, a trader would double his or her money if the Swiss franc depreciated by a mere 0.25%. This trade was therefore extremely attractive and perceived by many high stakes clients as almost "too good to be true." FXCM research analysts broadly promoted this trading strategy on FXCM's online marketing site, the "Daily FX."

71.     According to CW1, the significance of most traders maintaining stop loss orders at, or close to, the 120 peg was that "it clarifies the risk." As CW1 explained, "because the Swiss franc is a pegged currency, and because traders all maintained a long position on EUR/CHF, it's clear that once the peg is broken, all the stop losses would trigger, and you're in trouble."

72.     CW1 explained that some high stakes EUR/CHF traders utilized the "martingale strategy," which required traders to add, and oftentimes double, their bets on losing positions in hopes of regaining all losses when the market moved favorably.   CW1 communicated on a weekly basis with many clients that maintained significant open EUR/CHF positions.   He said that certain of the high stakes EUR/CHF clients informed him that they had "doubled on the downside," meaning they had doubled their position when the EUR/CHF moved to 1.2015, for example, and doubled again when the EUR/CHF went to 1.2005.   CW1 stated that this trading strategy is precisely how some clients built up such massive EUR/CHF positions over time.

73.     In September 2014, Gain Capital and Saxo Bank both announced that they would be increasing margin requirements on Swiss franc pairs.   Saxo Bank, in explaining to its clients why they were raising the margin level from 2% to 8%, stated that increasing pressure on the EUR/CHF floor and the build-up of short CHF positions in the broader market could represent a larger risk should the 1.2 floor give way; as Saxo Bank stated, "We believe any breach of the 1.2000 peg could see a significant appreciation of CHF" – *i.e.*, the risk that ultimately came to pass on January 15, 2015.   This information from Saxo Bank was reported on September 2, 2014, by *Finance Magnates*, an online website available to foreign exchange traders.   In a September 16, 2014 post, *Finance Magnates* similarly described the reasoning behind the Gain Capital increase in required margin collateral for the EUR/CHF pair as follows: "[T]he increasingly high risk associated with the one-sided exposure of retail market participants is forcing another company to change its leverage policy towards the Swiss franc peg to the euro."

74.     While CW1 provided information from which it could be inferred that Niv was aware of the September 2014 actions of its key competitors when, in September 2014, they

increased their customers' required margin collateral for the EUR/CHF pair, direct evidence of this knowledge was produced in the CFTC action.

75.     Patel, in the CFTC action, testified to "a lot of news articles about other brokers possibly raising margins [to] as high as 10 percent." Patel Tr. at 58:16-18.  In a transcript of a January 16, 2015 "chat" marked as a CFTC deposition exhibit, Patel expressed concern about losing his job following the January 15, 2015 devastation, notes that he searched his past emails and stated "then I sent to drew to raise margins and he said no." *See* Ex. 8.

76.     A CW1 explained, retail FX customers consistently seek higher leverage as a matter of course.  As a result, providing more leverage (as Niv decided to do here) was a critical marketing strategy by which FXCM was able to obtain significant market share, in general and with regard to the EUR/CHF pair specifically.  As CW1 explained, "it was easy [for FXCM] to get those people in the market trying to find a broker that offers that high leverage."  CW1 noted that these customers included "really big clients" that traded and maintained highly leveraged large positions in EUR/CHF.

77.     CW1 explained that following Gain's and Saxo's announcements, there was a significant and almost immediate influx to FXCM of retail customers that had previously traded through the Gain and Saxo platforms.  A November 14, 2014 email from CW1 that Defendants themselves produced in this litigation reports that the size of Non-US FXCM customers' EUR/CHF highly margined positions on the EUR/CHF pair increased after Gain and Saxo's September 2014 announcement and Niv's decision not to similarly increase FXCM's margin collateral requirements:

> I [CW1] have people opening accounts to shift their exposure to us that they have with some other broker (who requires higher margins) . . . these typically with 1:400.

Ex. 9.

78.     That Niv knew the risks of the EUR/CHF pair expressed by its most significant competitors, and made a calculated decision to grant more leverage to customers to spur increases in trading volume and therefore, revenue (despite the far greater resulting risks to FXCM), is also inferred from the reports by FXCM of far greater customer trading volumes in September and October 2014.   While FXCM's second quarter 2014 ("2Q 2014") Form 10-Q attributes its 29% losses in revenue to historically low customer trading volumes, in a slide presentation on its 3Q 2014 results, dated November 6, 2014, the Company reported "record" levels of customer trading volumes in September and October 2014.

79.     CW1 described how, in late 2014, he and other FXCM officers had specifically and repeatedly warned Callan, the FXCM CEO of Europe, and Niv's direct report for Europe's operations, about the massive risks of the EUR/CHF customer accounts.   CW1 stated that, for several months prior to his December 2014 departure, he communicated on a regular basis with his direct supervisor and Callan about the massive market exposure due to EUR/CHF open positions.   As CW1 explained, "I said to them 'here's something piling up, it's getting worse and worse and we should take care because if that 120 peg is removed, it [*i.e.*, the euro's value] will drop dramatically."   CW1 stated that he had explained to Callan that because FXCM maintained a no debit policy where client losses could not go below zero, FXCM would have to bear those negative balance losses.

80.     As CW1 stated, Callan replied, "[y]ou take care of your sales; the risk is being managed by the Dealing Department, which you're not a part of."   CW1 explained that the Dealing Room was the group in New York City that would know FXCM's worldwide exposure on EUR/CHF and would have likely passed that information on to Niv, since Niv was ultimately

responsible for risk measures at the Company. CW1 noted that Callan's reply captured the general attitude and position of FXCM's highest ranking executives. As CW1 explained, FXCM's senior executives consistently encouraged its personnel to grow revenue, but were dismissive about any concerns relating to potential risk and market exposure.

