## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

RETIREMENT BOARD OF THE
POLICEMEN'S ANNUITY AND BENEFIT
FUND OF CHICAGO ON BEHALF OF
THE POLICEMEN'S ANNUITY AND
BENEFIT FUND OF CHICAGO,
Individually and on Behalf of All Others
Similarly Situated,

      Plaintiff,

      v.

FXCM INC. and DROR NIV,

       Defendants.

Case No: 1:15-cv-03599-KMW

**OPPOSITION TO DEFENDANTS'
MOTION TO DISMISS THE SECOND
AMENDED CONSOLIDATED CLASS
ACTION COMPLAINT**

## <u>TABLE OF CONTENTS</u>

Pg.

INTRODUCTION ....................................................................................................... 1

STATEMENT OF FACTS ........................................................................................... 4

    A.  Background ........................................................................................................4

    B.  FXCM's "Agency" Model ................................................................................6

    C.  The $2.2 Billion Gamble Fails .........................................................................8

    D.  CFTC and NFA Investigations ........................................................................11

ARGUMENT ............................................................................................................... 13

I.   Defendants Made Materially False and Misleading Statements............................ 14

    A.  Defendants Attempt to Rewrite Plaintiffs' Complaint.......................................16

    B.  Defendants Made a Host of Material Misstatements and Omissions ................17

    C.  The "Risk" Disclosures Are Inadequate or Are Themselves Misleading.........22

II.  The SAC Pleads a Strong Inference of Scienter ................................................... 26

    A.  Niv Had Knowledge of the True Facts that the SAC Alleges Were Materially Misstated or Concealed.....................................................................................28

    B.  The Factual Record Compiled in the CFTC Proceeding Confirms the CW Allegations .......................................................................................................33

    C.  Defendants' Post-January 15, 2015, Misrepresentations Concerning the Reasons for FXCM's Losses Are Powerful Evidence of Scienter....................................35

    D.  The Presumption Favors Plaintiff's Inference of Scienter................................36

III. Loss Causation Is Established................................................................................ 38

CONCLUSION............................................................................................................ 39

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

CASES

*Akerman v. Arotech Corp.*,
    608 F. Supp. 2d 372 (E.D.N.Y. 2009) ....................................................................38

*Asher v. Baxter Int'l Inc.*,
    377 F.3d 727 (7th Cir. 2004) ..............................................................................24

*Brady v. Wal-Mart Stores, Inc.*,
    531 F.3d 127 (2d Cir. 2008)................................................................................29

*Caiola v. Citibank, N.A., N.Y.*,
    295 F.3d 312 (2d Cir. 2002)................................................................................21

*City of Providence v. Aeropostale, Inc.*,
    No. 11 Civ. 7132 (CM), 2013 WL 1197755 (S.D.N.Y. Mar. 25, 2013)................................23

*Credit Suisse First Boston Corp. v. ARM Fin. Group, Inc.*,
    No. 99 CIV 12046 WHP, 2001 WL 300733 (S.D.N.Y. 2001) ...............................23

*Dodona I, LLC v. Goldman, Sachs & Co.*,
    847 F. Supp. 2d 624 (S.D.N.Y 2012)................................................................21, 25

*Dura Pharms., Inc. v. Broudo*,
    544 U.S. 336 (2005)........................................................................................38

*Epstein v. World Acceptance Corp.*,
    203 F. Supp. 3d 655 (2016) ..............................................................................19

*Freudenberg v. E*Trade Fin. Corp.*,
    712 F. Supp. 2d 171 (S.D.N.Y. 2010)..............................................................28, 39

*Heller v. Goldin Restructuring Fund, L.P.*,
    590 F. Supp. 2d 603 (S.D.N.Y. 2008)................................................................27

*Holmes Grp., Inc. v. Vornado Air Circulation Sys., Inc.*,
    535 U.S. 826 (2002)........................................................................................17

*Hunt v. Alliance N. Am. Gov't Inc. Trust, Inc.*,
    159 F.3d 723 (2d Cir. 1998)..............................................................................20

*In re American Int'l Group, Inc. 2008 Secs. Litig.*,
    741 F. Supp. 2d 511 (S.D.N.Y. 2010)................................................................18

*In re Bear Stearns Mortgage Pass-Through Certificates Litig.*,
851 F. Supp. 2d 746 (S.D.N.Y. 2012).....................................................................29

*In re Forex Capital Markets, LLC, FXCM Holdings, LLC, Dror Niv, and William Ahdout*,
CFTC Dkt. No. 17-09 .........................................................................................11

*In re Forex Capital Markets, LLC, William Ahdout, Dror Niv, and Ornit Niv*,
NFA Case No. 17-BCC-001 .................................................................................12

*In re Initial Public Offering Sec. Litig.*,
544 F. Supp. 2d 277 (S.D.N.Y. 2008)...................................................................39

*Institutional Investors Group v. Avaya, Inc.*,
564 F.3d 242 (3d Cir. 2009).................................................................................37

*In re Moody's Corp. Sec. Litig.*,
599 F. Supp. 2d 493 (S.D.N.Y. 2009)...................................................................27

*In re Motorola Sec. Litig.*,
505 F. Supp. 2d 501 (N.D. Ill. 2007) ...................................................................39

*In re Nortel Networks Corp. Sec. Litig.*,
238 F. Supp. 2d 613 (S.D.N.Y. 2003)...................................................................27

*In re Prudential Secs. Inc. Ltd. P'ships Litig.*,
930 F. Supp. 68 (S.D.N.Y. 1996).........................................................................26

*In re Rezulin Prods. Liab. Litig.*,
168 F. Supp. 2d 136 (S.D.N.Y. 2001)...................................................................17

*In re Sanofi-Aventis Sec. Litig.*,
774 F. Supp. 2d 549 (S.D.N.Y. 2011)...................................................................22

*In re Scholastic Corp. Sec. Litig.*,
252 F.3d 63 (2d Cir. 2001)...................................................................................26

*In re UBS AG Sec. Litig.*,
No. 07 Civ. 11225 (RJS), 2012 WL 4471265 (S.D.N.Y. Sept. 28, 2012)..............37

*In re Van der Moolen Holding N.V. Sec. Litig.*,
405 F. Supp. 2d 388 (S.D.N.Y. 2005)...................................................................25

*In re Vivendi Universal, S.A.*,
381 F. Supp. 2d 158 (S.D.N.Y. 2003)...................................................................14

*In re Wachovia Sec. Litig.*,
753 F. Supp. 2d 326 (S.D.N.Y. 2011)...................................................................37

*In re Xerox Corp. Sec. Litig.*,
165 F. Supp. 2d 208 (D. Conn. 2001) ................................................................35

*King Cnty., Wash. v. IKB Deutsche Industriebank AG*,
708 F. Supp. 2d 334 (S.D.N.Y. 2010) ...............................................................38

*Lentell v. Merrill Lynch & Co., Inc.*,
396 F.3d 161 (2d Cir. 2005) ........................................................................38, 39

*Leonard F. v. Isr. Disc. Bank of N.Y.*,
199 F.3d 99 (2d Cir. 1999) ...............................................................................13

*Loreley Financing (Jersey) No. 3 Ltd. v. Wells Fargo Secs., LLC*,
797 F.3d 160 (2d Cir. 2015) ..............................................................................29

*Matrixx Initiatives, Inc. v. Siracusano*,
131 S. Ct. 1309 (2011) ................................................................................13, 21

*Metz v. U.S. Life Ins. Co. in City of New York*,
662 F.3d 600 (2d Cir. 2011) ..............................................................................13

*Meyer Pincus & Assocs., P.C. v. Oppenheimer & Co., Inc.*,
936 F.2d 759 (2d Cir. 1991) ..............................................................................23

*Meyer v. Jinkosolar Holdings Co., Ltd.*,
761 F.3d 245 (2d Cir. 2014) ....................................................................13, 21, 25

*New Orleans Empls. Ret. Sys. v. Celestica, Inc.*,
455 Fed. Appx. 10 (2d Cir. 2011) ...............................................................13, 28

*Novak v. Kasaks*,
216 F.3d 300 (2d Cir. 2000) .......................................................................14, 28

*Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pension Fund*,
135 S. Ct. 1318 (2015) ................................................................................18, 21

*Romano v. Kazacos*,
609 F.3d 512 (2d Cir. 2010) ..............................................................................17

*S.E.C. v. Gabelli*,
653 F.3d 49 (2d Cir. 2011) ................................................................................22

*S.E.C. v. Lee*,
720 F. Supp. 2d 305 (S.D.N.Y. 2010) ...............................................................29

*Teamsters Local 445 Freight Div. Pension Fund v. Dynex Capital Inc.*,
531 F.3d 190 (2d Cir. 2008) ..............................................................................27

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
    551 U.S. 308 (2007)..................................................................................26

*U.S. v. Gilbert*,
    668 F.2d 94 (2d Cir. 1981).......................................................................29

*Van Dongen v. CNinsure Inc.*,
    951 F. Supp. 2d 457 (S.D.N.Y. 2013).....................................................27

*Virginia Bankshares, Inc. v. Sandberg*,
    501 U.S. 1083 (1991)..........................................................................22, 23

## STATUTES, RULES & REGULATIONS

15 U.S.C. §78j(b)........................................................................................13
    §78u-4 (PSLRA)...............................................................................26, 29

17 C.F.R. §5.7(b)(2)(v)(A)..........................................................................19
    §240.10b-5..............................................................................................13

Fed. R. Civ. P. 8(a)(2).................................................................................38
    9(b)...........................................................................................................29
    10b-5........................................................................................................13
    12(b)(6)....................................................................................................13

Plaintiff, by its attorneys, respectfully submits this memorandum of law in opposition to the motion to dismiss the Second Amended and Consolidated Class Action Complaint (the "SAC") filed by Defendants FXCM, Inc. ("FXCM" or the "Company") and its Chief Executive Officer Dror Niv's ("Niv").

## INTRODUCTION

Defendants' motion to dismiss must be denied because it is predicated on the false narrative that Plaintiff is seeking to hold Defendants liable for failing to predict when the Swiss National Bank ("SNB") would lift the artificial cap it had imposed in 2011 on the price of the Swiss franc ("CHF") versus the euro ("EUR").  This Court should not be misled.  Plaintiff does not allege that Defendants should have been clairvoyant, but rather that they violated their legal duty under the federal securities laws to truthfully disclose the risks inherent in the Company's so-called "agency" trading model.

Throughout the Class Period, Defendants falsely stated that FXCM acted as a mere "agent," "credit intermediary," or "riskless principal," and that its "agency model" "hedged" and "eliminated" the Company's exposure to "market risk," which the Company itself defined as the "risk of a position moving up or down."  ¶¶4, 6, 91, 101-103.[1]  This was patently false because FXCM's "no debit" policy limited its customers' exposure for their trading to their minimal margin capital while FXCM held the market risk with respect to the full amount of these trades through its own trades with its banks.  Thus, losses that FXCM incurred on January 15, 2015, were simply a consequence of this allocation of market risk between FXCM and its retail customers.  As a consequence of the 15% decline in the price of the euro relative to the Swiss franc when the artificial cap on the Swiss franc was lifted, FXCM's customers lost their margin

---

[1]     All references to "¶__" and "¶¶__-__" are to the SAC.

