USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED: AUGUST 10, 2018

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

RETIREMENT BOARD OF THE
POLICEMEN'S ANNUITY AND BENEFIT
FUND OF CHICAGO ON BEHALF OF THE
POLICEMEN'S ANNUITY AND BENEFIT
FUND OF CHICAGO, Individually and on Behalf
of All Others Similarly Situated,

                Plaintiff,

        v.

FXCM INC. and DROR NIV,

                Defendants.

15-CV-3599 (KMW)

**OPINION & ORDER**

KIMBA M. WOOD, United States District Judge:

    Plaintiff Retirement Board of the Policemen's Annuity and Benefit Fund of Chicago on Behalf of the Policemen's Annuity and Benefit Fund of Chicago ("Plaintiff") brings this putative securities class action against Defendants FXCM Inc. ("FXCM") and Dror Niv (collectively, "Defendants"). Plaintiff alleges that Defendants made material misstatements and omissions concerning risks in FXCM's business. Defendants have moved to dismiss Plaintiff's Second Amended Complaint for failing to adequately allege (i) that Defendants made a materially false statement, (ii) that Defendants acted with scienter, and (iii) loss causation.

    For the reasons stated below, Defendants' motion is GRANTED because Plaintiff has failed to adequately allege that Defendants made material misrepresentations or omissions and acted with scienter.

I.  **BACKGROUND**

   A.  **Factual Background**

      1.  The Parties

Defendant FXCM was one of the first brokerage firms to permit retail customers to trade currency in the retail foreign exchange ("FX") market. (Compl.,[1] ¶ 31.) Dror Niv is one of the founders of FXCM and was, at all relevant times, its CEO. (*Id.* ¶ 29.)

Plaintiff is an institutional investor that purchased FXCM common stock from March 17, 2014, up to and including January 20, 2015 (the "Class Period"). (*Id.* ¶¶ 1, 27.) Plaintiff brings this putative class action on behalf of all those who purchased or otherwise acquired FXCM stock during the Class Period and were damaged thereby. (*Id.* ¶ 1.)

      2.  FXCM's Business and the FX Market

FXCM gives its customers access to the FX market, allowing them to bet on changes in prices for certain currency pairs, such as the Euro against the Swiss Franc ("EUR/CHF"). (*Id.* ¶ 33.) Whenever an FX trader buys one currency—known as trading "long"—that trader simultaneously sells another currency, such as by simultaneously buying Euros and selling Swiss Francs. (*Id.*)

Most retail brokerage firms earn revenue through what is known as a "principal model." (*Id.* ¶ 40.) Under that model, the broker takes the opposite side of its customers' trades, meaning that when the customer takes a loss on a trade, the broker profits (and, conversely, when the customer makes a profit, the broker takes a loss). (*Id.*) FXCM, by contrast, primarily relied on an "agency model," under which FXCM served as an intermediary between its customer and banks serving as "liquidity providers." (*Id.*) Under this model, FXCM did not

---

[1] "Compl." or "Second Amended Complaint" refers to the Second Amended and Consolidated Class Action Complaint, ECF No. 96.

profit when its customers lost money, but instead earned commissions on trades. (*Id.* ¶ 42.) Because FXCM did not take the opposite side of its customers' trades, it was not exposed to the risk that a customer's profit would result in a loss the FXCM, as the customer's counterparty. (*See id.* ¶¶ 40–42.)

Although FXCM's business model eliminated the "principal risk"—acting as its customers' counterparty—FXCM was still exposed to certain changes in currency prices. (*Id.* ¶¶ 41, 45.) One type of risk FXCM faced resulted from its practice of permitting customers to use leverage to place trades for amounts much larger than the amount of collateral posted in their account. (*Id.*) Customers in the United States, for example, were permitted to trade with leverage up to 50:1, meaning a customer with $100 in collateral could post a trade up to $5,000. (*Id.* ¶ 34.) The leverage permitted in other countries was higher, such as up to 500:1 in Australia. (*Id.* ¶ 36.) Under FXCM's agreements with its customers, in the event that a customer suffered a loss, the customer would be responsible only for the amount of collateral the customer posted. (*Id.* ¶ 41.) Thus, if a loss exceeded the customer's collateral, FXCM would responsible for paying that excess loss, known as "negative equity" or a "debit." (*Id.* ¶ 35.) In this way, although FXCM was not exposed to the "principal risk" that could result in losses when its customers did well, it was exposed to the risk that its customers could experience losses exceeding their collateral. (*See id.* ¶ 41.) To protect itself against the risk of customers accruing losses over-and-above their collateral, FXCM closed out a customer's position whenever changes in currency prices exhausted that customer's collateral. (*See id.* ¶ 8.)