81.     According to CW1, Callan, at one point, replied to his concerns stating that the Dealing Room was not going to reduce leverage on the EUR/CHF across the book. In November 2014, however, after several weeks in which CW1 had expressed concern on a weekly basis to Callan about the EUR/CHF massive market exposure, Callan finally asked that CW1 provide him with a list of the top five to ten retail customers in the German-speaking market (*i.e.*, those that CW1 oversaw), which had the most market exposure on the pair. CW1 obliged and provided the list via email stating to Callan, "here's your risk, get rid of it," meaning reduce the leverage for these individual customers. However, as of the time CW1 left in late December 2014, the leverage for these clients had not been reduced.

82.     As CW1 explained, in his last week at FXCM, and exasperated at this point by Callan's failure to act, he told Callan, "do whatever you want, but this is where your risk is," indicating the list of customers he had provided, and "don't come back to me complaining, if you lose out." CW1 explained that he felt compelled to bring this issue to the attention of Callan, as it was in the best interest of the Company to do so. CW1 stated that because he was leaving FXCM, he was able to speak very emphatically with Callan and did so.

83.     CW1 also explained that the Managing Directors for the UK and France likely also raised concerns about the EUR/CHF pair to Callan and the Dealing Department. He noted that along with customers based in France, the French managing director also oversaw FXCM's operations in the French-speaking section of Switzerland. CW1 stated that there were "at least a

couple" of high stakes Swiss traders with significant EUR/CHF exposure that were under the purview of FXCM's French managing director.

84.    According to CW1, the German-speaking markets (Germany, Austria, and Switzerland) "account[ed] for a very high percentage" of the market exposure and ultimately, the losses arising from the decoupling.  CW1 estimated that only about 5% or less of clients in the German-speaking markets traded EUR/CHF.  However, a subset of those 5% had massive open long positions on EUR/CHF, with the highest leverage allowed in that market, 400:1.  CW1 explained that the majority of losses came about due to open positions of approximately 20 to 40 retail traders.  CW1 estimated that there were only about 100 or so additional retail customers in the German market that traded EUR/CHF.  CW1 recalled that one customer alone maintained an open position of approximately $200 million (which at 400:1 would have required a $500,000 margin).  He noted that for high stakes retail customers, maintaining $1 million in their FXCM trading account was "not a lot."

85.    CW1 explained that the reason FXCM's losses were significantly more than its competitors was that FXCM had attracted clients by offering the highest leverage, which in turn enabled these clients to take significant positions.  He also stated his view that FXCM's no debit policy emboldened traders to take more risks than they otherwise might have.  This same position was expressed to Niv in his interview with *Euromoney*'s reporters in February 2015. For a question put to Niv about market place assumptions, the reporters stated, "Many levered retail investors placed bets, assuming the downside would be 100% backstopped by FXCM. Some market players suggest that aggressive marketing language adopted by retail FX brokers nurtured this impression."   Niv responded by falsely pointing to the Company's supposedly

"extraordinarily robust risk-management systems," which purportedly had "prevented highly levered investors from losing more money than they had in their account."  *See* Ex. 1.

86.     CW2 also described participating in a conference call in the Summer of 2014 in which all personnel in the Plano, Texas, office, as well as personnel from other offices, including Ornit Niv (Drew Niv's sister), the CEO of FXCM U.S., were involved.  CW2 stated that on that call, he suggested that FXCM increase margin requirements "to reduce some of the risk."  Ornit Niv replied that such a proposal did not fit with the Company's current business model and that increasing margin requirements would reduce client interest because "customers come to FXCM because of the leverage."

**Other Indicia of Defendants' Scienter**

87.     With the events of January 15, 2015, FXCM suffered more than $270 million in losses on the EUR/CHF pair and on January 16, 2015, FXCM, through its punitive deal with Leucadia, transferred away essentially all of the remaining shareholder equity in FXCM.  Shortly thereafter, Niv and others at FXCM acted to cover up their own culpable conduct, in the earlier misrepresentation of the Company's risks and causing the Company's demise, by blaming FXCM's losses on a once-in-a-lifetime "Flash Crash."

88.     In the February 2015 interview with *Euromoney*, and several times thereafter (including before this Court), Defendants asserted that FXCM's January 15th losses resulted from a "failure of the banks to provide pricing" and a lack of "liquidity from banks" that had caused its retail customers to close out their trades at "dislocated" execution prices.  As Niv stated in February 2015, the market saw pricing go from $1.20 "to well below 0.8," a theme that was reiterated in Niv's March 11, 2015 investor presentation, where FXCM included a January 15th minute-by-minute, and at times second-by-second, change in EUR/CHF price quotes,

noting that at one point, prices had changed 6000 pips (60%) in two seconds.  Ex. 11, attached hereto and incorporated by reference herein.

89.     These presentations were highly misleading because as Niv himself wrote in a February 11, 2015 email prepared for an interview he was about to have with the press, he expressed his "sincere gratitude and appreciation" because FXCM's two primary banks for its EUR/CHF trading positions, Citibank and Deutsche Bank, had "NEVER turned us off."  Ex. 5 (emphasis in the original).  Similarly, Lester, FXCM's former chief compliance officer, testified that "[W]e never had our pricing halted by our liquidity providers nor did prime brokers [*i.e.*, Citibank and Deutsche Bank] stop trading with us."  According to Lester, FXCM's retail customers had, in fact, not traded at dislocated prices because "seatbelts" in FXCM's systems prevented those trades.  Lester Tr. 129:15-18, 130:4-19.