1

collateral, just $80 million, on their losing bets with FXCM, while FXCM suffered losses of $276 million on its own trades with its banks.

Equally false and misleading were Defendants' statements that FXCM had a "fairly conservative margin policy" and that it maintained "a substantial pool of liquidity" and "excess capital to provide liquidity during periods of unusual or unforeseen market volatility." ¶¶6, 102-104. FXCM set its margin policy without regard to risk in order to win market share and drive revenues. Further, FXCM did not determine its liquidity and capital requirements based on its unhedged exposure to its banks for its open FX trades. In particular, Defendants did not consider the highly leveraged trades of European customers when calculating liquidity and capital requirements, a staggering omission given that the majority of FXCM's highly leveraged, open EUR/CHF positions related to trading of these customers.

That Defendants had misstated and concealed the true risks of FXCM's "agency" model is evidenced by analysts' reaction in the wake of the events of January 2015. For example, one market analyst stated that it "had perceived FXCM's primarily agency based model as low risk, especially compared to peer retail FX broker Gain Capital (GCAP), who operate[d] a principal based model" and that "high leverage [was] the likely culprit." ¶97. Similarly, *Bloomberg Business* concluded that "FXCM's reversal of fortune has laid bare the risks Niv's firm and its more than 230,000 customers were taking." *Id.* Indeed, Niv himself, following the events of January 2015, admitted the shortcomings of the agency model as applied by FXCM. In February, he explained that when a client was not profitable, "FXCM ends up having to pay an equivalent amount of the loss to the liquidity providers." ¶11. At the same time, however, Niv sought to evade blame for FXCM's losses, claiming that they were the result of extreme dislocations in price following the SNB's announcement. In fact, as recently revealed evidence

shows, FXCM's "seat-belts" had assured that FXCM's customers had not run up losses by trading at off-market prices, and that FXCM had satisfied its own margin calls from its books using EUR/CHF prices that had stabilized at their true market rate.

Defendants' narrative that FXCM was the innocent victim of a "Black Swan" event is thus a fiction designed to cover-up their fraudulent misconduct.  While Defendants may have been partially successful in using this tactic earlier, new evidence – witness testimony and internal Company documents produced to the Commodities Future Trading Commission ("CFTC") – has now come to light that makes it all but undeniable that Defendants committed securities fraud.[2]  This newly discovered evidence, which is cited throughout the SAC, consists of:

- FXCM internal documents and deposition testimony of FXCM senior executives obtained by the CFTC revealing that, on January 15, 2015, FXCM's clients held highly leveraged open positions on the EUR/CHF pair of $2.2 billion, more than double the amount FXCM told investors and this Court, and that FXCM held the principal risk on its own equivalent, highly leveraged open position with its liquidity providers (¶¶15-19, 51-52);

- FXCM internal documents and deposition testimony of FXCM senior executives evidencing that Defendant Niv was aware, in September 2014, that other companies had raised margin requirements with respect to the volatile EUR/CHF pair because of the risk, and that Niv was involved in internal discussions concerning whether FXCM should follow suit, but ultimately refused to do so (¶¶20-21, 75);

- Deposition testimony of FXCM's former Director of Compliance, Janelle Lester, that FXCM "never had [its] pricing halted by [its] liquidity providers nor did prime brokers stop trading with [FXCM]" on January 15, 2015 (¶89), and that the Company's "seatbelt" technology had prevented its customers from trading at dislocated market prices (¶¶16, 89);

---

[2]     Defendants make much of the fact that this is Plaintiff's third class action complaint. However, it is important to note that the first amended complaint was actually the first consolidated amended complaint that is allowed *as of right* while the SAC was submitted at the direction of the United States Court of Appeals for the Second Circuit in order to incorporate the new evidence that only came to light in February 2017.

- FXCM internal documents and deposition testimony of FXCM senior executives demonstrating that FXCM's $275MM loss on January 15, 2015, was equivalent to roughly 15% of its own then-existing, highly leveraged long euro position with its banks and resulted from its satisfaction of margin calls received from its banks that, due to the Company's "no debit" policy, were not offset by retail customers' margin collateral (¶18); and

- Deposition testimony of FXCM's managing director of finance and risk, Joshua Rosenfeld, demonstrating that FXCM had not retained "excess" regulatory capital or liquidity because FXCM-U.S. engaged in highly leveraged trades with its banks to "hedge" the customer loans of its foreign affiliates without receiving collateral to cover their risk (¶19).

This evidence, which must be accepted as true by this Court in deciding Defendants' motion to dismiss, puts the lie to Defendants' repeated assertions to this Court that the Company's losses following the SNB's removal of the cap were the result of an historic "Black Swan" event that Defendants could not have foreseen, and for which they should not be blamed.

Defendants' motion to dismiss must be denied.

## STATEMENT OF FACTS

### A.    Background

FXCM[3] is an on-line currency brokerage firm that focuses on FX trading, essentially betting on changes in the prices of foreign currencies against each other.  The Company was founded by Defendant Niv and a handful of others and was taken public in 2010.  ¶28.  FXCM, a holding company, conducted its business through operating subsidiaries located in a number of countries, including the United States.  ¶34.  FXCM's primary competitors for the trading of foreign exchange were Gain Capital Holdings Inc. and Saxo Bank.  ¶31.

Retail FX trading involves simultaneously buying one currency (*i.e.*, trading long) and selling another (a combination known as a currency pair) in the hope that their relative prices

---

[3]      On February 27, 2017, FXCM changed its name to Global Brokerage, Inc. and adopted the ticker symbol "GLBR."  ¶28.

will move in the direction chosen by the investor.  Because currency values fluctuate due to a number of largely unknown factors, the trading of currencies by retail, or individual, investors is highly speculative, and the vast majority of retail customers lose money betting on currency prices.  ¶31.  Although FXCM permitted its customers to trade up to 59 currency pairs, more than 50% of its business and exposure involved the trading of only seven pairs, including the euro and the Swiss franc ("EUR/CHF").  ¶33.  To increase the potential for gains on their bets, retail FX investors are more likely to trade volatile currencies and to trade on margin.  ¶31.  For this reason, the amount of margin an FX broker is willing to provide its customers is a significant competitive factor in attracting and retaining customers.  *Id*.

FXCM's U.S. subsidiary provided its retail customers with margin of as much 50:1, consistent with CFTC regulations depending on the currencies traded.  ¶34.  This meant that a customer was required to deposit margin collateral of just 2% of the value of its trades.  *Id*.  However, for its foreign subsidiaries, which were not subject to CFTC regulation, FXCM set the "default" for required margin collateral at 100:1, and even permitted some customers to trade with leverage of as much as 400:1 or even 500:1.  ¶36.  Although Niv, in an interview with *Bloomberg News* acknowledged that, "leverage is the enemy" and that a "big move" in currency prices is "what kills you," Niv approved extraordinarily high amounts of leverage for FXCM's largest customers because FXCM earned its revenues as commissions calculated on the full amount of the customers' trades.  ¶46.  These high levels of leverage meant that relatively small movements in the wrong direction in the prices of currency pairs were sufficient to exhaust the margin collateral in customer accounts, creating the potential of negative or "debit" balances in customer accounts.  *Id*.  However, in violation of CFTC regulations, FXCM guaranteed that its customers' losses would be limited to the amount of margin collateral in their accounts.  ¶¶35,

41.[4]   As explained below, due to the workings of its so-called "agency" trading model, this guarantee meant that FXCM, not its customers, was exposed to the market risk (*i.e.*, the risk of a position moving up or down in value) as a result of its retail customers' trading.

### B.      FXCM's "Agency" Model

Although retail FX brokers can trade currencies as a "principal" taking the other side of their customers' trades, and gaining or losing as the prices of currencies change in an inverse relationship to the bets of their customers, FXCM operated on a so-called "agency" model, which involved two simultaneous sets of transactions that, contrary to Defendants' public statements, left FXCM holding the lion's share of the market risk with respect to its customers' trading.  FXCM's "agency" model worked as follows:  When a customer placed a trade/opened a position on a currency pair, FXCM took the other side of the customer's trade on that pair at prices provided by FXCM's banks (the "liquidity providers").   Therefore, if a customer was "long" on one currency (*e.g.*, the euro) versus another (*e.g.*, the Swiss franc), *i.e.*, betting that the price of the euro would rise relative to the price of the Swiss franc, in its own trade with its customer, FXCM would be "short" the euro and long the Swiss franc.  ¶42.  At the same time, FXCM placed the identically leveraged trade as its customer (*e.g.*, long the euro and short the Swiss franc) with one of its banks.  ¶43.[5]  Although Defendants publicly stated that this second transaction "ha[d] the effect of automatically hedging [FXCM's] positions and eliminating market risk exposure" (¶101), nothing could have been further from the truth.  The two sets of

---

[4]      This has been termed the "no debit" policy because, if a currency moved in an amount more than the customer's collateral, a customer's account would have a negative or "debit" balance.  ¶34.

[5]      As explained by one of the deponents in the CFTC proceeding, for non-U.S. FXCM affiliates, there would have been at least ***three*** trades because FXCM-U.K. would collect and funnel all the non-U.S. positions to FXCM-U.S. and then FXCM-U.S. would trade with one of its banks for the full amount of the FXCM-U.S. and non-U.S. customer positions.  ¶44.

trades did not offset each other because FXCM had agreed with its customers that they were not responsible for negative balances in their margin accounts, while FXCM had no such agreement for its own highly margined accounts with its own banks.  ¶¶35, 45.[6]  Thus, for all amounts in excess of the margin collateral deposited by its customers for their trades, FXCM, and particularly FXCM-U.S., through its own trades with its banks, was exposed to the market risk of its positions moving up or down in value.  This included the market risk of all customer positions of FXCM's foreign affiliates since FXCM-U.S. traded with FXCM-U.K. for the aggregate amount of the foreign affiliates' highly margined retail customer positions.  ¶¶37-38, 44.  The only difference between a principal model and FXCM's so-called "agency" model was that FXCM took the **_same side_**, rather than the opposite side, of the trades placed by its customers – *e.g.*, in the case of the EUR/CHF pair, FXCM-U.S. was net "long" on the euro.  ¶41.  Thus, contrary to its public statements during the Class Period (and in its brief here ) (Defs. Brf.) at 4, FXCM functioned as an at-risk principal, not as a "credit intermediary."