        3.      <u>The EUR/CHF Pair and the SNB Crash</u>

On September 6, 2011, the Swiss National Bank ("SNB") announced that it was pegging the value of the Swiss Franc to the Euro at a rate of 1.20 Swiss Francs to 1 Euro. (*Id.* ¶ 60.) By doing so, the SNB permitted the Euro's value to increase against the Swiss Franc, but

prevented the Swiss Franc's value to ever increase beyond the rate of 1.20 Swiss Francs to 1 Euro.  (*Id.* ¶¶ 60, 110.)   The SNB's decision resulted in an immediate change in currency prices, causing a movement of 8% in the Swiss Franc within minutes.   (*Id.* ¶ 60.)

In January 2015, FXCM's customers collectively held a $2.2 billion position in the EUR/CHF pair.   (*Id.* ¶ 52.)   On January 15, 2015, the SNB announced that it would de-peg the Swiss Franc from the Euro, meaning that SNB would allow the Swiss Franc to move to its actual market value, even if that value went beyond the rate of 1.20 Swiss Francs to 1 Euro.   (*Id.* ¶ 51)   Within minutes, the price of the Swiss Franc soared.   (*Id.* ¶ 110.)   As a result, many of FXCM's customers with positions in the EUR/CHF pair suffered losses well above their collateral, meaning that FXCM was responsible for those losses.   (*Id.* ¶ 55)   FXCM ultimately suffered losses of $276 million.   (*Id.*)   To avoid a regulatory default, FXCM agreed the next day to a punitive financing agreement with an outside investment company, Leucadia National Corporation.   (*Id.* ¶ 56, 112.)   As a result, FXCM's stock plummeted from $14.87 on January 14, 2015, to $1.60 on January 20, 2015.   (*Id.* ¶ 113.)

4. <u>Plaintiff's Allegations of Fraud</u>

In the Second Amended Complaint, Plaintiff alleges that Defendants made a number of materially false or misleading statements during the Class Period, in violation of Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.   (Compl., ¶¶ 132–40.)   Plaintiff alleges that Niv, as a "controlling person" of FXCM, violated Section 20(a) of the Exchange Act. (*Id.*, ¶¶ 141–44.)   Plaintiff alleges, in particular, that Defendants misled investors about the risks associated with FXCM's business, especially with respect to the risks associated with FXCM's "agency model," FXCM's leverage policies, and FXCM's exposure to massive losses if the Euro

4

were de-pegged from the Swiss Franc.  (*See* Opp'n,[2] at 14–15.)

### B. Relevant Procedural History

On May 8, 2015, Plaintiff filed its Complaint.  (ECF No. 1.)  On January 12, 2016, Plaintiff filed its Amended Complaint.  (ECF No. 50.)  On February 25, 2016, Defendants moved to dismiss the Amended Complaint.  (ECF No. 53.)  On August 18, 2016, the Court granted Defendants' motion to dismiss the Amended Complaint.  (ECF No. 73.)  On October 7, 2016, judgment was entered against Plaintiff.  (ECF No. 77.)  On November 3, 2016, Plaintiff appealed the Court's order of dismissal.  (ECF No. 78.)  On July 27, 2017, the Second Circuit vacated the judgment against Plaintiff, to permit this Court to hear new evidence and arguments.  (ECF No. 92.)  On July 28, 2017, the Court granted Plaintiff leave to amend its complaint.  (ECF No. 93.)  On August 25, 2017, Plaintiff filed a Second Amended Complaint.  (ECF No. 96.)  On September 28, 2017, Defendants filed a motion to dismiss the Second Amended Complaint, which became fully-briefed on November 17, 2017.  (ECF Nos. 102, 105, 108.)

On December 14, 2017, Defendants filed a Suggestion of Bankruptcy and Notice of Automatic Stay.  (ECF No. 111.)  On December 21, 2017, the Court stayed this action as to FXCM.  (ECF No. 112.)  On February 9, 2018, FXCM notified the Court that the automatic stay has been lifted.  (ECF No. 115.)

## II. LEGAL STANDARD

### A. Rule 12(b)(6), Rule 9(b), and the PSLRA Pleading Standard

To survive a motion to dismiss pursuant to Rule 12(b)(6), a civil complaint must be "plausible on its face," meaning that its allegations must "allow[] the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Ashcroft v. Iqbal*,

---

[2] "Opp'n" refers to Plaintiff's Opposition to Defendants' Motion to Dismiss the Second Consolidated Class Action Complaint, dated October 31, 2017, ECF No. 105.

5

556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556, 570 (2007)). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.* at 678. For this reason, although a court must "accept[] all factual allegations as true," it should give "no effect to legal conclusions couched as factual allegations." *Starr v. Sony BMG Music Entm't*, 592 F.3d 314, 321 (2d Cir. 2010) (citation and internal quotation marks omitted). Ultimately, the court must determine whether the allegations of the complaint "plausibly give rise to an entitlement to relief." *Iqbal*, 556 U.S. at 679.