90.     FXCM's 2014 Form 10-K filed in March 2015 – which Niv signed – also supported the false story that FXCM's losses were the result of an unforeseeable once-in-a-lifetime "Flash Crash" event, by representing that the $276 million in customer negative accounts, after the exhaustion of their $80 million in margin collateral, had occurred on an aggregate EUR/CHF position of about $1 billion – meaning that customers had traded at prices that were down over 30%, rather than the 15% true market price change that actually occurred on the actual ***$2.2 billion*** net open position on this pair.

### Defendants' Materially False and Misleading Statements

91.     Defendants' statements falsely claimed that FXCM's so-called agency model eliminated the Company's exposure to "market risk," which FXCM defined as the "risk of a position moving up or down in value."  FXCM misrepresented in its 2013 Form 10-K that it had "hedged" and "eliminated" its "market risk."  This was materially false and misleading, and grievously so in connection with the enormous risk FXCM had assumed for its $2.2 billion

highly margined open position for customer trades on the EUR/CHF pair, because FXCM had committed in its marketing and client agreements that FXCM, not the customers, would be responsible for customers' losses that exceeded the customers' debit balances.  Thus, the market risk had not been effectively "hedged" or "eliminated" because, *e.g.*, when the "long" bet on the EUR/CHF pair lost, the price dropped 15%, and FXCM's banks served FXCM with margin calls, FXCM had no claim over against its customers who had placed these risky bets beyond the nominal amounts of margin in their accounts.   In particular, FXCM-US was exposed to significant and unhedged market risks because: (a) the margin collateral required of Non-US customers was much lower than the amounts required by U.S. regulators; (b) the Non-US FXCM companies did not deposit margin collateral for its customers' trades with FXCM-US; (c) FXCM-US did not factor in the balances in customer accounts at FXCM-UK and the other Non-US FXCM companies when calculating its daily required regulatory capital; and, finally, (d) FXCM-US did not consider the amount of these Non-US customer liabilities, or FXCM-US's exposure to its banks for "hedging" the outstanding aggregate position, in determining the amount of cash (or liquidity) it needed on hand.

92.    Because FXCM's client agreements and marketing assured clients that only FXCM would be responsible for trading losses in excess of their margin accounts, FXCM's statements with respect to its so-called "minimal credit risk" were materially false and misleading.  FXCM's exposure could not accurately be characterized as a mere "credit" exposure in the event that certain clients "failed to meet their obligations" (as FXCM represented in its SEC filings) because the clients did not have any obligations for those trading losses, and FXCM's exposure was far greater than the amount it would be if it were limited to only customers willing to default on their obligations.

93.     Where, as here, FXCM-US was trading as an "at risk" principal on the ***same side***
as FXCM's retail customers in amounts that represented the open positions of all retail customers
for the consolidated group of FXCM companies, FXCM-US also clearly failed to maintain
"substantial liquidity" and "excess regulatory capital," sufficient to "address unusual or
unforeseen market volatility."   The suggestion that margin decisions were made as part of the
Company's "risk management," and that FXCM's margin collateral policy was "fairly
conservative," was materially false and misleading when, in fact, enormous amounts of margin,
as much as eight times that permitted in the U.S., were routinely, as a matter of policy, granted
by Niv, without regard to risk, to boost sales and market share.

94.     All of these statements, as quoted and highlighted below, were materially false
and misleading in their own right, but were even more misleading in light of the omission of
critical facts, particularly that FXCM was routinely permitting its retail customers to trade with
nominal amounts of margin collateral and at the same time, had agreed that FXCM, rather than
its customers, would suffer the trading losses associated with the negative balances in their
accounts.

95.     Throughout the Class Period, Defendants deceptively fostered the misleading
impression that their customers faced the risk when they traded with high leverage (rather than
FXCM), while suggesting that the Company was generally authorizing prudent levels of
leverage.   For example, in an interview with *Bloomberg News*, Niv reportedly "recommended
using no more than 10:1 leverage," because "Leverage is the enemy."   However, at the same
time, Niv was secretly approving leverage to FXCM's largest customers of 400:1 or 500:1.   In
3Q 2014, in presentations to investors, Defendants also authorized an addition of $50 million for
the Company's share repurchase program purportedly from its "excess" capital.

96.    In truth, FXCM-US was severely undercapitalized given the extent of its net long massive $2.2 billion position with its banks on the EUR/CHF pair that was not offset or "eliminated" or effectively hedged by the amounts due from FXCM customers on the EUR/CHF pair that had grown as a result of Niv's calculation to accept higher margin risks than FXCM's competitors.

97.    There is no question that Defendants' statements successfully misled the market about how the Company operated and its fundamental risks.  Thus, both market analysts and investors were shocked by the devastating effects that the Swiss decoupling had on FXCM and their reports demonstrate that they, and investors, had been misled about the nature and extent of the Company's true exposure for FXCM's own trading losses in the highly speculative FX market.  As one market analyst (Sandler O'Neill Partners) reported, it "had perceived FXCM's primarily agency based model as low risk, especially compared to peer retail FX broker Gain Capital (GCAP), who operate[d] a principal based model," and noted that "high leverage [was] the likely culprit."  *See* Ex. 12, attached hereto and incorporated herein.  After the January 14, 2015 event, *Bloomberg Business* observed that, "FXCM's reversal of fortune has laid bare the risks Niv's firm and its more than 230,000 customers were taking," Ex. 3; and, as *FX-Week*, the leading on-line publication serving the foreign exchange industry, summed up the winners and losers, the "SNB fallout highlights [the] danger of agency only models."  Ex. 13, attached hereto and incorporated herein.

98.    Each of these analyst reports demonstrates that even sophisticated analysts had been duped by Defendants' materially false and misleading statements and omissions in FXCM's SEC filings and investor presentations and that only the materialization of the extraordinary market risks taken on the EUR/CHF pair had revealed the truth while causing Plaintiff's losses.