By November 2014, FXCM held open long positions with its banks in the EUR/CHF pair of more than $2.2 billion.  The market risk associated with this position was substantial given the huge amounts of leverage Defendants had afforded retail customers of its foreign affiliates.  ¶46.  However, FXCM had a total of only $69.5 million in regulatory capital, a grossly inadequate amount given its market exposure.  ¶19.  As Joshua Rosenfeld ("Rosenfeld") admitted in his testimony before the CFTC, FXCM did not consider its exposure on trades with its banks for the

---

[6]     In their SEC filings, Defendants mischaracterized this guarantee as a "general policy" and falsely suggested that FXCM's obligation to its banks to cover negative balances was something less than absolute.  Defs. Brf. at 6 ("[I]f FXCM's computer trading system . . . is unable to close out positions in a customer's account before the margin deposit is depleted and the account goes into negative equity, FXCM may have to cover the client's losses to the financial institution on the other side of the trade in light of its general policy of not pursuing negative equity balances from customers.").

purpose of "hedging" the highly margined trades of non-U.S. customers when calculating its needed liquidity or regulatory capital. Instead, Rosenfeld testified that he generally sought to retain just $20 million in cash from amounts due FXCM-U.K. to cover any short-term capital requirements, regardless of the amounts that FXCM-U.S. had at risk on account of trading by retail customers of its foreign affiliates. ¶39.

As a result, contrary to its statements throughout the Class Period, FXCM did not hold excess capital as a buffer for unforeseen economic events resulting in a loss of liquidity in the market. To the contrary, it was substantially undercapitalized. Paresh Patel ("Patel"), an FXCM operations manager, explained in his CFTC testimony that a broker with FXCM's level of capital that "was not offsetting every position one-to-one" was permitted to hold market risk with respect to only $140 million in notional value. ¶19. Yet, FXCM, which was not offsetting its customers' positions one-to-one due to its "no debit" policy, held $2.2 billion in open long positions in the EUR/CHF pair by November 2014.

### C.    The $2.2 Billion Gamble Fails

On September 6, 2011, the SNB had placed a 1.2 "cap" on the EUR/CHF pair resulting in an immediate 8% decline in the price of the Swiss franc. ¶60. This cap was known to be "temporary." Indeed, FXCM's own researchers, in tutorials to its customers, debated when (not "if") the cap would be lifted. ¶61.

In September 2014, two of FXCM's most significant competitors announced that they were scaling back on the amount of leverage they permitted their customers trading the EUR/CHF pair, because of the increasing risk. ¶73. Saxo Bank explained that it "believe[d] any breach of the 1.2000 peg could see *a significant appreciation of CHF*." ¶73 (emphasis added). As *Finance Magnates* reported – as it related to Gain Capital's decision to increase its

customers' required margin collateral – "[t]he increasingly high risk associated with the one-sided exposure of retail market participants is forcing another company to change its leverage policy towards the Swiss franc peg to the euro." *Id*.

Significantly, Defendant Niv was aware of Saxo and Gain's moves and, more importantly, that they had prompted customers to flock to FXCM due to its lower margin requirements.  In his CFTC testimony, Patel, the FXCM operations manager, acknowledged seeing "a lot of news articles about other brokers possibly raising margins [to] as high as 10 percent," and a "chat" between Patel and another employee produced in the CFTC proceeding stated that Patel had emailed "[D]rew [Niv] to raise margins and he said no." ¶75.[7]

Further, as Defendant Niv knew or recklessly disregarded, his refusal to increase margins prompted an immediate influx of customers who previously traded with Gain and Saxo to FXCM.  This is documented in a November 14, 2014 email from CW1, a former FXCM Managing Director in Germany, to Brendan Callan, head of FXCM's U.K. operations and one of FXCM's founders who reported directly to Defendant Niv, produced by Defendants in this litigation.  CW1's email reported that the EUR/CHF positions of non-U.S. FXCM customers had increased in response to Gain and Saxo's decisions to increase margin requirements, and that these accounts were particularly risky because of their high leverage.  ("I [CW1] have people opening accounts to shift their exposure to us that they have with some other broker (who requires higher margins) . . . these typically with 1:400."). ¶77.  In light of this, CW1 warned Callan about the massive market exposure due to the EUR/CHF open positions:  "I said to them

_____

[7]     CW2, an operations associate, also reported that he suggested increasing margin requirements to reduce risk in the summer of 2014 in a meeting with Defendant Niv's sister, Ornit Niv, the CEO of FXCM-U.S.  ¶86.  However, Ornit Niv replied that this would not be consistent with FXCM's current business model.  *Id*.

'here's something piling up, it's getting worse and worse and we should take care because if that 120 peg is removed, it [*i.e.*, the euro's value] will drop dramatically." ¶¶79.

The increase in trading volume following the influx of customers from competitors was indisputably known to Niv as the Company reported "record" levels of customer trading volume in September and October 2014, coinciding with the Gain and Saxo Bank announcements.  ¶78. While Niv's gamble not to raise margins benefitted FXCM in the short term by increasing trading volume, unbeknownst to investors, but as Defendants knew or recklessly disregarded, Defendants' conduct exposed FXCM to catastrophic risks as FXCM's open, largely unhedged long position in the euro position with its own banks grew to a staggering $2.2 billion. Defendants' conduct was particularly reckless as it was undertaken despite clear warnings of the danger from FXCM employees in both Europe (CW1) and the U.S. (Patel).

On January 15, 2015, the SNB decoupled its currency from the euro and lifted the 1.2:1 cap that had been put in place in 2011.  ¶51.  Due to its staggering, largely unhedged long position in the euro, FXCM's trading losses on the EUR/CHF pair exceeded $350 million. Indeed, FXCM suffered larger losses on the EUR/CHF pair than any other (published) retail trader of foreign currency.  ¶55.  The Company was forced to enter into a highly punitive financing "deal" with Leucadia National Corp. ("Leucadia"), which effectively transferred the Company's remaining shareholder equity to Leucadia.  ¶112.  Trading of the Company's stock was suspended on January 16, 2015 and, while it resumed on January 20, 2015, its stock price declined over 90%.  ¶113.  By the end of 1Q2015, the prior quarter's $643 million in shareholder equity had become ***an $87 million deficit***.  ¶56.

Following the events of January 15, 2015, Defendants worked to cover-up their wrongdoing.  Specifically, Defendants wrongly attributed FXCM's losses to a once-in-a-lifetime

"Black Swan event," falsely stating that the failure of its banks to provide pricing and a lack of liquidity had caused its customers' positions to be liquidated at dislocated prices. ¶¶87-88.  To support this false narrative, Defendants falsely stated that FXCM's losses had occurred on an aggregate EUR/CHF position of about $1 billion, a loss rate of approximately 30%. ¶90.  In fact, as testimony of FXCM witnesses and documents produced by FXCM in the CFTC proceeding have since revealed, the "flash crash" narrative was a smokescreen.  As Defendant Niv himself admitted in a February 11, 2015 email, FXCM's banks on the other side of its EUR/CHF trades – Citibank and Deutsche Bank – had "NEVER turned [FXCM] off." ¶89.  This was confirmed by Janelle Lester, FXCM's head of compliance, who testified that FXCM "never had [its] pricing halted by [its] liquidity providers nor did [its] prime brokers [*i.e.*, Citibank and Deutsche Bank] stop trading with us." ¶¶16, 89.  Further, Lester confirmed that FXCM's retail customers had, in fact, not traded at dislocated prices because "seatbelts" in FXCM's systems prevented those trades.  *Id*.  This was confirmed by FXCM's own trading records produced in the CFTC proceeding which reflected that it suffered losses of just 15% on $2.2 billion in open positions in the EUR/CHF pair, a loss equivalent to the change in the market price of euro and Swiss franc when the artificial cap on the Swiss franc was lifted. ¶90.

### D.    CFTC and NFA Investigations

In February 2017, the CFTC and the National Futures Association ("NFA") published proceedings against FXCM and Niv.  The CFTC made public its Order Instituting Proceedings Pursuant to Sections 6(c) and 6(d) of the Commodity Exchange Act, Making Findings, and Imposing Remedial Sanctions dated February 6, 2017 in the matter *In re Forex Capital Markets, LLC, FXCM Holdings, LLC, Dror Niv, and William Ahdout*, CFTC Dkt. No. 17-09, while the Business Conduct Committee ("BCC") of the NFA issued a complaint and decision dated

February 6, 2017 in the matter *In re Forex Capital Markets, LLC, William Ahdout, Dror Niv, and Ornit Niv*, NFA Case No. 17-BCC-001.   Rather than contest the allegations made in these proceedings, Defendants opted to settle them.   *See* Consent Order of Permanent Injunction, Civil Monetary Penalty, and Other Equitable Relief entered in the CFTC action on February 13, 2017. Defendants' settlements required FXCM to cease its business operations in the U.S. and barred Niv from future CFTC registration.[8]

The regulatory actions did, however, bring to light more details into Defendants' wrongful conduct and, specifically, as to Defendants' scienter.   Specifically, sworn testimony of three former or current senior managers at FXCM, as well as business records, were made public when Defendants' motion to dismiss the federal complaint filed by the CFTC was converted to a motion for summary judgment and the evidence submitted by the CFTC in opposition to the motion was unsealed by U.S. District Judge Forrest.

As explained above, the new evidence demonstrates that, in fact, FXCM imploded because Defendant Niv made a calculated choice to accept overwhelming "market risk" for which FXCM was not adequately capitalized.   Thus, Defendants' entire argument in its brief that FXCM was unexpectedly swept up in a once-in-a-lifetime event that even Niv could not predict, is a fabrication.

---

[8]     Defendants seek to have it both ways at once arguing that "the CFTC Consent Order is a 'no-admit no-deny' settlement with no evidentiary value," and that the Court should draw inferences in their favor from the fact that the CFTC did not make certain allegations.  Defs. Brf. at 13.  This argument is nonsensical.  As an initial matter, the SAC relies on testimony and documents produced by Defendants to the CFTC, not the findings in the Consent Order.  Further, that the CFTC did not allege, for example, "that FXCM's public filings were false or misleading, or that Defendants had misled . . . investors regarding the risks associated with the agency model" is not surprising given that the CFTC's regulatory focus is the protection of customer assets, not the protection of investors.

**ARGUMENT**

On a Rule 12(b)(6) motion, the Court must "accept all factual allegations as true and draw all reasonable inferences in favor of the plaintiff." *Metz v. U.S. Life Ins. Co. in City of New York*, 662 F.3d 600, 602 (2d Cir. 2011); *New Orleans Empls. Ret. Sys. v. Celestica, Inc.*, 455 Fed. Appx. 10, 12 (2d Cir. 2011). In addition, the Court must consider the Complaint holistically, reviewing the allegations in context and taken together. *Meyer v. Jinkosolar Holdings Co., Ltd.*, 761 F.3d 245, 250-51 (2d Cir. 2014).