A complaint that asserts securities fraud, in particular, must satisfy the heightened pleading requirements of Federal Rule of Civil Procedure 9(b) and the Private Securities Litigation Reform Act ("PSLRA"). *See* 15 U.S.C. § 78u–4(b) (stating pleading requirements for securities fraud actions); *Nguyen v. New Link Genetics Corp.*, 297 F. Supp. 3d 472, 482 (S.D.N.Y. 2018) (Pauley, J.). Rule 9(b) provides, in particular, that a party alleging fraud "must state with particularity the circumstances constituting fraud."

### B. Section 10(b) and Rule 10b-5

Plaintiff's principal claim is brought under Section 10(b) of the Exchange Act and Rule 10b-5, under which plaintiffs must allege (1) a material misrepresentation or omission; (2) scienter; (3) connection with the purchase or sale of a security; (4) reliance; (5) economic loss; and (6) loss causation. *Dura Pharm., Inc. v. Broudo*, 544 U.S. 336, 341-42 (2005).[3]

### III. DISCUSSION

Defendants contend that the Second Amended Complaint should be dismissed because it

---

[3] Plaintiff also brings a claim under Section 20(a) of the Exchange Act against Defendant Niv. (Compl., ¶¶ 141–144.) Because liability under Section 20(a) requires the plaintiff to "show a primary violation by the controlled person"—and because, as discussed below, Plaintiff has not adequately alleged a violation by FXCM—Plaintiff's claim under Section 20(a) is similarly dismissed. *See Harborview Master Fund, LP v. Lightpath Techs.*, Inc., 601 F. Supp. 2d 537, 550 (S.D.N.Y. 2009) (dismissing claim under Section 20(a) because plaintiff failed to plead primary violation under Section 10(b)).

6

does not adequately allege (1) material misstatements or omissions, (2) scienter, or (3) loss causation. As discussed below, Defendants' motion is GRANTED because Plaintiff has failed to allege material misrepresentations and scienter.

**A. Materiality**

1. Legal Standard

A misstatement or omission is material only if there is "a substantial likelihood that a reasonable shareholder would consider it important." *Basic Inc. v. Levinson*, 485 U.S. 224, 231 (1988) (citation and internal quotation marks omitted). Because materiality is generally a "mixed question of law and fact," a complaint can be dismissed on the basis of materiality only if the alleged misstatement or omission is "so obviously unimportant to a reasonable investor that reasonable minds could not differ on the question of their importance." *ECA, Local 134 IBEW Joint Pension Tr. Of Chicago v. JP Morgan Chase Co.*, 553 F.3d 187, 197 (2d Cir. 2009) (citation and internal quotation marks omitted). To determine whether a particular statement is materially misleading, the court must consider the statement in the context of the document "as a whole." *DeMaria v. Andersen*, 318 F.3d 170, 180 (2d Cir. 2003) (citation and internal quotation marks omitted); *Miller v. Lazard, Ltd.*, 473 F. Supp. 2d 571, 579 (S.D.N.Y. 2007) (Marrero, J.) ("In assessing whether statements provided in the prospectus are materially misleading, the prospectus must be read as a whole, not selectively or in a piecemeal fashion.").

Statements that "are too general to cause a reasonable investor to rely upon them"—such as puffery—are not actionable under securities laws. *ECA*, 553 F.3d at 206; *Lasker v. New York State Elec. & Gas Corp.*, 85 F.3d 55, 59 (2d Cir. 1996) (holding that statements about the future prosperity of the business were not actionable, because they "consist of precisely the type of 'puffery' that this and other circuits have consistently held to be inactionable"); *see also Oklahoma Firefighters Pension & Ret. Sys. v. Xerox Corp.*, 300 F. Supp. 3d 551, 570 (S.D.N.Y.

7

2018) (Engelmayer, J.) (holding that statement about how an event was a "success" is not actionable, because it is not an "assessment that can be measured or verified"). Statements that are false only in "hindsight," similarly, cannot form the basis of a claim for fraud. *SRM Glob. Fund Ltd. P'ship v. Countrywide Fin. Corp.*, 448 F. App'x 116, 118 (2d Cir. 2011).