99.     Specifically, Defendants made the following highlighted materially false and misleading statements:

**FXCM's 2013 Annual Form 10-K Filed March 17, 2014**

100.     The Company's Form 10-K filed with the SEC on March 17, 2014, and signed by Niv, contained the following materially false and misleading statements:

**Business Overview**

***We primarily offer our customers what is referred to as an agency model to execute their trades.  Our agency model is fundamental to our core business philosophy because we believe that it aligns our interests with those of our customers and reduces our risks.  In the agency model, when our customer executes a trade on the best price quotation offered by our FX market makers, we act as a credit intermediary, or riskless principal,*** simultaneously entering into offsetting trades with both the customer and the FX market maker.  We earn trading fees and commissions by adding a markup to the price provided by the FX market makers.

[Emphasis added].

101.     In describing its "Retail Trading Revenue," the Company elaborated on why FXCM was supposedly not the party taking the highly speculative risks of a principal in FX trading, even though FXCM did enter into its own trades with its own banks, the purported "market makers" or "liquidity providers" – *i.e.*, that the two sets of trades, one with its clients and one with its banks, "hedged" and "eliminated" the trading or "market" risks.

Under our retail agency FX offering, trading revenue is earned by adding a markup to the price provided by FX market makers generating trading revenue based on the volume of transactions and is recorded on trade date. Under the agency model, when a customer executes a trade on the best price quotation presented by the FX market maker, we act as a credit intermediary, or a riskless principal, simultaneously entering into a trade with the customer and the FX market maker. ***This agency model has the effect of automatically hedging our positions and eliminating market risk exposure.***

[Emphasis added].

40

102.    Under the heading of "Risk Management," FXCM asserted that it faced a
potential loss on its trades *when its customers failed to perform their obligations*, *i.e.*, to pay on
losing trades, which supposedly was managed by the Company's margin collateral risk
management policies.   In this section, Defendants also represented their view that FXCM's
margin collateral requirements were "fairly conservative."

**Risk management**

In our agency model, when a customer executes a trade with us, we act as a credit
intermediary, or riskless principal, simultaneously entering into trades with the
customer and the FX market maker.

***Our FX trading operations require a commitment of our capital and involve
risk of loss due to the potential failure of our customers to perform their
obligations under these transactions. In order to minimize the incidence of a
customer's losses exceeding the amount of cash in their account, which we
refer to as negative equity, we require that each trade must be collateralized in
accordance with our collateral risk management policies*. . . . Because we do not
net across different currency pairs, *we believe we produce a fairly conservative
margin policy.* Our systems automatically monitor each customer's margin
requirements in real-time and we confirm that each of our customers has
sufficient cash collateral in their account before we execute their trades. If at any
point in time a customer's trading position does not comply with the applicable
margin requirement because our predetermined liquidation thresholds have been
exceeded, the position will be automatically liquidated in accordance with our
margin policies and procedures documented in our customer agreement. We
believe this policy protects both us and the customer. We believe that as a result
of implementing real-time margining and liquidation processing, the incidence of
customer negative equity has been insignificant.

[Emphasis added].

103.    The 2013 Form 10-K, under the heading "Item 7A. Quantitative and Qualitative
Disclosures about Market Risk," described FXCM's purported "Credit risk," absence of "Market
risk," "Liquidity risk," and "Regulatory capital risk."   The highlighted sections of each of these
descriptions were materially false and misleading, standing on their own and/or were misleading
as a result of material omissions:

**(A)     Credit risk**

***Credit risk is the risk that a borrower or counterparty will fail to meet their obligations. We are exposed to credit risk from our retail and institutional customers as well as institutional counterparties.***

All retail customers are required to deposit cash collateral in order to trade on our platforms. Our policy is that retail customers are not advanced credit in excess of the cash collateral in their account and our systems are designed so that each customer's positions are revalued on a real-time basis to calculate the customer's useable margin. Useable margin is the cash the customer holds in the account after adding or deducting real-time gains or losses, less the margin requirement. ***The retail customer's positions are automatically closed once his or her useable margin falls to zero. Exposure to credit risk from customers is therefore minimal. While it is possible for a retail customer account to go negative in rare circumstances, for example, due to system failure***, a final stop loss on the account is automatically triggered which will execute the closing of all positions.

* * *

**(B)     Market risk**

***Market risk is the risk of losses in on- and off-balance sheet positions arising from movements in market prices.*** In our retail business, ***we operate predominantly on an agency execution model and are not exposed to the market risk of a position moving up or down in value with the exception of certain trades of our CFD customers.***

* * *

**(C)     Liquidity risk**

In normal conditions, our business of providing online FX trading and related services is self-financing as we generate sufficient cash flows to pay our expenses as they become due. As a result, ***we generally do not face the risk that we will be unable to raise cash quickly enough to meet our payment obligations as they arise.*** Our cash flows, however, are influenced by customer trading volume and the income we derive on that volume. These factors are directly impacted by domestic and international market and economic conditions that are beyond our control. ***In an effort to manage this risk, we maintain a substantial pool of liquidity.***

**(D)     Regulatory capital risk**

Various domestic and foreign government bodies and self-regulatory organizations responsible for overseeing our business activities require that we

maintain specified minimum levels of regulatory capital in our operating subsidiaries. *If not properly monitored or adjusted, our regulatory capital levels could fall below the required minimum amounts set by our regulators, which could expose us to various sanctions ranging from fines and censure to the imposition of partial or complete restrictions on our ability to conduct business. To mitigate this risk, we continuously evaluate the levels of regulatory capital at each of our operating subsidiaries and adjust the amounts of regulatory capital in each operating subsidiary as necessary to ensure compliance with all regulatory capital requirements*. These may increase or decrease as required by regulatory authorities from time to time. *We also maintain excess regulatory capital to provide liquidity during periods of unusual or unforeseen market volatility, and we intend to continue to follow this policy*. In addition, we monitor regulatory developments regarding capital requirements to be prepared for increases in the required minimum levels of regulatory capital that may occur from time to time in the future.