To state a claim under §10(b) and Rule 10b-5, a plaintiff must allege: (1) a material misrepresentation or omission by defendants; (2) scienter; (3) a connection between the misrepresentation or omission and plaintiff's purchase or sale of a security; (4) plaintiff's reliance upon the misrepresentation or omission; (5) an economic loss; and (6) loss causation. *Matrixx Initiatives, Inc. v. Siracusano*, 131 S. Ct. 1309, 1317 (2011). Here, Defendants argue that Plaintiff has failed to allege: (#1) the existence of false statements or omissions, (#2) scienter, and (#6) loss causation, and have further argued that the Company's risk disclosures bar Plaintiff's claims.

Acting as though this were a motion for summary judgment, Defendants have submitted a litany of press releases and articles not mentioned, referenced, or even alluded to in the SAC, in an attempt to show that the decoupling of the EUR/CHF was a "shock" and a "Black Swan" event. Defs. Br. 10-12. *See* Exhibits 2-8, 10-13, 18, 20-24. However, when considering a Rule 12(b)(6) motion, a District Court must confine its consideration to "facts stated on the face of the complaint, in documents appended to the complaint or incorporated in the complaint by reference, and to matters of which judicial notice may be taken." *Leonard F. v. Isr. Disc. Bank of N.Y.*, 199 F.3d 99, 107 (2d Cir. 1999). Indeed, Defendants previously attempted this tactic by

submitting a declaration with articles, and the Court refused to rely upon them. *See* ECF No. 73 at 8.   The Court should again disregard the myriad of press releases and articles impermissibly presented by Defendants here.   Should the Court opt to consider them, though, they are of no avail except to again demonstrate Defendants' fundamental misunderstanding of the case at hand.   This case is ***not*** about whether the SNB actions were a "surprise," but rather about whether Defendants knowingly misstated and concealed the fundamentals of FXCM's business and the massive risks facing the Company.   In short, they did.

## I.   **Defendants Made Materially False and Misleading Statements**

To allege a false or misleading statement or omission, a plaintiff need only specify the statements, "identify the speaker, state where and when the statements were made, and explain why the statements were fraudulent" by pleading facts "sufficient to support a reasonable belief as to the misleading nature of the statement or omission."   *In re Vivendi Universal, S.A.*, 381 F. Supp. 2d 158, 184 (S.D.N.Y. 2003).   A plaintiff need not "plead with particularity every single fact upon which [its] beliefs concerning false or misleading statements are based."   *Novak v. Kasaks*, 216 F.3d 300, 313 (2d Cir. 2000).   There can be no doubt that this standard is met here.

As stated above and in the SAC, Defendants made a series of misstatements primarily in the 2013 Form 10-K (and reiterated in each of the quarterly Form 10-Qs filed during the Class Period) concerning the nature of FXCM's retail currency trading operations and the risks then facing the Company.   These included:

- That the agency model "***reduce[d]*** [the Company's] ***risks***" and that FXCM served as a "***credit intermediary***" or "***riskless principal***" (¶100);

- That FXCM's "agency model ha[d] the effect of ***automatically hedging [the Company's] positions*** and ***eliminating market risk*** exposure" (¶101);

- That FXCM faced a "risk of loss due to ***the potential failure of [its] customers to perform their obligations***" in the event of losing FX trades (¶102);

- That FXCM had "*a fairly conservative margin policy*" (¶102);

- That FXCM was exposed to "minimal" "*credit risk*" from its customers' trading – *i.e.*, the risk that a [customer would] fail to meet [its] obligations" " (¶103(A));

- That since it "operate[d] predominantly on an agency execution model" FXCM was "*not exposed to the market risk of a position moving up or down in value*" with the limited exception of certain CFD customers (¶103(B));

- That FXCM "*maintain[ed] a substantial pool of liquidity*" and "[did] not face the risk that [it would] be unable to raise cash quickly enough to meet [its] payment obligations as they arose" (¶103(C));

- That FXCM "continuously evaluate[d] the levels of regulatory capital at each of [its] operating subsidiaries as necessary to ensure compliance with all regulatory capital requirements," and "maintain[ed] *excess regulatory capital* to provide liquidity during periods of unusual or unforeseen market volatility"(¶103(D)); and

- That as of the filing of FXCM's 3Q2014 Form 10-Q on November 7, 2014, there had been "*no material changes in the Company's risk factors* from those disclosed in its Annual Report on Form 10-K," which was filed on March 17, 2014 (¶106).

These statements were materially false and misleading for a variety of reasons including:

- That FXCM was *not* a mere "credit intermediary" or "riskless principal". Because of its agreements with its customers that they were not responsible for negative account balances, FXCM was not a "credit intermediary" and FXCM's potential risk of loss from its customers' trading was not "credit risk" or a risk that customers would "fail to meet their obligations" (¶104(B)). Due to its "no debit" policy FXCM was the "at risk" principal exposed to the *market risk* – the risks arising from movements in the market prices of currencies traded by its customers – and which FXCM, in turn, traded with its own banks. Further, this *market risk* was not "minimal" due to the Company's extreme leverage policy (¶104(A),(D));

- That FXCM had not "hedged" its risk due to its no debit policy which meant FXCM was "on the hook" for the amounts of its trades with its banks in excess of customers' nominal amounts of margin collateral (¶104(A));

- That FXCM had nowhere near a "conservative margin policy," but instead permitted non-U.S. customers to trade at margins of up to 500:1.[9]  Further, FXCM's margin

---

[9]      Thus Defendants are both completely disingenuous and simply wrong when they write that "FXCM followed the industry standard for margin trading."  Defs. Br. at 4.  Leverage of 500:1 was ten times the maximum permitted by the CFTC for retail trades with U.S. customers.

policy was crafted largely without regard to risk and designed to win market share and drive revenues (¶104(C));

- That FXCM had performed no stress tests or similar analysis sufficient to state that it maintained a "substantial pool of liquidity."  Further, given its immense, highly leveraged, open FX positions with its banks, which exposed it to margin calls and immediate needs for cash, FXCM faced enormous risk that it would not be able to raise cash quickly enough to meet it payment obligations as they arose (¶104(E));

- That FXCM did not maintain "excess" regulatory capital and in no way mitigated its "regulatory capital risk."  As the evidence disclosed in the regulatory proceedings showed, FXCM-U.S. circumvented the normal regulatory capital protections imposed by the CFTC when it traded with its own banks to "hedge" trades with the retail customers of its foreign affiliates.  For example, if FXCM-U.K. allowed its customers 400:1 leverage, FXCM-U.S. not only traded with its own banks on the same highly margined basis, it did so without receiving any margin collateral from FXCM-U.K.  Thus, FXCM did not "adjust the amounts of regulatory capital in each operating subsidiary as necessary to ensure compliance with all regulatory capital requirements" (¶104(F), (G); and

- That there had been material changes in FXCM's market, liquidity and regulatory capital risks since the filing of its 2013 Form 10-K because by November 2014, FXCM had built up an enormous net open position of $2.2 billion in the highly volatile EUR/CHF pair as customers of Saxo Bank and Gain Capital flocked to FXCM after Defendant Niv declined to follow FXCM's competitors and raise the Company's margin requirements.

In the face of such glaring misstatements and omissions, Defendants misconstrue the SAC's allegations entirely, claim to never have made any misstatements or omissions, and if they did, suggest that Defendants provided other risk disclosures that neutralized their deceptive statements.

## A.      Defendants Attempt to Rewrite Plaintiffs' Complaint

Defendants' principal tactic is re-write the SAC to set up a straw man.  According to Defendants, Plaintiff "is . . . saying . . . that FXCM should have predicted and disclosed the black swan event that occurred as a result of the way in which the SNB removed the peg."  Defs. Br. at 35.  Once again, this is not at all what Plaintiff is alleging and, therefore, whether Niv knew that

the lifting of the cap was imminent or that it would result in temporary illiquidity in the market (Defs. Brf. at 19) is irrelevant.

Instead, this case concerns the clear and material misstatements and omissions listed in the SAC and above in the face of contrary information known to Defendants concerning: (i) the fundamental nature of the Company's retail trading business; (ii) the Company's risks, including significant changes in those risks as FXCM increased its market exposure on the EUR/CHF pair; and (iii) its regulatory capital, liquidity, and margin practices.. ***None*** of those statements pertain to if or when the SNB would remove the peg.  Try as they might, Defendants cannot rewrite the SAC, as Plaintiff is master of its own pleading.  *Romano v. Kazacos*, 609 F.3d 512, 518 (2d Cir. 2010); *Holmes Grp., Inc. v. Vornado Air Circulation Sys., Inc.*, 535 U.S. 826, 831 (2002); *In re Rezulin Prods. Liab. Litig.*, 168 F. Supp. 2d 136, 150-51 (S.D.N.Y. 2001).

## B. <u>Defendants Made a Host of Material Misstatements and Omissions</u>

In an attempt to dodge the clear misstatements and omissions detailed in the SAC, Defendants argue that they never characterized FXCM's business model as "low risk," that Plaintiff does not understand the meaning of the term "market risk" as used in the FX industry, and that they had no duty to disclose margins or positions.  Defs. Br. at 31-38.  First of all, it is clear as demonstrated above that Defendants both made explicit misstatements about FXCM's risks, and fostered the materially false and misleading impression that FXCM was a mere "agent" or middleman without any significant exposure to its customers' speculative currency trading.  While Defendants may not have used the exact words "low risk," they clearly intended that this be the takeaway from FXCM's risk disclosures.  In this regard, Defendants stated that (i) they were not the persons taking the "market risks" of trading currency pairs; (ii) that FXCM's risk was as a credit intermediary in the event that customers did not fulfill their obligations; (iii)

that this "credit risk" was "minimal;" and (iv) that FXCM had a policy of maintaining not merely adequate but "excess regulatory capital" in order to provide "liquidity during periods of unusual or unforeseen market events."  ¶103.  Even when Defendants hint at FXCM's possible exposures in the event of a loss of market "liquidity," these statements do not neutralize the deception of their other misstatements or render them immaterial, because the purportedly truthful disclosures are themselves inadequate and misleading.  The risk disclosure involving the possible consequences of a loss of market liquidity, is discussed in terms of FXCM's "competitive" standing and ability to provide "competitive" pricing, not in terms of FXCM's exposure to losses from changes in the prices of the currency pairs its customers were trading.