With respect to omissions, disclosure is not required "merely because a reasonable investor would very much like to know that fact." *In re Time Warner Inc. Sec. Litig.*, 9 F.3d 259, 267 (2d Cir. 1993). An omissions is instead material only if there was a duty to disclose the information or if disclosure becomes "necessary to make prior statements not misleading." *Id.*

2. <u>Application</u>

Plaintiff contends that Defendants (1) made misleading statements about FXCM's agency model, including whether it reduced FXCM's risks; (2) misled investors about the risk that FXCM faced from its "no debit policy," which made FXCM responsible for any customer losses that exceeded collateral; (3) misled investors about its margin policy, liquidity, and excess regulatory capital; and (4) falsely stated that there were "no material changes in the Company's risk factors" when FXCM faced serious risks if the EUR/CHF pair were de-pegged. (Opp'n, at 14–15.)

a) <u>Statements about FXCM's Agency Model</u>

Plaintiff alleges that FXCM's 2013 Form 10-K falsely stated that FXCM's agency model "reduced [the Company's] risks" and falsely implied that FXCM was riskless, such as by stating that FXCM was a "riskless principal" and was "not exposed to the market risk of a position moving up or down in value." (*See* Opp'n, at 14.)

FXCM's alleged misstatement that the agency model "reduced [the Company's] risks" is "puffery" and so is not actionable under securities laws. *See ECA*, 553 F.3d at 205–06 (holding

8

that mere "generalizations" about risk management practices are not actionable); *C.D.T.S. v. UBS AG*, No. 12-CV-4924 KBF, 2013 WL 6576031, at *4–5 (S.D.N.Y. Dec. 13, 2013) (holding that general statement about risk controls is "aspirational puffery found inactionable by courts"), *aff'd sub nom. Westchester Teamsters Pension Fund v. UBS AG*, 604 F. App'x 5 (2d Cir. 2015).

FXCM's statements in its 2013 10-K that it was a "riskless principal" and was "not exposed to market risk" were not materially misleading when viewed in the context of the document as a whole. In that context, it is clear that FXCM's agency model did not eliminate all risk, but only certain types of risk. The document discloses, for example, that FXCM's operations "involved risk of loss due to the potential failure of [FXCM's] customers to perform their obligations under these transactions," including the risk that "a customer's losses exceed the amount of cash in their account." (Dahan Decl., Ex. 1, at 7; *see also* Dahan Decl., Ex. 1, at 11 ("[O]ur policy is generally not to pursue claims for negative equity against our customers."), 25 (same).[4]) For these reasons, no reasonable investor reading FXCM's 2013 Form 10-K would have believed that FXCM's agency model made it "riskless."

Plaintiff does not dispute that the agency model did, in fact, eliminate the counterparty risk inherent to the "principal model," meaning the risk that the broker will face losses when its customer experiences gains. (*See* Compl., ¶ 40.) Plaintiff instead alleges that because of FXCM's margin policy, FXCM was exposed to the same risk as its customers, namely the risk that FXCM's customers' investments would fall in value. (*Id.* ¶ 41.) Plaintiff claims that this

---

[4] "Dahan Decl." or "Dahan Declaration" refers to the Declaration of Israel Dahan, dated September 28, 2017, ECF No. 104. Exhibit 1 to the Dahan Declaration contains excerpts of FXCM's 2013 Form 10-K, the primary document that Plaintiff contends contains material misrepresentations. Because this document is integral to the complaint, the Court may rely upon it even though it is not attached to the complaint. *See I. Meyer Pincus & Assocs., P.C. v. Oppenheimer & Co.*, 936 F.2d 759, 762 (2d Cir. 1991) (holding that court could consider prospectus containing alleged misrepresentations, even though plaintiff "fail[ed] to submit the prospectus as an exhibit to the complaint").

9

type of risk is "market risk," and so FXCM misled investors by stating it was not exposed to "market risk." (*See* Opp'n, at 15.) Defendants, by contrast, claim that this type of risk is not "market risk," but "credit risk." (*See* Defs.' Mem.,[5] at 5.) Regardless of whether the 2013 Form 10-K should have referred to this type of risk as "market risk" or "credit risk," what matters is that the document disclosed that FXCM was exposed to loss in the event that its customers' investments decreased to a point where their losses exceeded their collateral. (*See* Dahan Decl., Ex. 1, at 7, 11, 25.) Because FXCM fully explained this risk, a reasonable investor would have understood the risk to which FXCM was exposed.

b) <u>Statements about the Risk of FXCM's Customers Not Performing Their Obligations</u>

Plaintiff alleges that Defendants misled investors by not disclosing that FXCM had a "no debit" policy making FXCM responsible for its customers' losses exceeding their collateral. (Opp'n, at 1, 15.) A reasonable investor reviewing the Form 2013 10-K as a whole, however, would have understood that FXCM *was* responsible for losses exceeding customer collateral and that FXCM faced risk from that exposure. *First*, the document plainly discloses that FXCM could be exposed to liability in the event that "a customer's losses exceed[] the amount of cash in their account." (Dahan Decl., Ex. 1, at 7.) *Second*, in two different places, FXCM discloses its policy "generally not to pursue claims for negative equity against our customers." (*Id.* at 11, 25.) A reasonable investor would understand from these disclosures both that FXCM is generally responsible for any "negative equity" held by its customers and that this policy poses serious risks for FXCM. For this reason, Plaintiff's claim based on this allegation fails.