[Emphasis added].

104.    These highlighted statements were materially false and misleading because:

(A)    Rather than acting as a "agent" or "riskless principal," FXCM was, in fact, an "at risk" principal for the trades with its banks that corresponded to its retail customers' trades.  FXCM, or specifically FXCM-US, had not effectively "hedged" or "eliminated" its market risk because FXCM's retail customers had no offsetting obligation for amounts exceeding their margin collateral in their accounts, which typically was far less than the open positions that FXCM, and particularly FXCM-US, had with its own banks.  FXCM had entered into contracts with its retail customers, and induced them to trade through aggressive marketing, with the representation and commitment that the retail customers were not obligated to pay negative balances in their accounts and would not suffer the trading losses to the extent of their negative account balances.  That meant that FXCM was not "hedged" for any of the amounts of the FXCM-US trades with its banks in excess of its customers' nominal amounts of margin collateral in their accounts.

43

(B)     Because of the agreement with its customers that they were not responsible for negative account balances, there was no debtor-creditor relationship between FXCM and its retail customers and FXCM was not a "credit intermediary."  It was misleading to discuss a supposed "credit" risk, or a risk that customers would "fail to meet their obligations" because the retail customers had no obligations to pay their negative balances, and the losses would not be limited to those from customers who defaulted on their obligations.  FXCM was the principal exposed to the market risks and these risks were decidedly not "minimal" in light of the extremely high leverage FXCM typically approved for its Non-US customers, including on highly volatile currencies.

(C)     FXCM did not have, and Defendants knew FXCM did not have, a "fairly conservative margin policy," and made its margin approval decisions largely without regard to risk or risk management, in order to win market share and drive revenues.

(D)     For all amounts in excess of their customers' nominal amounts of margin collateral, FXCM, and particularly FXCM-US, was exposed on its highly margined trades with its banks for "market risk," the risk "arising from movements in market prices," or the "risk of a position moving up or down in value."

(E)     FXCM, in fact, had substantial "liquidity risk" because it did not determine the amount of cash it needed on hand based upon its exposure for its open positions with its banks, or particularly FXCM-US's NoP with its banks, which exposed it to margin calls and immediate needs for cash.  FXCM-UK funneled enormous amounts of Non-US customer positions to FXCM-US to "hedge" with its banks, without providing it with the cash needed to respond to margin calls by the banks against FXCM-US.  FXCM-US received no cash from FXCM-UK for these exposures and FXCM did not consider these

exposures in stress tests or otherwise in determining whether its "liquidity" was adequate. FXCM's lack of these fundamental risk management controls grossly increased the risk that FXCM-US would not have the necessary cash to pay its margin calls to its banks.

(F)     FXCM did not mitigate its "Regulatory capital risk" but rather accentuated it by funneling Non-US customer trades to FXCM-US to hedge with its banks, without increasing FXCM-US's "excess" capital for these accounts.  As Rosenfeld testified, FXCM-US generally attempted to maintain only $20 million to offset the risks that FXCM-UK funneled to FXCM-US, regardless of the extent of the amount of the highly margined positions of Non-US customers that FXCM-US was required to "hedge" through its own banks.  Thus, FXCM did not "adjust the amounts of regulatory capital in each operating subsidiary as necessary to ensure compliance with all regulatory capital requirements."  Instead, FXCM's practices grossly increased the risk that FXCM-US's regulatory capital would be quickly exhausted, as market prices fluctuated on volatile currency pairs that had been traded by Non-US customers.

(G)     Finally, FXCM-US did not maintain "excess regulatory capital to provide liquidity" for even "foreseen," much less unforeseen, market volatility, as became clear with respect to the amounts of cash and regulatory capital maintained by FXCM-US to cover its known exposures on the EUR/CHF pair.

105.   FXCM's Form 10-Qs filed for each of first through third quarters of 2014 repeated the same materially false and misleading statements, as appeared in the 2013 Form 10-K under the heading "Item 7A. Quantitative and Qualitative Disclosures about Market Risk," virtually verbatim, and each was false and misleading for the reasons stated above.  In addition, as of the time that the 3Q 2014 Form 10-Q was filed, each of FXCM's risks had become far

more severe and required additional material disclosures, which were omitted and further caused the disclosures that were made to be materially misleading.  In particular, the 3Q 2014 Form 10-Q and the material omissions, as of the time that it was filed in November 2014, were false and misleading because the Company had built up an enormous NoP of $2.2 billion on the highly volatile EUR/CHF pair, so that each of the structural risks that were incident to the Company's practices presented a far greater and more concrete risk to the Company.

106.    In addition, Defendants represented in the 3Q 2014 Form 10-Q that, apart from certain changes not relevant here, "there have been no material changes in the Company's risk factors from those disclosed in its Annual Report on Form 10-K," which was materially false and misleading because of the much greater and more concrete risks that had arisen, as a result of FXCM's $2 billion NoP on the EUR/CHF pair.  Thus, *e.g.*, by November 2014, the Company had enormous "market risk" on the volatile EUR/CHF pair and the exceedingly low amounts of margin collateral taken from Non-US retail customers meant that those market risks were not effectively offset or eliminated, or that FXCM's liquidity was substantial or its regulatory capital adequate to protect against known or unforeseen market volatility, and that the Company's changed risk profile had to be disclosed.