These are the same type of statements and omissions about the true fundamental risks of a company's operations that were found to be "material," and false and misleading in *In re American Int'l Group, Inc. 2008 Secs. Litig.*, 741 F. Supp. 2d 511 (S.D.N.Y. 2010).  There, plaintiff alleged defendants had materially misled the market by, among other things, repeatedly emphasizing the strength of the Company's "risk controls."  The Court found each of these misstatements and omissions "plausibly and with particularity frame[] a claim of concealment of either a significant decision taken by the Company to expose itself to risk or a significant weakness in the Company's risk controls that 'would have been viewed by the reasonable investor as having significantly altered the total mix of information made available.'"  *Id.* at 531.[10]

---

[10]    Defendants also say *Omnicare* applies because Defendants' statements that FXCM's agency model were "low risk" were statements of opinion believed to be true at the time.  Defs. Br. at 34, n.19.  However, "opinion statements are not wholly immune from liability" and may be considered as misstatements or omissions under several circumstances.  *Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pension Fund*, 135 S. Ct. 1318, 1321 (2015).  As the Supreme Court instructed in *Omnicare*, where a "reasonable investor" may "understand an opinion statement to convey facts about how the speaker has formed the opinion" and those facts

Defendants, in discussing low risk, further take the Court down a curious and distracting path and compare the situation at hand to a meteorite that crashed into a woman on her couch in Alabama.   Defs. Br. at 34.   However amusing this anecdote, this is simply a variant of Defendants' argument that Plaintiff's claims are about Defendants' failure to predict the timing of the SNB's lifting of the cap.   Defendants' repeated efforts to transform Plaintiff's claims into something they are not demonstrates that Defendants are unable to secure dismissal of Plaintiff's actual claim that Defendants fundamentally misrepresented the Company's business risks, as well as their magnitude.   Furthermore, to suggest that the risk of loss arising from FXCM's provision and use of extreme leverage to make a $2.2 billion aggregate bet on the volatile EUR/CHF pair is a "low-probability event" akin to a meteorite striking is to ignore the clear allegations in the SAC.   Rather than a "low-probability" event, the SAC's allegations make clear that the risk of loss to FXCM was both known to and discussed by Defendants.   For example, operations manager Paresh Patel raised the issue of increasing margins with Niv as its competitors' customers flocked to FXCM to take advantage of its more generous (and risky) margin requirements, but Niv declined to do so.   CW1 issued a similar warning to Niv subordinate Brendan Callan, head of the Company's European operations.

As to market risk, Defendants give a convoluted explanation of the meaning of market risk, but FXCM's Form 10-K and 10-Q's state precisely what the Company meant by that term –

---

are false, the opinion is actionable.  135 S. Ct at 1328.  Here, Defendants' "opinions" about low risk and a conservative margin policy utterly omitted facts known to them that were starkly contrary to the opinions espoused.  *See also Epstein v. World Acceptance Corp.*, 203 F. Supp. 3d 655, 667 (2016)("Further, *Omnicare* is distinguishable from this case, as the plaintiff in *Omnicare* explicitly disclaimed any allegations of deception, instead solely alleging that defendants' stated beliefs turned out to be untrue").  Further, Defendants' argument that federal regulators somehow viewed the agency model as lower risk than the principal model (Defs. Br. at 34 n.19) is not supported by the facts.  The cited regulation, 17 C.F.R. §5.7(b)(2)(v)(A) does not mention any particular model but pertains to the capital deductions used to compute adjusted net capital for various currencies.

within a sentence of saying FXCM was not exposed to that risk:  "Market risk" was defined as "the risk of losses in on-and-off balance sheet positions ***arising from movements in market price***."  FXCM had market risk because it was exposed to its banks for its own highly leveraged trading that was not "hedged" by amounts due from its customers given their minimal margin collateral and the Company's "no debit" policy.  If, as occurred in connection with FXCM's huge open long positions in the EUR/CHF pair, the market price of the pair moved adversely to FXCM's position with its banks in excess of its margin collateral, FXCM was subject to margin calls from its banks, and it had no equivalent access to collateral or claim over against its retail customers.  These are thus classic misstatements on market risk and hedging.

The case of *Hunt v. Alliance N. Am. Gov't Inc. Trust, Inc.*, 159 F.3d 723 (2d Cir. 1998), is precisely on point here.  In that case, investors brought suit following the collapse of the Mexican peso.  Plaintiffs claimed that defendants' representations concerning the availability of hedging alternatives to protect against exposure to the peso were misleading, because, as a practical matter, they were too costly to be used.  When the Mexican government devalued the peso against the U.S. dollar, the value of the peso fell rapidly, and the plaintiff's fund's net asset value plummeted.  The Court found that the statements concerning "hedging" against the risk of the peso's loss of value were misleading because a reasonable reader of the statements would have understood that hedging techniques, although not foolproof, were available when, in fact, they were not.  *Id.* at 728.  The exact same holds true here, where "hedging" did not eliminate or even significantly reduce FXCM's "market risk" because of the combination of high amounts of customer leverage and FXCM's agreements with its customers that FXCM, rather than the customer, was responsible for trading losses once the customer's margin collateral was exhausted.

20

As to FXCM's margin policy, Defendants claim that FXCM's margin policies could be located on its website, but these assertions of fact are not in the SAC, subject to judicial notice or properly before the Court on a motion to dismiss.  Instead, the SAC alleges that Defendants' 2013 Form 10-K stated that FXCM had a "fairly conservative margin policy."  This is blatantly misleading absent a disclosure of what FXCM's margin policy actually entailed, given that the U.S. capped leverage at 50:1 while FXCM's "default" position was to provide foreign retail customers with 100:1 leverage, and Niv and others at FXCM's Dealing Desk routinely authorized leverage of as much as 400 or 500:1.  Nor can this statement be said to be a non-actionable statement of "opinion" absent any facts about how Defendants formed the opinion. *Omnicare*, 135 S. Ct. at 1321.

Defendants further aver that they had no duty to disclose the amounts of leverage extended.  Defs. Br. at 35.  However, "once a company speaks on an issue or topic, there is a duty to tell the whole truth." *Jinkosolar Holdings*, 761 F.3d at 250; *see also Caiola v. Citibank, N.A., N.Y.*, 295 F.3d 312, 331 (2d Cir. 2002)("Once Citibank chose to discuss its hedging strategy, it had a duty to be both accurate and complete").  *See also Dodona I, LLC v. Goldman, Sachs & Co.*, 847 F. Supp. 2d 624, 646-47 (S.D.N.Y 2012) (holding that Goldman Sachs, having spoken about the nature of the risks relating to the "CDO's" (Collateral Debt Obligations) had a "Duty to State Risk Accurately and Completely" and that because of the "buildup of negative events in the subprime mortgage market," it had failed to do so); *cf. Matrixx*, 131 S. Ct. at 1321 ("Disclosure is required . . . when necessary "to make . . . statements made, in the light of the circumstances under which they were made, not misleading.").  When a company broaches a topic, a "plaintiff need only demonstrate the materiality of the omitted facts because '[i]f a reasonable investor would so regard the omitted fact [as material], it is difficult to imagine a

circumstance where the prior statement would not be rendered misleading in the absence of the disclosure.'" *In re Sanofi-Aventis Sec. Litig.*, 774 F. Supp. 2d 549, 564 (S.D.N.Y. 2011). Here, there is no question that Defendants' failure to disclose the significantly more liberal margin policies of FXCM's foreign affiliates, which substantially heightened the Company's risk exposure, was material information which rendered its risk disclosures materially false and misleading. *See also S.E.C. v. Gabelli*, 653 F.3d 49, 57 (2d Cir. 2011)("[S]o-called 'half-truths' – literally true statements that create a materially misleading impression- will support claims for securities fraud.").

C.  **The "Risk" Disclosures Are Inadequate or Are Themselves Misleading**

Defendants cite to a paragraph from the 2013 Form 10-K (Defs. Br. at 31) to claim that they "expressly warned" investors of the risks complained of in this case. While the paragraph Defendants cite mentions that the loss of "competitive pricing" or the "suspension of liquidity" as a result of exceptional volatility "would expose us to the risk of a default by the customer and consequently, trading losses," this clause is embedded in a "disclosure" that repeatedly describes the operative risk as one involving a threat to the Company's ability to "compete" and its inability to provide "competitive pricing." As the Supreme Court explained in *Virginia Bankshares, Inc. v. Sandberg*, 501 U.S. 1083 (1991), while a truthful statement when coupled with a false or misleading one can render it immaterial, "not every mixture with the true will neutralize the deceptive. If it would take a financial analyst to spot the tension between the one and the other, whatever is misleading will remain materially so, and liability should follow." *Id.* at 1097.

Here, when the purportedly truthful disclosure about the "suspension of liquidity" is read in conjunction with the Company's other misleading statements regarding how it operated and its

22

other misstatements concerning risks, in particular, its purported lack of "market risk," this quoted paragraph enhances rather than cures the misleading nature of the Company's disclosures. *Meyer Pincus & Assocs., P.C. v. Oppenheimer & Co., Inc.*, 936 F.2d 759, 761-62 (2d Cir. 1991)(A company's public reports violate the securities laws if material facts have "been omitted or presented in such a way as to 'obscure[] or distort[]' their significance" or have been "submerge[d] . . . in a flood of collateral data," or treated in a "cavalier" manner). Indeed, the fact that even sophisticated analysts following FXCM's stock did not appreciate the significance of this paragraph is telling, if not required. *Virginia Bankshares*, 501 U.S. at 1097 ("[I]t is not sufficient that overtones might have been picked up by the sensitive antennae of investment analysts") (quoting *Gerstle v. Gamble-Skogmo, Inc.*, 478 F.2d 1281, 1297 (2d Cir. 1973)). *See* ¶115 (Sandler O'Neill Partners stated that it "had perceived FXCM's primarily agency based model as low risk" and surmised that "high leverage [was] the likely culprit.").

In addition, the paragraph erroneously cited by Defendants as fully disclosing the Company's risk profile falsely states that the Company's "margining practices are designed to mitigate this risk," when, in fact, extraordinary levels of leverage were granted by FXCM without regard to risk, in order to boost its revenues. Margins were set by Niv and the Dealing Desk with the purpose of increasing trading volume (and thereby revenues), which only increased FXCM's own exposure to catastrophic market losses. These statements in the Form 10-K are clearly inadequate to advise investors of the concrete and massive risks that were being taken by FXCM in 2014. *See Credit Suisse First Boston Corp. v. ARM Fin. Group, Inc.*, No. 99 CIV 12046 WHP, 2001 WL 300733, at *8 (S.D.N.Y. 2001)(Company's public risk disclosures were inadequate and misleading because, "[W]arnings of specific risks in the ARM Prospectus do not shelter defendants from liability if they fail to disclose hard facts critical to appreciating

the magnitude of the risks described"); *City of Providence v. Aeropostale, Inc.*, No. 11 Civ. 7132 (CM), 2013 WL 1197755, at *14 (S.D.N.Y. Mar. 25, 2013) ("[W]arnings of specific risks . . . do not shelter defendants from liability if they fail to disclose hard facts critical to appreciating the magnitude of the risks described.") (quoting *In re AIG 2008 Sec. Litig.*, 741 F. Supp. 2d 511, 531 (S.D.N.Y. 2010) (quoting *Credit Suisse First Boston Corp.*, 2001 WL 300733, at *8)).