---

[5] "Defs.' Mem." refers to "Memorandum of Law in Support of Defendants' Motion to Dismiss Plaintiff's Second Amended and Consolidated Class Action Complaint," dated September 28, 2017, ECF No. 103.

### c) Statements About FXCM's Margin Policy, Liquidity, and Regulatory Capital

Plaintiff alleges that Defendants made false statements that FXCM had a "fairly conservative margin policy," "maintained a substantial pool of liquidity," and "maintained excess regulatory capital." (Opp'n, at 15.) These types of statements are not actionable, because they are the types of general statements that investors are unlikely to rely on. *See SRM Glob. Fund Ltd. P'ship v. Countrywide Fin. Corp.*, 448 F. App'x 116, 118 (2d Cir. 2011) (summary order) (holding that statements about the "high hopes" defendant had for its "Liquidity Management Plan" were not actionable); *Meyer v. Concordia Int'l Corp.*, No. 16-CV-6467 (RMB), 2017 WL 4083603, at *6 (S.D.N.Y. July 28, 2017) (Berman, J.) (holding that statements that defendant had "a strong free cash profile" and "no liquidity or debt issues" were "puffery" and not actionable) (internal quotation marks omitted); *In re Wachovia Equity Sec. Litig.*, 753 F. Supp. 2d 326, 354 (S.D.N.Y. 2011) (Sullivan, J.) (holding that general statement that company was "obsessed with conservative underwriting" was not actionable under securities laws).

Additionally, with respect to FXCM's margin policy, Plaintiff argues that Niv misled investors by stating that "leverage is the enemy" while simultaneously permitting customers to trade with leverage as high as 400:1 or 500:1. (Opp'n, at 5.) In the very statement that Plaintiff references, however, Niv noted that "[m]ost clients . . . use 15:1 [leverage], and some use *much more*." (Compl., ¶ 108 (emphasis added).) Niv's statement, then, did not misrepresent the amount of leverage that FXCM permitted its clients to use and, in fact, suggested that FXCM permitted its customers to trade with a high amount of leverage.

### d) Changes in Risk Policy

Plaintiff claims that because FXCM's customers had a $2.2 billion position in the EUR/CHF pair, FXCM misrepresented that it had "no material changes in its risk factors."

11

(Opp'n, at 15.) Like with FXCM's general statements about its liquidity and margin policies, this statement is too vague to be actionable. *See Abuhamdan v. Blyth, Inc.*, 9 F. Supp. 3d 175, 190 (D. Conn. 2014) (holding that statement that "nothing in [the companies'] fundamentals has changed" was not actionable). Regardless, as discussed below, Plaintiff's allegations that FXCM should have disclosed the risks inherent in the de-pegging of the EUR/CHF pair fail, because Plaintiff has not adequately alleged scienter.

### B. Scienter

#### 1. Legal Standard

Although Rule 9(b) permits "[m]alice, intent, knowledge and other conditions of a person's mind [to] be alleged generally," a plaintiff is required to "allege facts that give rise to a *strong inference* of fraudulent intent." *Acito v. IMCERA Grp., Inc.*, 47 F.3d 47, 52 (2d Cir. 1995) (emphasis added). To qualify as a "strong inference" of scienter, the inference must be "at least as compelling as any opposing inference one could draw from the facts alleged." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 324 (2007). In other words, the court must be able to answer the following question in the affirmative: "When the allegations are accepted as true and taken collectively, would a reasonable person deem the inference of scienter at least as strong as any opposing inference?" *Id.* at 326; *see also Teamsters Local 445 Freight Div. Pension Fund v. Dynex Capital Inc.*, 531 F.3d 190, 197 (2d Cir. 2008) (holding that complaint did not adequately allege scienter, because the inference in favor of scienter was not "'at least as compelling' as the competing inference" (quoting *Tellabs*, 551 U.S. at 314)).

In the Second Circuit, "scienter can be established by alleging facts to show either (1) that defendants had the motive and opportunity to commit fraud, or (2) strong circumstantial evidence of conscious misbehavior or recklessness." *ECA*, 553 F.3d at 198. Although a plaintiff can adequately allege scienter without alleging a motive, "the strength of the circumstantial

12

allegations must be correspondingly greater' if there is no motive." *Id.* at 198–99 (quoting *Kalnit v. Eichler*, 264 F.3d 131, 142 (2d Cir. 2001)).