107.    The statements above were further materially false and misleading, and omitted facts necessary to make them not misleading, because:

> (a) In fact, Defendants had knowingly assumed catastrophic and foreseeable market, liquidity, and regulatory capital risks in connection with the Company's one-sided, highly leveraged $2.2 billion dollar bet on the EUR/CHF pair, as the customers of FXCM's key competitors, Gain Capital and Saxo Bank, flocked to FXCM, after the competitors increased their margin capital requirements in September 2014 and FXCM did not;

> (b) Exposure to risk for the negative balances in retail customer accounts was not "minimal" because of Niv's decision to provide greater leverage to retail customers for this pair versus its competitors and to permit more than $2 billion to

accumulate without regard to the obvious need for risk management procedures and controls; and

(c)  FXCM's liquidity and capital was grossly inadequate for the entirely foreseeable and foreseen risks that Defendants knowingly took on the EUR/CHF pair.

108.   A November 12, 2014 article by *Bloomberg Business* quoted comments from an interview with Defendant Niv in which Niv further fostered the materially misleading impression that FXCM was not providing excessive leverage to its customers.   The *BloombergBusiness* reporter ascribed the following statement to Niv:

> "Leverage is the enemy; don't overleverage." . . . He [Niv] recommends using no more than 10:1 leverage.  Most clients, he says, use 15:1, and some use much more.

Ex. 4.

109.   The statements above implied that Niv was not authorizing FXCM customers to trade with excessive amounts of margin, and were misleading, given FXCM's practices in which it routinely permitted FXCM-UK customers to trade with as much as 400:1 leverage on the EUR/CHF currency pair.  By this statement, Niv also concealed the extraordinary risks to FXCM that these practices entailed, including with respect to the EUR/CHF pair.

**The Fog Begins to Lift and the Truth is Revealed**

110.   On January 15, 2015, the SNB announced that it was ending a policy in place since 2011, which capped the Swiss franc-euro exchange rate at 1.20 euros to the Swiss franc and allowed the franc to trade freely against the euro.  The franc jumped as much as 41% against the euro and closed at a price about 14% higher than the previous day.

111.   After hours, on January 15, 2015, the Company announced that – despite its vaunted agency model which supposedly insulated it from market risk – the Company's customers had suffered cumulative losses of $225 million, as a result of the aftermath of the

announcement by the SNB, and that the Company was in danger of not meeting its regulatory capital requirements.

112.    On January 16, 2015, the Company announced that it had been extended a $300 million loan by Leucadia National Corp. in order to stave off the regulatory default and possible bankruptcy facing the Company.  The terms of the loan were described by a Sandler O'Neill Research analyst, Richard Repetto, as "highly punitive" and wiped out nearly all shareholder value in the Company.  Trading of the Company's stock was suspended.

113.    Trading of FXCM stock resumed on January 20, 2015.  That day, the stock price closed at $1.60, down from a close of $14.87 on January 14, 2015.  In all, Company stock dropped *over 90%* in three trading days.

114.    The events of January 15 and 16 disclosed the truth about the actual and foreseeable risks of FXCM's so-called "agency model," the enormous amounts of leverage permitted to its retail customers, and other reckless practices with respect to permitting its customers to take a highly concentrated and enormous one-sided position on a currency whose price was dependent on policy decisions of a central bank, rather than market forces.

115.    Prior to January 15, 2015, the market had been misled by Defendants' misrepresentations that it did not take the "market risks" for its customers' trades.  This is apparent from the comments of market analyst Sandler O'Neill Partners, which, on January 16, 2015, reported that it "*had perceived FXCM's primarily agency based model as low risk*, especially compared to peer retail FX broker Gain Capital (GCAP), who operate[d] a principal based model."  [Emphasis added].  Sandler O'Neill further reported that "*high leverage [was] the likely culprit*," and that they had been informed that "FXCM offered clients leverage of 50x (often the standard in the UK for EUR/CHF trades").  [Emphasis added].

116.    On January 20, 2015, David Evans of *Bloomberg Business*, in an article entitled, "How Swiss Shock Humbled King of Leveraged Currency Trading," ***reported that FXCM's reversal of fortune "has laid bare the risks Niv's firm and its more than 230,000 customers were taking***." [Emphasis added].   That article also quoted from an earlier interview that Evans had had with Niv, suggesting that Niv had been fully aware of the risks, and that by January 20th, *Bloomberg Business* had learned that FXCM's customers were trading with as much as "200-to-one" leverage (though not the 400:1 trades that had, in fact, been authorized).   As Evans reported:

> ***"Leverage is the enemy," Niv said in an interview with Bloomberg News in May 2014.  "The big move, it's what kills you."***
>
> Well, the big move just arrived, via Zurich.  The Swiss central bank's decision to let its national currency float freely against the euro has blown a $225-million hole in FXCM and left Niv, its chief executive, struggling to contain the damage. ***Turns out, the leverage he'd warned of just eight months ago magnified his customers' bets by as much as 200-to-1.***

[Emphasis added].

117.    On February 3, 2015, *FX-Week* posted an article online to its foreign exchange customers, entitled "SNB Fallout Highlights Danger of Agency Only Models."   As *FX-Week* reported:

> ***The diverging fortunes of retail brokers in the wake of the Swiss National Bank's (SNB) decision to remove its EUR/CHF currency floor on January 15 appear to be largely due to whether a company operates an agency or principal execution model.***  Brokers relying on agency only models have suffered steep losses and in some cases, such as FXCM's, there were emergency cash injections. In contrast, principal brokers that act as counterparties to client trades came out of the shock event with flying colours and suffered zero or very small losses.

[Emphasis added].

118.    As became apparent, the only difference, in terms of "market risk," between the model operated by FXCM versus the "principal model" of its peers was that FXCM's

competitors took the *opposite* side of the bets taken by their retail customers, while FXCM's "market risk" taken with its banks was on the *same side* as the bets of its retail customers.