Moreover, even as exposure to market and related risks dramatically increased as FXCM built up its $2.2 billion position on the EUR/CHF pair in late 2014, FXCM's generic "risk" disclosures remained largely the same in each of the Form 10-Q's filed after the 2013 Form 10-K. Indeed, while Defendants misstated and downplayed the Company's true risks when the 2013 Form 10-K was originally filed, the substantially unchanged risk disclosures in later-filed Form 10-Q's were, if anything, even more misleading. This was particularly true of the third quarter 2014 Form 10-Q filed in November 2014 under the facts that prevailed at that time. As the Seventh Circuit noted in *Asher v. Baxter Int'l Inc.*, 377 F.3d 727, 734 (7th Cir. 2004), "cautionary language [that] remained fixed even as the risks changed" may fall short.

Defendants also cite to another paragraph in the 2013 Form 10-K stating that the Company attempted to control "a variety of risks" (and then lists market exposure, human error, fraud, etc.) and that "[t]hese methods may not adequately prevent losses . . . ." Defs. Br. at 32. It concludes by stating that the risk management protocols "may not protect us against all risks . . . in which case our business . . . may be materially adversely affected." *Id.* These "disclosures" are so generic as to be functionally void. All companies face risk, attempt to mitigate risk, and, if unsuccessful, may experience difficulties. There is ***nothing*** in this paragraph that informs investors of the true and actual risks of FXCM's version of its "agency" business model, the high amounts of leverage, FXCM's commitment to assume its customers' trading losses in excess of

24

their margin collateral, or the $2.2 billion bet on the EUR/CHF pair.  A generic warning of a risk will not suffice when undisclosed facts on the ground would substantially affect a reasonable investor's calculations of the nature and extent of the risk or the likelihood that it will materialize.  *See, e.g.*, *Jinkosolar Holdings*, 761 F.3d at 251 ("A generic warning of a risk will not suffice when undisclosed facts on the ground would substantially affect a reasonable investor's calculations of probability.").

Finally, the two cited paragraphs from the 2013 Form 10-K are inadequate to effectively neutralize Defendants' other materially false and misleading statements and omissions, because they speak of a theoretical risk should "exceptional volatility" or "extreme market movements" occur.  Defs. Br. at 31-32.  However, by November 2014, Defendants had already taken extraordinary risks by accumulating a $2.2 billion long position on an artificially capped and relatively thinly traded currency, and choosing to offer higher levels of leverage than its peers.  Risk warnings are inadequate if they warn that a risk may impact a company's business when that risk has already materialized.  *Jinkosolar Holdings*, 761 F.3d at 251 ("One cannot, for example, disclose in a securities offering a business's peculiar risk of fire, the installation of a comprehensive sprinkler system to reduce fire danger, and omit the fact that the system has been found to be inoperable, without misleading investors.").  *Dodona I, LLC v Goldman, Sachs & Co.*, 847 F. Supp. 2d 624, 646-47 (S.D.N.Y. 2012): *In re Van der Moolen Holding N.V. Sec. Litig.*, 405 F. Supp. 2d 388, 400 (S.D.N.Y. 2005).  It has also long been the law that even specific risk disclosures will not provide protection for actual, important risks that are presented as theoretical problems or when real developing threats to the Company are portrayed as insignificant:

> To warn that the untoward may occur when the event is contingent is prudent; to caution that it is only possible for the unfavorable events to happen when they

have already occurred is deceit.  *Huddleston*, 640 F.2d at 544.  ***The doctrine of bespeaks caution provides no protection to someone who warns his hiking companion to walk slowly because there might be a ditch ahead when he knows with near certainty that the Grand Canyon lies one foot away***.  The bespeaks caution doctrine requires a contextual analysis and, ***in context, even apparently specific risk disclosures like those in [defendants'] prospectus are misleading if the risks are professionally stamped in internal undisclosed analyses (as they were here) as significantly greater or more certain than those portrayed*** . . . .

*In re Prudential Secs. Inc. Ltd. P'ships Litig.*, 930 F. Supp. 68, 72 (S.D.N.Y. 1996) (emphasis added).

In sum, Defendants' risk disclosures were materially false and misleading absent the disclosure of the true workings of FXCM's "agency" model, including FXCM's margin policy, the guaranteed "no-debit" policy, which eliminated FXCM's "hedging" of its own trades with its banks and made it the true at-risk principal subject to the market risks of the undisclosed $2.2 billion gamble on the EUR/CHF pair.

## II.   The SAC Pleads a Strong Inference of Scienter

In the Second Circuit, the scienter requirement can be satisfied by alleging facts constituting strong circumstantial evidence of: (1) a motive and opportunity to commit fraud; or (2) knowing falsity or recklessness.  *See In re Scholastic Corp. Sec. Litig.*, 252 F.3d 63, 74-76 (2d Cir. 2001).  "The inference that the defendant acted with scienter need not be irrefutable, *i.e.*, of the 'smoking-gun' genre, or even the 'most plausible of competing inferences.'"  *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 324 (2007).  The Court must therefore determine "whether *all* of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard."  *Id.* at 323 (italics in original).  The PSLRA does not "require the pleading of detailed evidentiary matter" to establish scienter.  *Scholastic Corp.*, 252 F.3d at 72.  "Common sense requires that courts remember the purpose of a pleading—to state a claim and provide adequate notice of that claim.

A pleading is not a trial and plaintiffs are not required to marshal their evidence and sustain a verdict at this stage." *In re Nortel Networks Corp. Sec. Litig.*, 238 F. Supp. 2d 613, 621 (S.D.N.Y. 2003).

In the Second Circuit, a plaintiff may establish scienter by alleging facts showing that defendants: "knew facts or had access to information suggesting that their public statements were not accurate." *Teamsters Local 445 Freight Div. Pension Fund v. Dynex Capital Inc.*, 531 F.3d 190, 194 (2d Cir. 2008) (quoting *Novak v. Kasaks*, 216 F.3d 300, 311 (2d Cir. 2000)).[11] *See also Heller v. Goldin Restructuring Fund, L.P.*, 590 F. Supp. 2d 603, 622 (S.D.N.Y. 2008); *In re Moody's Corp. Sec. Litig.*, 599 F. Supp. 2d 493, 514 (S.D.N.Y. 2009)(allegations that defendants "had access to information suggesting that [his] public statements were not accurate" were "sufficient to allege . . . scienter"); *Van Dongen v. CNinsure Inc.*, 951 F. Supp. 2d 457, 473 (S.D.N.Y. 2013)("[t]he Court finds a strong inference of scienter because Lead Plaintiffs have adequately alleged that defendants were aware of information that contradicted their statements.").

Plaintiff has alleged that Niv, while fully aware of the truth, falsely described the risks inherent in FXCM's business in the many SEC reports that he signed. These false and misleading statements, when made in the third quarter 2014 Form 10-Q filed in November 2014, were made while concealing FXCM's enormous, highly-leveraged $2.2 billion long bet on the

---

[11]     Although Defendants point to Defendant Niv's purported losses on his personal holdings of FXCM stock as rebutting any inference of scienter (Defs. Brf. at 17), Plaintiff is not relying on allegations of motive and opportunity to establish the requisite strong inference of scienter. Whether, in fact, Niv lost the amount Defendants assert or protected himself from the risk he concealed from investors is not known at this pre-discovery stage of the litigation.  What is known, based on the testimony and evidence produced in the CFTC proceeding and alleged in the SAC, is that Niv knowingly, or at an absolute minimum recklessly, misstated FXCM's business risks and margin policies and the adequacy of its liquidity and regulatory capital.  This is sufficient to allege scienter at the pleading stage.

EUR/CHF pair.  "[S]ecurities fraud claims typically have sufficed to state a claim based on recklessness when they have specifically alleged defendants' knowledge of facts or access to information contradicting their public statements."  *Novak*, 216 F.3d at 308, 311-12  ("[D]espite knowledge of the true reasons for rising inventory levels, the defendants made repeated statements to the investment community either offering false reassurances that inventory was under control or giving false explanations for its growth"); *Celestica*, 455 Fed. Appx. at 15 ("[T]he particular allegations that [defendants] were specifically informed, and had reason to know, of the growing inventory stockpile in Celestica's Mexican and American facilities are sufficient to establish the individual defendants' scienter.").  "Such 'allegations alone are enough to satisfy the pleading requirements for scienter.'" *Freudenberg v. E*Trade Fin. Corp.*, 712 F. Supp. 2d 171, 197 (S.D.N.Y. 2010).

### A.   Niv Had Knowledge of the True Facts that the SAC Alleges Were Materially Misstated or Concealed

Once again, Defendants misconstrue Plaintiff's allegations in an attempt to set up a "straw man" and distract the Court from an evaluation of the claims actually alleged in the SAC. According to Defendants, the issue of "scienter" turns on whether the Defendants actually knew (or recklessly disregarded) that the SNB would lift the cap on its currency in January 2015. Defs. Br. at 18-20.  Indeed, they now summarize the case as being about "Niv's failure to predict the timing . . . of the SNB Flash Crash . . . ," and seem to point the finger at the SNB acting "irresponsibly."  *Id*.  The timing of the SNB action, however, is not the essence of – nor is it particularly relevant to – Plaintiff's claims.  It would be wholly nonsensical to expect Plaintiff to be able to show that Niv knew with certainty the date on which the SNB would remove its artificial cap on its currency but nonetheless placed the $2.2 billion bet against the increase in its value versus the Euro.  Instead, Plaintiff claims that Niv misrepresented the fundamental and

inherent **risks** of FXCM's retail currency business, at a time when, unbeknownst to investors, he personally had made a calculated decision to boost revenue by accumulating a potentially catastrophic $2.2 billion position on the EUR/CHF pair by offering higher leverage than FXCM's peers.[12]

Niv's actual knowledge of the undisclosed risks is evidenced by numerous allegations in the SAC, including deposition testimony of an FXCM employee who discussed increasing the required margin collateral for the EUR/CHF pair with Niv in response to press accounts of the decision of FXCM's peers to do so,[13] his own later admissions, his role in creating the agency model, FXCM's internal business records produced to the CFTC, FXCM's prior market losses, and accounts of confidential witnesses.

To begin with, there can be no doubt that Niv fully understood how the agency model worked and that it required simultaneous trades by FXCM with a client, whose losses were

---

[12]     Indeed, Judge Calabresi seemed to agree that Defendants knowingly assumed undisclosed risks which was "enough" to establish scienter in the prior Complaint. *See, e.g.*, Tr. 14:16-22 ("The nearest thing that comes to it is where in fact defendants had knowingly assumed catastrophic and foreseeable credit, liquidity, operation and regulatory capital risks in connection with the company's one-sided, highly leveraged $1 [billion bet] on the EUR/CHF and failed to disclose these risks in the Form 10Q.  That's the nearest and may be enough.").