Where a complaint alleges nothing more than "fraud by hindsight," it fails to show scienter. *Novak v. Kasaks*, 216 F.3d 300, 309 (2d Cir. 2000) ("[A]llegations that defendants should have anticipated future events and made certain disclosures earlier than they actually did do not suffice to make out a claim of securities fraud."); *Stevelman v. Alias Research Inc.*, 174 F.3d 79, 85 (2d Cir. 1999) ("Management's optimism that is shown only after the fact to have been unwarranted does not, by itself, give rise to an inference of fraud."); *Acito*, 47 F.3d at 53 ("[D]efendants' lack of clairvoyance simply does not constitute securities fraud."). Allegations of "corporate mismanagement," similarly, cannot support a claim under section 10(b). *Boca Raton Firefighters & Police Pension Fund v. Bahash*, 506 F. App'x 32, 36 (2d Cir. 2012) (quoting *Santa Fe Indus., Inc. v. Green*, 430 U.S. 462, 477 (1977)).

2. Application

In the present case, Plaintiff has not attempted to argue that Defendants had a motive to commit fraud. (Opp'n, at 27 n.11.) Plaintiff instead attempts to show scienter by alleging that Niv "falsely described the risks inherent in FXCM's business," even though he was "fully aware of the truth." (Opp'n, at 27.) Specifically, Plaintiff relies on the following allegations to prove scienter: (1) Niv knew that FXCM was exposed to a $2.2 billion long bet on the EUR/CHF pair, (Opp'n, at 28–29); (2) because Niv "pioneered" the agency model, he knew about the risks associated with it, (Opp'n, at 30); (3) the extreme price movement of the EUR/CHF pair in 2011 informed Niv of the risks of the EUR/CHF pair being de-pegged, (Opp'n, at 31); (4) FXCM experienced a reduction in excess net capital on December 12 and 15, 2014, due to changes in the Japanese Yen and Russian Ruble, as well as further reductions a week later, (Opp'n, at 32); (5) Niv knew that two of FXCM's competitors had increased their margin collateral requirements to

reduce the risk from the EUR/CHF pair, (Opp'n, at 33); and (6) Niv tried to "cover up" the extent of the loss by (i) claiming that the amount of customers' open positions in the EUR/CHF pair was $1 billion (not $2.2 billion), (Opp'n, at 35), and (ii) stating that the loss resulted from "failure of the banks to provide pricing" and because of a lack of "liquidity from banks," (Compl., ¶¶ 88–89).[6]

Individually, and when taken together with all of the other allegations in the Second Amended Complaint, these allegations do not create a "strong inference" of scienter.

### a) $2.2 billion bet

Plaintiff claims that as FXCM's CEO, Niv must have known that FXCM was concealing an "enormous, highly-leveraged $2.2 billion long bet," and thus must have known that FXCM's statements about its risks were false. (Opp'n, at 27–28.) On its own, this allegation is not enough to show scienter. Although Niv's knowledge of the $2.2 billion position shows that Niv was aware of the possible *consequences* of the EUR/CHF being de-pegged, it does not speak to the *likelihood* of that event occurring. To prove scienter, Plaintiff must allege Niv perceived the risk as a serious possibility at the time, not merely in hindsight. *See SRM Glob. Fund Ltd. P'ship*, 448 F. App'x at 118 ("Fraud cannot be pled by hindsight."); *Stevelman*, 174 F.3d at 85 ("Management's optimism that is shown only after the fact to have been unwarranted does not, by itself, give rise to an inference of fraud."). Because Plaintiff's allegation about Niv's knowledge of the size of the position does not show that Niv perceived the position as posing a real risk to FXCM, the allegation is not adequate to show scienter.

When considered in light of all of the allegations in the complaint, as well, Niv's

---

[6] Plaintiff has waived any other allegations of scienter by not making them in its motion papers. *See Wilbush v. Ambac Fin. Grp., Inc.*, 271 F. Supp. 3d 473, 487 n.9 (S.D.N.Y. 2017) (Berman, J.) ("Where a plaintiff fails to raise claims in opposition to dismissal in the district court, any such claims [are] forfeited." (alteration in original; citation and internal quotation marks omitted)).

14

knowledge of the $2.2 billion position does not show scienter. In particular, the allegations in the complaint lead to the inference that Niv did *not* believe there was a serious risk of the EUR/CHF pair being de-pegged in the near future. *First*, Plaintiff admits that "industry participants" were "shocked" by the SNB "suddenly lifting the cap." (Compl., ¶ 13.) *Second*, as noted in the Court's prior ruling (ECF No. 73, at 17), news articles cited in the complaint refer to the unexpected nature of the SNB's decision, including by referring to it as the "Swiss shock." (Compl., Ex. 3; *see also* Compl., Ex. 12, at 1 (referring to the crash as a "unique (black swan-like) event.").) *Third*, as noted in the Court's prior ruling (ECF No. 73, at 16), Plaintiff's own confidential witness—CW1—told upper management at FXCM, "I personally don't think the peg is in danger." (Dahan Decl., Ex. 17, at 1.[7]) *Fourth*, FXCM's research analyst reported that a change in the SNB policy "looks a long way off." (Compl., ¶ 59.) *Fifth*, the Euro and Swiss Franc had been pegged together for over three years, and there is no evidence that, as of January 15, 2015, anyone believed that the SNB's position was likely to change in the near future. (*See id.* ¶ 110.)