## CLASS ACTION ALLEGATIONS

119.    Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a class consisting of all those who purchased, or otherwise acquired, FXCM common stock during the Class Period (the "Class") and were damaged thereby.  Excluded from the Class are Defendants, the directors and officers of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors, or assigns, and any entity in which Defendants have or had a controlling interest.

120.    The members of the Class are so numerous that joinder of all members is impracticable.  Throughout the Class Period, FXCM securities were actively traded on the NYSE.  While the exact number of Class members is unknown to Plaintiff at this time, and can be ascertained only through appropriate discovery, Plaintiff believes that there are thousands of members in the proposed Class.  Record owners and other members of the Class may be identified from records maintained by FXCM or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

121.    Plaintiff's claims are typical of the claims of the members of the Class, as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

122.    Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation. Plaintiff has no interests antagonistic to, or in conflict with, those of the Class.

123.    Common questions of law and fact exist, as to all members of the Class, and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

(a)    whether the federal securities laws were violated by Defendants' acts as alleged herein;

(b)    whether statements made by Defendants to the investing public during the Class Period omitted and/or misrepresented material facts about the business, operations, and management of FXCM;

(c)    whether the price of FXCM common stock was artificially inflated during the Class Period; and

(d)    to what extent the members of the Class have sustained damages and the proper measure of damages.

124.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy, since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in managing this action as a class action.

## LOSS CAUSATION

125.     Defendants' wrongful conduct, as alleged herein, directly and proximately caused the economic loss suffered by Plaintiff and the Class.

126.     During the Class Period, Plaintiff and the Class purchased FXCM securities at artificially inflated prices.  When the misrepresentations that had been made to the market, the information alleged herein to have been concealed from the market, and/or the effects thereof were revealed, the price of the Company's securities significantly declined, causing investors' losses.

## APPLICATION OF PRESUMPTION OF RELIANCE (FRAUD-ON-THE-MARKET DOCTRINE)

127.     The market for FXCM securities was open, well developed, and efficient at all relevant times.  As a result of the materially false and/or misleading statements and/or failures to disclose, FXCM securities traded at artificially inflated prices during the Class Period.  Plaintiff and other members of the Class purchased, or otherwise acquired, the Company's securities, relying upon the integrity of the market price of FXCM securities and the market information relating to FXCM and have been damaged thereby.

128.     During the Class Period, the artificial inflation of FXCM stock was caused by the material misrepresentations and/or omissions particularized in this Complaint, causing the damages sustained by Plaintiff and other members of the Class.  As described herein, during the Class Period, Defendants made, or caused to be made, a series of materially false and/or misleading statements about FXCM's business, operations, and financial prospects. These material misstatements and/or omissions created an unrealistically positive assessment of FXCM and its business, financial condition, and risks, thus causing the price of the Company's securities to be artificially inflated at all relevant times and, when disclosed, negatively affected

the value of the Company stock. Defendants' materially false and/or misleading statements during the Class Period resulted in Plaintiff and other members of the Class purchasing the Company's securities at such artificially inflated prices and after the truth was revealed, each of them was damaged as a result.

129.     At all relevant times, the market for FXCM securities was an efficient market for the following reasons, among others:

     (a)     FXCM stock met the requirements for listing and was listed and actively traded on the NYSE, a highly efficient and automated market;

     (b)     As a regulated issuer, FXCM filed periodic public reports with the SEC and/or the NYSE;

     (c)     FXCM regularly communicated with public investors via established market communication mechanisms, including through regular dissemination of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and

     (d)     FXCM was followed by securities analysts, employed by brokerage firms, who wrote reports about the Company and these reports were distributed to the sales force and certain customers of their respective brokerage firms.  Each of these reports was publicly available and entered the public marketplace.

130.     As a result of the foregoing, the market for FXCM securities promptly digested current information regarding FXCM from all publicly available sources and reflected such information in FXCM's stock price.   Under these circumstances, all purchasers of FXCM

securities, during the Class Period, suffered similar injury through their purchase of FXCM securities at artificially inflated prices, and a presumption of reliance applies.

## NO SAFE HARBOR

131.    The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this Complaint. The statements alleged to be false and misleading herein all relate to then-existing facts and conditions.   In addition, to the extent certain of the statements alleged to be false may be characterized as forward looking, they were not identified as "forward-looking statements" when made and there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements.   In the alternative, to the extent that the statutory safe harbor is determined to apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the speaker had actual knowledge, or was reckless in not knowing, that the forward-looking statement was materially false or misleading and/or the forward-looking statement was authorized or approved by an executive officer of FXCM who knew, or was reckless in not knowing, that the statement was false when made.

## COUNT I
### Violation of §10(b) of the Exchange Act and Rule 10b-5 Promulgated Thereunder
### Against All Defendants

132.    Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

133.    During the Class Period, Defendants carried out a plan, scheme, and course of conduct, which was intended to, and, throughout the Class Period, did: (i) deceive the investing

public, including Plaintiff and other Class members, as alleged herein; and (ii) cause Plaintiff and other members of the Class to purchase FXCM securities at artificially inflated prices. In furtherance of this unlawful scheme, plan, and course of conduct, Niv and other senior officers of FXCM took the actions set forth herein.

134.    The Defendants: (i) employed devices, schemes, and artifices to defraud; (ii) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (iii) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the Company's securities in an effort to maintain artificially high market prices for FXCM securities in violation of §10(b) of the Exchange Act and Rule 10b-5. Niv is sued either as a primary participant in the wrongful and illegal conduct charged herein or as controlling person as alleged below.

135.    The Defendants, directly and indirectly, by the use, means, or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about FXCM's business, operations, and financial performance and prospects, as specified herein.