[13]     Defendants suggest that the testimony and internal Company documents provided to the CFTC  have "no evidentiary value" and should not be considered.  Defs. Br. at 26, n.15.  Defendants' position, however, makes no sense and its citations are wholly inapposite.  Here Plaintiff does not rely on a government's consent agreement or pleadings.  Plaintiff instead relies on the sworn testimony of FXCM current and former officers elicited during depositions where Defendants' current counsel appeared on their behalf, as well as on internal business records produced by FXCM to the CFTC.  These are obviously appropriate sources of information on which a plaintiff may rely in forming its complaint.  Indeed, even if Plaintiffs did not now have this entire body of evidence from the related federal action, Plaintiff could consider and include information from the CFTC pleadings and orders under the Second Circuit's decision in *Loreley Financing (Jersey) No. 3 Ltd. v. Wells Fargo Secs., LLC*, 797 F.3d 160, 179-80 (2d Cir. 2015).  *See also*, *In re Bear Stearns Mortgage Pass-Through Certificates Litig.*, 851 F. Supp. 2d 746, 768 n.24 (S.D.N.Y. 2012); *S.E.C. v. Lee*, 720 F. Supp. 2d 305, 340 (S.D.N.Y. 2010)("There is no absolute rule barring a private plaintiff from relying on government pleadings and proceedings in order to meet the Rule 9(b) and PSLRA thresholds."); *Brady v. Wal-Mart Stores, Inc.*, 531 F.3d 127, 136 (2d Cir. 2008); *U.S. v. Gilbert*, 668 F.2d 94, 97 (2d Cir. 1981).

capped at margin collateral, and with a liquidity provider, which were uncapped. Indeed, Defendants have conceded that Niv "pioneered" the agency model. Defs. Br. at 4. Furthermore, copious allegations in the SAC show that Niv was fully aware of both how highly leveraged FXCM was and of how its "no debit" policy effectively eliminated FXCM's ability to hedge its own trades and transferred the market risk of its customers' risky currency trading to FXCM itself. In fact, he, along with the Dealing Desk, had personally authorized the up-to-400:1 excessive levels of margin on the CHF/EUR pair for individual customers. He was also ultimately responsible for the Company's risk management practices and decisions. ¶68. Meanwhile, he admittedly fully understood the dangers of high leverage, describing it as "the enemy," particularly when coupled with a volatile currency, and noting that it's the "big move" that kills you." ¶¶46, 116. Therefore, he was aware that sudden and severe changes in currency prices could cause FXCM massive losses as the at-risk principal on its trades with its banks. ¶49.

Niv was also fully aware not only that a change in a currency price could cause FXCM losses, but that those losses could be catastrophic. The SAC cites emails prepared by the finance department concerning FXCM-U.S.'s daily capital reports for the NFA reflecting cash and customer liabilities. These were sent to senior executives at FXCM and exposed that FXCM's retail customers had open positions on the EUR/CHF pair of $2.2 billion, meaning that FXCM-U.S. had the same $2+ billion "long" position with its banks. ¶51.[14] Prior experience at FXCM also informed Niv that once (not when) the cap was removed on the Swiss franc the price of the Franc would appreciate immediately, not incrementally. Given FXCM's highly leveraged $2.2 billion exposure with respect to the EUR/CHF pair, and the Company's "no debit" policy with

---

[14]     Defendants are patently incorrect when they say ***customers*** had the positions. Defs. Br. at 21. Because of the extreme margins allowed by FXCM and the no-debit policy, it was actually FXCM that took the risk of being unable to cover the positions when the market prices changed to any significant extent.

respect to negative customer balances, Niv knew, or recklessly disregarded, that FXCM's financial condition would be significantly and adversely impacted in the event the cap was lifted and the Company had to make good on its customers FX trading losses. While Defendants point to 2011 when the cap was introduced as somehow *defeating* an inference of scienter (Defs. Br. at 21), the opposite is true. While FXCM survived the 8% move in the price of the Swiss franc when the cap was imposed in 2011, there is no evidence that FXCM at that time had a position in the pair anywhere near $2.2 billion. Moreover, the lesson to be drawn from the 2011 extreme price movement was that the EUR/CHF pair was highly volatile, and an immediate and sharp increase would occur in the price of the Swiss franc given that its price had been artificially set and maintained for a full three years. Defendants had no reason to believe that the capped price of the Swiss franc versus the euro prior to January 15, 2015, bore any relationship to the true relative market value of the pair. Saxo Bank acknowledged this when it raised its margin requirements, stating that "any breach of the 1.2000 peg could see *significant appreciation* of CHF." ¶73[15]

Further, as stated in the SAC, even if the change in the price of the Swiss franc in the wake of the de-pegging in 2015 was only the same 8% as when the cap was first installed, due to FXCM's $2.2 billion aggregate position (and the fact that FXCM-U.S. traded for its foreign affiliates without receiving cash to cover potential margin calls on their trades), an 8% change in the pricing of the EUR/CHF pair would still have wiped out the entire regulatory capital maintained by FXCM-U.S., and all of FXCM's excess regulatory capital. ¶60. Indeed, this is

---

[15]    For this reason, Defendants ignore reality in asserting (Defs. Brf. at 22) that had there been market liquidity in the immediate wake of the de-pegging, FXCM's systems would have allowed it to close out customer positions before they went negative. While gradual price movements may be the everyday norm, as Defendants knew, or recklessly disregarded, they were not the norm when currency prices were artificially set. Once the artificial constraint on the price of the Swiss franc was lifted the price would increase to its true value relative to the euro.

illustrated by FXCM's experience with the Japanese Yen and Russian Ruble. ¶50. Between December 12 and 15, 2014, FXCM-U.S. experienced a 23% reduction in its excess net capital (from $94 million to $72 million) due to margin calls from Citibank as a result of volatility in the Japanese Yen and Russian Ruble. A little more than a week later, FXCM-U.S.'s excess net capital again dropped, this time by almost 50% (from approximately $26 million to approximately $14 million), due to "large hedging losses from affiliate retail customer trades," and the NFA required FXCM to provide weekly capital calculations and to notify it of any material changes in FXCM's excess capital. *Id*.[16] Contrary to Defendants' assertions, these experiences serve to rebut Defendants' theory that only an unforeseeable once-in-a-lifetime or "Black Swan" event would significantly threaten FXCM-U.S.'s regulatory capital compliance. While the Company may have "survived" the Yen and Ruble market events (Defs. Br. at 29), it did suffer a significant capital reduction.[17]

In sum, Niv was fully aware of the true extent of the risks of FXCM's business operations (or at least recklessly disregarded them), including that the Company was exposed to substantial market risk, that its liquidity and capital were inadequate in light of this risk, that it was more highly margined than represented, that its customers were not obligated to pay FXCM for trading losses in excess of their margin collateral, that the cap on the Swiss Franc was temporary, and that, when lifted, the price change would be quick and severe. Therefore, there

---

[16]    While Defendants complain about a purported lack of "evidentiary support" for these reductions in FXCM's excess capital, these factual allegations were derived from the evidentiary record of the related CFTC action and need not be supported as if this were a summary judgment motion. This is a motion to dismiss and these allegations must be taken as true.

[17]    Defendants' contention that the decline in the price of the Ruble was an "extraordinary" market event that gave Defendants confidence that the Company could navigate the de-pegging of the Swiss franc (Defs. Brf. at 29 n.16) is based on material outside the Complaint that cannot be considered by this Court. *See* ECF No. 73 at 8.

can be no doubt that Defendants' materially false and misleading statements summarized above were made with scienter.

**B.**      **The Factual Record Compiled in the CFTC Proceeding Confirms the CW Allegations**

Defendants make much of the fact that this Court previously found the actions of Saxo Bank and Gain Capital insufficient evidence from which to impute scienter (Defs. Brf. at 22-23) but pointedly ignore the Court's reasoning: "Plaintiff's allegations that two out of three of FXCM's major competitors raised their margin requirements on the EUR/CHF *provide no information about Defendants' conduct or knowledge*." Dkt. #73 at 18.  As demonstrated above, the SAC indisputably contains such information.  Paresh Patel, one of the CFTC deponents, testified that, through news reports, Defendants knew that FXCM's competitors had increased their margin collateral requirements due to the increasing risk from the EUR/CHF pair, and an electronic "chat" produced in the CFTC proceeding reflects that Patel raised with Niv increasing FXCM's own margin requirements, but Niv refused to do so. ¶20.[18]  In light of this evidence, the SAC's allegations from CW1 that these concerns were being discussed at the highest levels of FXCM's European operation serve to illustrate how clear the risk to FXCM from customers' enormous bets on the EUR/CHF pair was to FXCM insiders.

Further, Defendants' argument that a similar increase in margin requirements by FXCM would not have made a material difference in the outcome for the Company (Defs. Brf. at 23) is

---

[18]      Defendants' contention that Plaintiff has mischaracterized the CFTC record with respect to Patel's communications with Niv on this subject (Defs. Brf. at 27) is false.  While Patel testified that he did not remember the specifics of the discussion with Niv, he did recall asking Niv about margins (Patel Tr. at 37:4-15), and in an electronic "chat" with a colleague in January 2015, Patel stated that he had sent an email "to [D]rew to raise margins and he said no."  SAC Ex. 8 (ECF No. 96-10).  In any event, Defendants' contention simply raises a factual dispute concerning the meaning of Patel's testimony and "chat," and the inferences to be drawn from this evidence must be drawn in Plaintiff's favor because this is a motion to dismiss.

at once wrong and misses the point.  As an initial matter, as explained by CW1, when competitors changed their margin requirements and FXCM did not follow suit, customers flocked to FXCM.  This increase in customers betting on the EUR/CHF pair only served to balloon Defendants' exposure to the massive $2.2 billion amount that existed on January 15.[19] In any event, the issue is not whether Defendants "ruined" or "decimated" the Company, but rather whether they knowingly or recklessly misrepresented its operations and significant risks such that FXCM's stock price was inflated and investors suffered losses when the truth was revealed.

Defendants' argument that CW1 himself floated a long position on the EUR/CHF pair is similarly misplaced.  Defs. Br. at 24.  As was the case for all FXCM retail customers, CW1's downside exposure was limited to his margin collateral, meaning he could not lose excess amounts.  Meanwhile, FXCM remained exposed on the entirety of the trade above that generally nominal amount.

Defendants also point to the email from CW1 that is attached to the SAC and highlight that CW1 did not anticipate the magnitude of the price change that would occur in the event the cap was lifted.  Defs. Br. at 24-5.  However, while CW1's estimates of how much the EUR/CHF pair could move if the cap was removed may have changed in his various conversations, this has little relevance.  Using any measure, FXCM would lose dearly given its enormous exposure and policies that heightened its risks of loss.  Thus, far from being exculpatory, the e-mail

---

[19]    Thus, Defendants' contention (Defs. Brf. at 28) (emphasis in original) that "Plaintiff fails to provide any *facts* connecting the increased trading volume during [September and October 2014] to the EUR/CHF currency pair or to the fact that FXCM did not raise its margin requirements for that currency pair" is simply untrue.  Indeed, CW1's November 14, 2014, email to Brendan Callan, the head of FXCM's European operations, which was produced by Defendants in this litigation, states that "I have people opening accounts to shift their exposure to us that they have with some other broker (who requires higher margin)."  SAC Ex. 9 (ECF No. 96-11).