For these reasons, the more "compelling" inference that can be drawn from the Second Amended Complaint is that Niv did not perceive a credible risk that the SNB would de-peg the EUR/CHF pair, and so did not act with scienter when making statements about the risks in FXCM's business and when omitting to disclose information about FXCM's positions in the EUR/CHF pair. *See Tellabs*, 551 U.S. at 324.

                    b)       <u>Niv "pioneered" the agency model</u>

Plaintiff alleges that Niv "pioneered" the agency model, and so must have known the risks inherent in FXCM's business. (Opp'n, at 29–30.) As discussed above, however, FXCM

---

[7] Because this exhibit is explicitly referenced in paragraph 77 of the Complaint, it can be relied upon by the Court. *See I. Meyer Pincus & Assocs., P.C.*, 936 F.2d at 762.

fully disclosed that it was exposed to risk from customer losses exceeding collateral. For this reason, Niv did not knowingly mislead investors about the general risks inherent in FXCM's business. Niv's knowledge of FXCM's agency model also did not make it any more likely that he believed that the SNB would de-peg the Euro from the Franc; instead, as discussed above, the more likely inference is that Niv did not perceive the potential de-pegging as a legitimate risk.

### c) Extreme price movements in 2011

Plaintiff contends that the extreme price movements that resulted from the SNB pegging the Euro to the Swiss Franc in 2011 should have informed Niv about the risks to FXCM if the pair were de-pegged. (Opp'n, at 31.) This allegation does not show scienter for the same reason that Niv's purported knowledge of the $2.2 billion position does not show scienter: The fact that FXCM could face serious consequences from the Euro and Franc being de-coupled says nothing about Niv's perception of the likelihood of that risk being realized. Additionally, when considered with the other allegations in the Second Amended Complaint, the facts surrounding the 2011 event weigh *against* a finding of scienter. In particular, as the Court previously held, although the pegging of the Euro to the Franc in 2011 led to volatility, FXCM survived that volatility unscathed, showing that FXCM's model was able to withstand high-volatility events. (ECF No. 73, at 17.)

### d) Reduction in capital in December 2014

Plaintiff claims that FXCM's prior experience with losses from changes in the Japanese Yen and Russian Ruble must have alerted Niv to the risks inherent in FXCM's business. The Second Amended Complaint also alleges, however, that FXCM *survived* that period of volatility. (Compl., ¶ 50.) For this reason, as the Court previously noted, this fact weighs against a finding of scienter. (*See* ECF No. 73, at 17 n.11.)

### e) Warnings from employees and competitors' decisions to change

<u>margin requirements</u>

Plaintiff contends that scienter exists because Niv was aware "that other companies had raised margin requirements" with respect to the EUR/CHF pair.  (Opp'n, at 33.)  As the Court previously held, however, information about FXCM's competitors "provide[s] no information about Defendants' conduct or knowledge."  (ECF No. 73, at 18.)  The fact that Niv made a different decision than his competitors shows nothing more than that he had a different business judgment.  *See In re Salomon Analyst Level 3 Litig.*, 373 F. Supp. 2d 248, 252 (S.D.N.Y. 2005) (Lynch, J.) ("[T]he fact that other individuals . . . may have had views different from [defendant] does not provide any basis for an inference that [defendant] did not believe his own professed opinions . . . .").

Plaintiff also contends that FXCM employee CW1 warned FXCM's management about the risks associated with the EUR/CHF pair and that Niv was personally warned about the risks by FXCM employee Paresh Patel.  (Opp'n, at 33–35.)  With respect to CW1's warning, the Court held that this fact was not sufficient to show scienter, because it was made to Brendan Callahan, *not* Niv.  (*See* ECF No. 73, at 17 n.10.)  But even if it the statement were made to Niv, it does not show scienter, because Niv may have simply held a different opinion.  *See In re Salomon Analyst Level 3 Litig.*, 373 F. Supp. 2d at 252.  When taken as a whole, CW1's statement also weighs against scienter because he told Niv, "I personally don't think the peg is in danger."  (Dahan Decl., Ex. 17, at 1.)