136.    The Defendants employed devices, schemes, and artifices to defraud, while in possession of material adverse non-public information, and engaged in acts, practices, and a course of conduct, as alleged herein, in an effort to assure investors of FXCM's value, performance, and continued substantial growth. These acts included the making of, or the participation in the making of, untrue statements of material facts and/or omitting to state material facts necessary in order to make the statements made about FXCM and its business operations and financial prospects, in light of the circumstances under which they were made, not misleading. As set forth more particularly herein, Defendants further engaged in

transactions, practices, and a course of business, which operated as a fraud and deceit upon the purchasers of the Company's securities during the Class Period. Defendants had actual knowledge of the misrepresentations and/or omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose such facts, even though such facts were available to them. Defendants' material misrepresentations and/or omissions were done knowingly or recklessly and for the purpose and effect of concealing FXCM's financial condition from the investing public and supporting the artificially inflated price of its securities. As demonstrated by Defendants' misstatements and/or omissions concerning the Company's business, operations, financial well-being, and prospects throughout the Class Period, Defendants, if they did not have actual knowledge of the misrepresentations and/or omissions alleged, were reckless in failing to obtain such knowledge by deliberately refraining from taking those steps necessary to discover whether those statements were false or misleading.

137. As a result of the dissemination of the materially false and/or misleading information, and/or failure to disclose material facts, as set forth above, the market price of FXCM securities was artificially inflated during the Class Period. In ignorance of the fact that market prices of the Company's securities were artificially inflated, and relying, directly or indirectly, on the false and misleading statements made by Defendants, upon the integrity of the market in which the securities trade, and/or in the absence of material adverse information that was known to or recklessly disregarded by Defendants, but not disclosed in public statements by Defendants during the Class Period, Plaintiff and the other members of the Class acquired FXCM securities during the Class Period at artificially high prices and were damaged when the truth was revealed.

138.    At the time of said misrepresentations and/or omissions, Plaintiff and other members of the Class were ignorant of their falsity and believed them to be true.  Had Plaintiff and the other members of the Class and the marketplace known the truth regarding FXCM and its business and prospects, which was not disclosed by the Defendants, Plaintiff and other members of the Class would not have purchased, or otherwise acquired, their FXCM securities or, if they had acquired such securities during the Class Period, they would not have done so at the artificially inflated prices which they paid.

139.    By virtue of the foregoing, Defendants have violated §10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

140.    As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their respective purchases and sales of the Company's securities during the Class Period.

<u>**COUNT II**</u>
**Violation of Section 20(a) of the Exchange Act**
<u>**Against the Individual Defendants**</u>

141.    Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

142.    Niv acted as a controlling person of FXCM within the meaning of §20(a) of the Exchange Act as alleged herein.   By virtue of his high-level positions, ownership, and contractual rights, participation in, and/or awareness of, the Company's operations, and/or intimate knowledge of the false statements filed by the Company with the SEC, all of which he signed and disseminated to the investing public, Niv had the power to influence and control, and did influence and control, directly or indirectly, the decision making of the Company, including the content and dissemination of the various statements which Plaintiff contends are false and

misleading.  Niv was provided with, or had unlimited access to, copies of the Company's reports, press releases, public filings, and other statements alleged by Plaintiff to be misleading prior to, and/or shortly after, these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

143.   In particular, Niv had direct and supervisory involvement in the day-to-day operations of the Company and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the securities violations, as alleged herein, and exercised the same.

144.   As set forth above, FXCM and Niv violated §10(b) and Rule 10b-5 by their acts and/or omissions as alleged in this Complaint.  By virtue of Niv's position as a controlling person, Niv is also liable pursuant to §20(a) of the Exchange Act.  As a direct and proximate result of Niv's wrongful conduct, Plaintiff and other members of the Class suffered damages in connection with their purchases of the Company's securities during the Class Period.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff prays for relief and judgment, as follows:

A.   Determining that this action is a proper class action under Rule 23 of the Federal Rules of Civil Procedure, with Plaintiff serving as Class representative;

B.   Awarding compensatory damages in favor of Plaintiff and the other Class members against both Defendants, jointly and severally, for all damages sustained, as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

C.   Awarding Plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

D.   Such other and further relief as the Court may deem just and proper.

## JURY TRIAL DEMANDED

Plaintiff hereby demands a trial by jury.

Dated: August 25, 2017

Respectfully submitted,

**SCOTT+SCOTT, ATTORNEYS AT LAW, LLP**

/s/ Beth A. Kaswan
Beth A. Kaswan
Deborah Clark-Weintraub
Thomas L. Laughlin
Donald A. Broggi
The Helmsley Building
230 Park Avenue, 17th Floor
New York, NY 10169
Telephone: 212-223-6444
Facsimile: 212-223-6334
bkaswan@scott-scott.com
dweintraub@scott-scott.com
tlaughlin@scott-scott.com
dbroggi@scott-scott.com

David R. Scott
Amanda F. Lawrence
**SCOTT+SCOTT, ATTORNEYS AT LAW, LLP**
156 South Main Street
P.O. Box 192
Colchester, CT  06415
Telephone:  (860) 537-5537
Facsimile:  (860) 537-4432
david.scott@scott-scott.com
alawrence@scott-scott.com

*Counsel for Plaintiff Retirement Board of the Policemen's Annuity and Benefit Fund of Chicago on Behalf of the Policemen's Annuity and Benefit Fund of Chicago*

## CERTIFICATE OF SERVICE

I hereby certify that on August 25, 2017, I caused the foregoing to be electronically filed with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the email addresses denoted on the Electronic Mail Notice List.

I certify under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed this 25th day of August, 2017, at New York, New York.

/s/ Beth A. Kaswan
Beth A. Kaswan
SCOTT+SCOTT, ATTORNEYS AT LAW, LLP
The Helmsley Building
230 Park Avenue, 17th Floor
New York, NY 10169
Telephone: 212-223-6444
Facsimile: 212-223-6334
bkaswan@scott-scott.com