Defendants produced thinking it was exculpatory only corroborates Plaintiff's allegations of scienter.

### C.    Defendants' Post-January 15, 2015, Misrepresentations Concerning the Reasons for FXCM's Losses Are Powerful Evidence of Scienter

Niv's efforts to cover up his culpability, including by signing off on the 2014 Form 10-K which falsely stated the amount of its customers' open positions on the EUR/CHF pair as $1 billion, as well as misleading presentations suggesting FXCM's losses were attributable to customers trading at dislocated prices resulting from a "Black Swan" event when, in fact, the "seatbelts" in FXCM's systems prevented this, also add to the already strong scienter inference pled in this case. *See, e.g.*, *In re Xerox Corp. Sec. Litig.*, 165 F. Supp. 2d 208, 218 (D. Conn. 2001)(covering up wrongdoing is evidence of "scienter").

In a desperate effort to rebut this powerful evidence of Defendants' scienter, Defendants once again resort to factual argument – *i.e.*, that Plaintiff has misrepresented the CFTC testimony of Janelle Lester, FXCM's former chief compliance officer, and a February 11, 2015 email of Niv's regarding the availability of liquidity when the cap was lifted and whether customer trades had been executed at dislocated prices. Even assuming this is a proper argument on a motion to dismiss, which it is not given that the factual allegations of the SAC must be accepted as true and all inferences must be drawn in Plaintiff's favor, Defendants' factual contentions are patently false. Indeed, Defendants' contention that Lester's statement "had nothing to do with available liquidity during the SNB Flash Crash" (Defs. Brf. at 30) is directly contradicted by her CFTC testimony cited in the SAC: "[W]e never had *our pricing* halted by our liquidity providers nor did prime brokers stop trading with us." ¶89.[20] In any event, Defendants attempt to refute

---

[20]    Defendants also mischaracterize the SAC as citing Lester's CFTC testimony in order to "criticize" or "blame" FXCM's "seatbelt" technology for FXCM's losses (Defs. Brf. at 30).

Lester's clear and unambiguous testimony with statements by another CFTC witness not quoted in the SAC, and their attempt to characterize the statements in Niv's email as limited to FXCM's prime brokerage account simply raise factual disputes that this Court cannot resolve on Defendants' motion to dismiss.

Finally, Defendants' effort to explain away their post-January 15, 2015, misrepresentations of FXCM's position in the EUR/CHF pair at the time the cap was lifted is nonsensical. While 30% of $1 billion and 15% of $2.2 billion may be rough mathematical equivalents, the CFTC testimony and internal FXCM documents make clear that FXCM's position in the pair was $2.2 billion, not $1 billion. The only plausible explanation for Defendants' failure to disclose this fact in the Company's 2014 Form 10-K is that Defendants wanted to mislead readers to believe that FXCM's losses had been caused by trading at dislocated prices immediately after the cap was lifted consistent with its phony "flash crash" narrative and conceal the truth – *i.e.*, that contrary to Defendants' public statements throughout the Class Period, FXCM's losses had resulted from its exposure to market risk in connection with its customers' trading of the volatile EUR/CHF pair.

## D.   The Presumption Favors Plaintiff's Inference of Scienter

Here, when the Court considers the allegations in their entirety (*i.e.*, holistically), Plaintiff's inference is at least as strong as Defendants' non-culpable one that Niv was merely negligent in making the false and misleading statements identified in the SAC. It defies credulity that Defendant Niv – the "pioneer" of FXCM's agency model who oversaw risk procedures and

---

Nothing could be further from the truth. Lester's testimony on this point is significant because it puts the lie to Defendants' post-January 15 public statements that trades at dislocated prices were responsible for FXCM's losses and demonstrates that the losses were the result of FXCM's long-denied exposure to market risk on account of its customers' FX trading.

would have approved the $2.2 billion bet – did not understand the true risks inherent in his Company's business model.[21]

*Institutional Investors Group v. Avaya, Inc.*, 564 F.3d 242 (3d Cir. 2009) is precisely on point. The Court there, in finding scienter, noted that, based on the totality of the allegations, "[i]t strains reason to suggest" that the defendants did not know about certain company occurrences that were the subject of the relevant public statements. *Id.* at 268. Factors that the Court there looked at included, like here, "an array of circumstantial evidence" (such as the importance of the business segment in question) which led to the inference that the defendants were "at least reckless." *Id.* at 269. While plaintiff in *Avaya* (unlike in this case) was not able to point to any precise documents or conversations that would have informed defendants about the unusual corporate activities, the court found that its analysis "will ultimately rest not on the presence or absence of certain types of allegations but on a ***practical judgment*** about whether, accepting the whole factual picture painted by the Complaint, it is at least as likely as not that defendants acted with scienter." *Id.* Based on the composite allegations and the application of practical judgment, the court found a strong inference of scienter existed. The same can be said here. The inference of scienter here is at least as strong as Defendants' inference of mere negligence, and "[w]hen the competing inferences rest in equipoise, the 'tie . . . goes to the

---

[21] These allegations (as to the CWs, the actions of competitors, Niv's pioneering role in the agency model, and the testimony and documents from the regulatory matters) further serve to distinguish this case from either of the two cases so heavily relied upon by Defendants. In both *In re Wachovia Sec. Litig.*, 753 F. Supp. 2d 326 (S.D.N.Y. 2011) and *In re UBS AG Sec. Litig.*, No. 07 Civ. 11225 (RJS), 2012 WL 4471265 (S.D.N.Y. Sept. 28, 2012), the courts looked at whether plaintiffs had alleged scienter in cases involving the financial crisis. In both, the Court held that Defendants were only guilty of not predicting the future and that such allegations "alone" were insufficient to establish scienter. Here, this case is not about predicting the future nor has Plaintiff relied upon the outcome of the SNB actions to establish scienter. Instead, it points to direct evidence of scienter in numerous forms.

plaintiff.'"  *Akerman v. Arotech Corp.*, 608 F. Supp. 2d 372, 382 (E.D.N.Y. 2009) (quoting *City of Brockton Ret. Sys. v. Shaw Grp. Inc.*, 540 F. Supp. 2d 464, 472 (S.D.N.Y. 2008).

**III.**    **Loss Causation Is Established**

Defendants make the argument that Plaintiff has not alleged loss causation.  Defs. Br. at 38-40.  Defendants do not mention that ***loss causation is subject only to the notice pleading requirements of Fed. R. Civ. P. 8(a)(2)***.  *King Cnty., Wash. v. IKB Deutsche Industriebank AG*, 708 F. Supp. 2d 334, 339 (S.D.N.Y. 2010).  Therefore, Plaintiff must only provide a "short and plain statement" that provides Defendants notice of a "causal connection" between the material misrepresentations and the loss.  *Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 346-47 (2005).  Plaintiff has patently done this in the Complaint.

Defendants again point to the "Black Swan" event of the "SNB Flash Crash" to claim that Plaintiff's losses were not a materialization of any undisclosed risk.  This is incorrect.  The lifting of the cap laid bare the true workings of the agency model as applied at FXCM and the enormous risks being taken by FXCM, as well as its severe undercapitalization and inadequate liquidity in view of those risks.  These are precisely the truths that were hidden from Plaintiff through the numerous misstatements in FXCM's Form 10-K's and Form 10-Q's.  Indeed, multiple analysts and Niv himself made that connection.  *See, e.g.*, ¶116 (*Bloomberg* reporter stating that the "reversal of fortune" at FXCM following the decoupling "has laid bare the risks Niv's firm and its more than 230,000 customers were taking.").

Defendants cite to *Lentell v. Merrill Lynch & Co., Inc.*, 396 F.3d 161, 172-73 (2d Cir. 2005).  Defs. Br. at 39.  However, *Lentell* holds that "[l]oss causation 'is the causal link between the alleged misconduct and the economic harm ultimately suffered by the plaintiff,'" and a plaintiff must claim that "the loss [was] foreseeable *and* that the loss [was] caused by the

materialization of the concealed risk." *Lentell*, 396 F.3d at 172-73 (italics in original). *See also Freudenberg v. E\*Trade Fin. Corp.*, 712 F. Supp. 2d 171, 202 (S.D.N.Y. 2010)(noting that no court addressing the loss causation pleading standard requires "a corrective disclosure be a 'mirror image' tantamount to a confession of fraud"); *In re Initial Public Offering Sec. Litig.*, 544 F. Supp. 2d 277, 289 (S.D.N.Y. 2008)("[T]here is no 'requirement that the disclosure take a particular form or be of a particular quality.'"); *In re Motorola Sec. Litig.*, 505 F. Supp. 2d 501, 542 (N.D. Ill. 2007)(Plaintiff is not confined to only "showing a corrective disclosure that both identifies a specific prior false representation and 'calls [it] into question.'").

Here there can be no doubt that when, from January 14 to January 20, 2015, the Company's stock price dropped over 90% following the Company's disclosure that it had suffered over $200 million in losses on its customers' FX trading, and had to enter into a punitive financing deal with Leucadia because of the breach of its capital requirements, the concealed risks of the Company's model and its intricacies were revealed. Nothing more is necessary to demonstrate "loss causation" at the pleadings stage. As such, the Complaint adequately pleads loss causation.

## CONCLUSION

For the reasons stated above, the Defendants' Motion to Dismiss should be denied.

Dated: October 31, 2017

Respectfully submitted,

SCOTT+SCOTT, ATTORNEYS AT LAW, LLP
/s/ Beth A. Kaswan
Beth A. Kaswan
Deborah Clark-Weintraub
The Helmsley Building
230 Park Avenue, 17th Floor
New York, NY 10169
Telephone: (212) 223-6444
Facsimile: (212) 223-6334
bkaswan@scott-scott.com

dweintraub@scott-scott.com

-and –

David R. Scott
Amanda F. Lawrence
**SCOTT+SCOTT, ATTORNEYS AT LAW, LLP**
156 South Main Street
P.O. Box 192
Colchester, CT  06415
Telephone:  (860) 537-5537
Facsimile:  (860) 537-4432
david.scott@scott-scott.com
alawrence@scott-scott.com

*Counsel for Plaintiff Retirement Board of the*
*Policemen's Annuity and Benefit Fund of Chicago*
*on Behalf of the Policemen's Annuity and Benefit*
*Fund of Chicago*

## CERTIFICATE OF SERVICE

I hereby certify that on October 31, 2017, I caused the foregoing to be electronically filed with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the email addresses denoted on the Electronic Mail Notice List.

I certify under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed this 31st day of October, 2017, at New York, New York.

/s/ Beth A. Kaswan
Beth A. Kaswan
SCOTT+SCOTT, ATTORNEYS AT LAW, LLP
The Helmsley Building
230 Park Avenue, 17th Floor
New York, NY 10169
Telephone: 212-223-6444
Facsimile: 212-223-6334
bkaswan@scott-scott.com