With respect to Patel's statements to Niv, they concern only FXCM's potential losses in the event the Euro and Franc were de-pegged, not the likelihood that SNB would, in fact, de-peg the Swiss Franc from the Euro.  (*See* Compl., ¶¶ 18–20.)  For this reason, just as Niv's knowledge about the $2.2 billion position is not sufficient to prove scienter, neither is Niv's knowledge about FXCM's potential losses.

f)  Evidence of a "cover up"

(1) $2.2 billion trading position

Plaintiff contends that after the January 15, 2015, crash, FXCM misrepresented to investors that its total trading position in the EUR/CHF pair was $1 billion, when in fact it was $2.2 billion. (Opp'n, at 35–36.) According to Plaintiff, this disparity shows a "cover up," resulting in an inference of scienter. (*Id.*) The statements Plaintiff points to, however, are not contradictory. The first statement, made in FXCM's 2014 Form 10-K, states that "over 3,000 of [FXCM's] clients held slightly over $1 billion in open positions," and that immediately following the de-pegging of the EUR/CHF pair, the positions of those 3,000 or so clients resulted in a $276 million debit. (Compl., ¶ 52; Dahan Decl., Ex. 19, at 40.[8]) The second statement is a document FXCM submitted to the Commodities Futures Trading Commission showing that that FXCM's customers had a *total* of $2.2 billion open positions in the EUR/CHF pair. (Compl., ¶ 18.) Whereas the first statement provides the trading position of the 3,000 or so customers *who were responsible for FXCM's loss*, the second statement provides the trading position of *all* of FXCM's customers. These statements, then, are not contradictory, and do not lend themselves to an inference that Niv attempted to cover up anything.

(2) Availability of liquidity providers

Plaintiff contends that Niv tried to cover up the reason for FXCM's losses by stating that one of the reasons for the loss was "a lack of 'liquidity from banks.'" (Compl., ¶ 88.) Plaintiff contends that a statement in an email by Niv and deposition testimony by another FXCM employee, Janelle Lester, show that Niv's statement that the loss resulted from "a lack of liquidity" was false. (*See id.* ¶¶ 88–89.) In the email statement by Niv, Niv states that

---

[8] Because this exhibit is explicitly referenced in paragraph 52 of the Complaint, it can be relied upon by the Court. *See I. Meyer Pincus & Assocs., P.C.*, 936 F.2d at 762.

Citibank and Deutsche Bank "NEVER turned us off," meaning that they never stopped trading with FXCM. (*Id.* ¶ 89.) This statement, however, does not contradict Niv's prior statement that part of FXCM's loss was due to "a lack of liquidity." In fact, Niv states in the same email that many of FXCM's liquidity providers did, in fact, stop trading with FXCM at the time of the crash: "Most of our LPs [liquidity providers] were back within early the next week after the January 15th event. Some took longer and have turned us on in the past two weeks." (Compl., Ex. 5, at FXCM-CFTC-00006482.)

The deposition testimony by Lester, similarly, does not prove scienter. Although Lester does state, "we never had our pricing halted by our liquidity providers" (ECF No 81-10, at 129:16–17), it is unclear whether she is referring to liquidity providers *in general* or liquidity providers trading in the EUR/CHF pair, in particular. Regardless, the fact that there is an apparent contradiction between a statement by Niv and deposition testimony by an FXCM employee is not sufficient proof of a "cover up." A contradiction in these statements—which were made *after* January 15, 2015—does not make it more likely that *before* January 15, 2015, Niv considered the de-pegging of the Euro and the Franc a serious risk, and lied to investors about that risk. For this reason, this apparent contradiction does not create a "strong inference" in favor of scienter. Instead, as detailed above, the more likely inference drawn from the Second Amended Complaint is that Niv did not consider there to be a legitimate risk that the EUR/CHF pair would be de-pegged.

### C. Loss Causation

Because Plaintiff fails to adequately plead material misstatements and scienter, the Court does not reach the issue of loss causation. *See, e.g.*, *In re UBS AG Sec. Litig.*, No. 07-CV-11225, 2012 WL 4471265, at *22 (S.D.N.Y. Sept. 28, 2012) (Sullivan, J.) ("Because the issue of scienter . . . proves fatal to Plaintiffs' Section 10(b) claims . . . the Court need not reach the UBS Defendants'

arguments regarding . . . loss causation . . . ."), *aff'd sub nom. City of Pontiac Policemen's & Firemen's Ret. Sys. v. UBS AG*, 752 F.3d 173 (2d Cir. 2014).

## IV. CONCLUSION

For the foregoing reasons, Defendants' Motion to Dismiss is GRANTED. This Opinion & Order resolves docket numbers 102 and 110.

The Clerk of Court is directed to close this case. Any pending motions are moot.

SO ORDERED.

Dated: New York, New York
August 10, 2018

*[signature]*
KIMBA M. WOOD
United States District Judge